

**FILED**
U. S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

AUG **1 4** 2019

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**

JAMES W. McCORMACK, CLERK
By:_____
                              DEP CLERK

| | |
|---|---|
| BARBARA BONESSI, Derivatively on Behalf of BANK OF THE OZARKS, INC., )<br><br>Plaintiff, )<br><br>vs. )<br><br>GEORGE GLEASON, NICHOLAS BROWN, PAULA H. J. CHOLMONDELEY, BEVERLY COLE, ROBERT EAST, KATHLEEN FRANKLIN, CATHERINE B. FREEDBERG, JEFFREY J. GEARHART, , PETER C. KENNY, WILLIAM J. KOEFOED, Jr., WALTER J. ("JACK") MULLEN, III, CHRISTOPHER ORNDORFF, ROBERT PROOST, JOHN REYNOLDS, M.D., STEVEN SADOFF, ROSS M. WHIPPLE, GREG McKINNEY, TIM HICKS, DAN THOMAS, TYLER VANCE, LINDA GLEASON, JOHN CARTER, DARREL RUSSELL, and RICHARD CISNE, )<br><br>                       Defendants. )<br>      and, )<br><br>BANK OF THE OZARKS, INC., also known as BANK OZK, )<br><br>                  Nominal Defendant ) | Case No.: <br><br>4:19-cv-567-KGB<br><br>**SHAREHOLDER DERIVATIVE COMPLAINT**<br><br><br><br><br>This case assigned to District Judge Baker<br>and to Magistrate Judge Harris |

Plaintiff Barbara Bonessi ("Plaintiff"), by and through her undersigned counsel,

derivatively on behalf of Nominal Defendant Bank of the Ozarks, Inc., also known as Bank OZK,

("OZK", "Bank" or the "Company"), submits this Verified Shareholder Derivative Complaint (the

"Complaint"). Plaintiff's allegations are based upon her personal knowledge as to herself and her

own acts, and upon information and belief, developed from the investigation and analysis by

Plaintiff's counsel, including a review of publicly available information, including filings by OZK

with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action brought in the right, and for the benefit of OZK against certain of its officers and directors seeking to remedy Defendants' violations of state and federal law that have occurred from at least February 19, 2016 and have caused substantial harm to the Company.  These wrongs resulted in millions of dollars in damages to OZK in addition to damages to its reputation and goodwill.  Moreover, these actions have exposed the Company to millions of dollars in potential liability for violations of federal securities law.

2.     OZK was founded in 1903 and describes itself as a "full-service Arkansas state-chartered bank".  In 1979 Defendant George Gleason ("Gleason") purchased a controlling interest of OZK and assumed active management as its Chairman and Chief Executive Officer ("CEO").  OZK became a public company in 1997.

3.     OZK's growth has been supported by its non-purchased loan portfolio, attributable to its Real Estate Specialties Group ("RESG").  The RESG focuses on commercial real estate ("CRE") and acquisition, construction and development lending.

4.     This action arises from and relates to Defendants' (defined below) repeated false representations to investors about the high quality of its RESG loan book and record low levels of nonperforming loans and related risk ratios.

5.     Plaintiff is informed and believes that in fact, while Defendants were making these false representations and participating in insider transactions, Defendants were manipulating at

2

least two particular loans to mask each loan's actual nonperforming status; one related to a project in South Carolina (the "SC Loan"), and one related to a project in North Carolina (the "NC Loan").

6.     On October 18, 2018, ~~OXK~~ OZK admitted that it lost $45.5 million on two loans originated by RESG; the SC Loan and the NC Loan.

7.     On this news, OZK shares dropped from its October 18, 2018 opening price of $36.39 to close on October 19, 2018 at $25.52.

8.     As an additional result of Defendants' wrongful conduct as alleged herein, various lawsuits were commenced including the securities class action entitled *Colbert, etc. v. Bank OZK*, et al., No. 4:18-cv-00793-JM (E.D. Ark.) (the "Securities Class Action")[1].

## JURSIDICTION AND VENUE

9.     Pursuant to 28 U.S.C. § 1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), this Court has jurisdiction over the claims asserted herein for violations of sections 10(b) and 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder. This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367.

10.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

11.     Venue is proper in this Court in accordance with 28 U.S.C. § 1391 because: (a) the Company maintains its principal place of business in this District; (b) one or more of the defendants

---

[1]     The substantive allegations hereunder regarding the SC Loan, NC Loan, and quoted public statements are restated here from the Securities Class Action (defined below) and are set forth on Plaintiff's information and belief.

either resides in or maintains executive offices in this District; (c) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to the Company, occurred in this District; and (d) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

**Plaintiff**

12.     ***Plaintiff Barbara Bonessi*** ("Plaintiff") is a current owner of OZK's stock and has held the stock during the time of Defendants' continuous wrongful course of conduct alleged herein. Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the Company.

**Nominal Defendant**

13.     Nominal Defendant OZK is incorporated under the laws of Arkansas with its principal executive offices located in Little Rock, Arkansas. OZK's common stock trades on the NASDAQ exchange under the ticker symbol "OZK". Until July 16, 2018, OZK was known as Bank of the Ozarks.

**Current Director Defendants**

14.     Defendant Gleason has served as a member of the OZK Board since 1979. Gleason is OZK's Chairman and Chief Executive Officer ("CEO") and has served the Company as CEO and/or President since 1979. Gleason presently is Chairman of OZK's Executive Committee and is a member of its Directors' Loan Committee and has served on these committees since at least 2015. Gleason was also a member of the ALCO Committee in 2015 through 2017 and the Trust

4

Committee from 2016 to December 2018.  Gleason's wife, Linda Gleason, served as a non-independent director on the OZK Board from 1987 until she retired effective May 7, 2019.

15.     Between February 19, 2016 and October 18, 2018 and with the benefit of insider information, Gleason sold 24,722 shares of OZK stock at a price of $49.08 per share and received approximately $1,213,355.76.

16.     *Defendant Nicholas Brown* ("Brown") has served as a member of the OZK Board since 2012.  Brown presently is Chairman of OZK's Personnel & Compensation Committee and is a member of its Executive Committee and IS Steering Committee and has held those committee memberships since at least 2015.

17.     *Defendant Paula H. J. Cholmondeley* ("Cholmondeley") has served as a member of the OZK Board since 2016.  Cholmondeley presently is a member of OZK's Personnel & Compensation Committee and CRA/Fair Lending Committee and has held those committee memberships since 2016.

18.     *Defendant Beverly Cole* ("Cole") has served as a member of the OZK Board since 2018.  Cole presently is a member of OZK's Risk Committee and CRA/Fair Lending Committee and has held those committee memberships since August 2018.

19.     *Defendant Robert East* ("East") has served as a member of the OZK Board since 1997.  East presently is Chairman of OZK's Nominating & Governance Committee and is a member of its Risk Committee and Executive Committee and has held those committee memberships since at least 2016.  In 2015 through May 2016, East was a member of the Audit Committee; effective May 16, 2016, East rotated off the Audit Committee and became a member of the Board's new Risk Committee.

20.     Between February 19, 2016 and October 18, 2018 and with the benefit of insider information, in two transactions East sold 8,000 shares of OZK stock at a price of $50.41 and $55.75 per share and received approximately $424,520.00.

21.     ***Defendant Kathleen Franklin*** ("Franklin") has served as a member of the OZK Board since 2017.   Franklin presently is a member of OZK's Nominating & Governance Committee, Personnel & Compensation Committee and, Risk Committee.  She has been a member of the Personnel & Compensation Committee and, Risk Committee since August 2018.

22.     ***Defendant Catherine B. Freedberg, Ph. D.*** ("Freedberg") has served as a member of the OZK Board since 2013.  Freedberg presently is Chairperson of OZK's Trust Committee (which chair responsibilities began on August 2018), is a member of its Nominating & Governance Committee, and has held those committee memberships since at least 2015.

23.     Between February 19, 2016 and October 18, 2018 and with the benefit of insider information, through multiple transactions, Freedberg sold 55,269 shares of OZK stock at a price ranging from $44.03 to $55.45 per share and received approximately $2,701,308.74.

24.     ***Defendant Jeffrey J. Gearhart*** ("Gearhart") has served as a member of the OZK Board since 2018.   Cole presently is a member of OZK's Audit Committee and IS Steering Committee and has held those committee memberships since May 2018.

25.     ***Defendant Peter C. Kenny*** ("Kenny") has served as a member of the OZK Board since 2013 and is identified in OZK's 2019 Proxy Statement as its "Presiding Independent Director."   Kenny is presently the chairman of the Investment Committee and has held that position since approximately 2016.  Kenny is also a member of the following committees and has been a member of these committees since at least 2015: Nominating & Governance Committee,

Personnel & Compensation Committee, Executive Committee, ALCO Committee (which was combined with the Investment Committee in 2015), and Directors' Loan Committee.

26.     Between February 19, 2016 and October 18, 2018 and with the benefit of insider information, through multiple transactions, Kenny sold 7,578 shares of OZK stock at a price ranging from $46.00 to $55.25 per share and received approximately $370,800.00.

27.     **Defendant William A. Koefoed, Jr.** ("Koefoed") has served as a member of the OZK Board since 2015.  Koefoed is presently the chairman of the Audit Committee and has held that position since May 2018.  Koefoed joined the Executive Committee in May 2018 and continues as a member of that committee.  Koefoed is also a member of the IS Steering Committee and has been a member of that committee and the Audit Committee since at least 2015.

28.     **Defendant Walter J. ("Jack") Mullen, III** ("Mullen") has served as a member of the OZK Board since 2016.  Mullen presently is a member of OZK's Investment Committee, Risk Committee, ALCO Committee, and Directors' Loan Committee and has held those committee memberships since 2016.

29.     Between February 19, 2016 and October 18, 2018 and with the benefit of insider information, through multiple transactions, Mullen sold 2,494 shares of OZK stock at a price ranging from $47.91 to $50.31 per share and received approximately $120,969.09.

30.     **Defendant Christopher Orndorff** ("Orndorff") has served as a member of the OZK Board since 2018.  Orndorff presently is a member of OZK's Audit Committee and has held this committee membership since May 2018.

31.     **Defendant Robert Proost** ("Proost") has served as a member of the OZK Board since 2011.  Proost presently is a member of OZK's Investment Committee, Audit Committee,

ALCO Committee, and Directors' Loan Committee and has held those committee memberships since at least 2015.

32.     Between February 19, 2016 and October 18, 2018 and with the benefit of insider information, Proost sold 10,044 shares of OZK stock at a price of $51.17 per share and received approximately $513,951.00.

33.     **Defendant John Reynolds, M.D.** ("Reynolds") has served as a member of the OZK Board since 2012. Reynolds presently is a member of OZK's Trust Committee and IS Steering Committee. Reynolds has been a member of the IS Steering Committee since at least 2015 and has been a member of the Trust Committee since 2017. Reynolds was a member of OZK's Personnel & Compensation Committee since at least 2015 until approximately 2016.

34.     **Defendant Steven Sadoff** ("Sadoff") has served as a member of the OZK Board since 2018. Sadoff presently is a member of OZK's Risk Committee and IS Steering Committee and has held those committee memberships since August 2018.

35.     **Defendant Ross M. Whipple** ("Whipple") has served as a member of the OZK Board since 2014. In 2015, Whipple was a member of OZK's Trust Committee. Effective May 16, 2016, Whipple was rotated off the Trust Committee to serve as Chairman of the Board's new Risk Committee and has continued as Chairman of the Risk Committee to the present. Whipple is and has been a member of the Executive Committee since 2017. Whipple also is and has been a member of the Directors' Loan Committee since 2018.

36.     Defendants Gleason, Brown, Cholmondeley, Cole, East, Franklin, Freedberg, Gearhart, Kenny, Koefoed, Mullen, Orndorff, Proost, Reynolds, Sadoff, and Whipple are herein referred to as the "Director Defendants."

37.     The Director Defendants have been highly compensated.  By way of example, the

following is a 2018 Director Compensation chart from OZK's 2019 Proxy Statement:

| Name | Fees Earned or Paid in Cash ($) | Stock Awards (1)(2)($) | All Other Compensation (3)($) | Total ($) |
|---|---|---|---|---|
| Nicholas Brown | 101,250 | 49,965 | 432 | 151,647 |
| Paula Cholmondeley | 103,750 | 49,965 | 432 | 154,147 |
| Richard Cisne | 96,250 | 49,965 | 432 | 146,647 |
| Beverly Cole | 41,250 | 36,950 | 192 | 78,392 |
| Robert East | 122,500 | 49,965 | 432 | 172,897 |
| Kathleen Franklin | 90,000 | 49,965 | 432 | 140,397 |
| Catherine B. Freedberg | 91,250 | 49,965 | 432 | 141,647 |
| Jeffrey Gearhart | 77,500 | 49,965 | 432 | 127,897 |
| Linda Gleason | 133,750 | 49,965 | 432 | 184,147 |
| Peter Kenny | 191,250 | 49,965 | 432 | 241,647 |
| William Koefoed | 101,875 | 49,965 | 432 | 152,272 |
| Henry Mariani[4] | 51,875 | --- | -- | 51,875 |
| Walter J. Mullen | 161,250 | 49,965 | 432 | 211,647 |
| Christopher Orndorff | 57,500 | 49,965 | 432 | 107,897 |
| Robert Proost | 163,750 | 49,965 | 432 | 214,147 |
| John Reynolds | 102,500 | 49,965 | 432 | 152,897 |
| Steven Sadoff | 42,500 | 36,950 | 192 | 79,642 |
| Ross Whipple | 100,000 | 49,965 | 432 | 150,397 |

## Current Officer Defendants

38.     ***Defendant Greg McKinney*** ("McKinney") is OZK's Chief Financial Officer and

Chief Accounting Officer.  McKinney joined the Bank in 2003 and served as Executive Vice

President and Controller prior to assuming the role of Chief Financial Officer and Chief

Accounting Officer on December 31, 2010.  Though not a member of the Company's Board,

McKinney is and has served as the chairman of OZK's CRA/Fair Lending Committee and ALCO

Committee since at least 2015.  McKinney has a bachelor's degree in Accounting and is a Certified

Public Accountant (inactive).

39.     Between February 19, 2016 and October 18, 2018 and with the benefit of insider information, in two transactions McKinney sold 25,344 shares of OZK stock at a price of $52.57 and $52.51 per share and received approximately $1,331,374.08.

40.     **Defendant Tim Hicks** ("Hicks") serves as the Chief Administrative Officer and Executive Director of Investor Relations of the Company.  Prior to assuming the role of Chief Administrative Officer & Executive Director of Investor Relations in July 2017, Hicks served as Executive Vice President and Chief of Staff since September 2016.  Hicks joined the Bank in 2009 and served as Senior Vice President, Corporate Finance until assuming the role of Executive Vice President, Corporate Finance in 2012.

41.     Between February 19, 2016 and October 18, 2018 and with the benefit of insider information, through multiple transactions, Hicks sold 8,431 shares of OZK stock at a price ranging from $46.84 to $55.83 per share and received approximately $437,682.67.

**Former Director and Officer Defendants**

42.     **Defendant Dan Thomas** ("Thomas") served as a member and vice chairman of the OZK Board from 2013 until July 27, 2017.  Thomas joined the Company in 2003 and served as Executive Vice President from 2003 to 2005.  He served as President of OZK's Real Estate Specialty Group ("RESG") since 2005 and was appointed as the Chief Lending Officer in August 2012.

43.     On May 2, 2017 and July 14, 2017, and with the benefit of insider information, in two transactions Thomas sold 75,737 shares of OZK stock at a price of $47.37 and $47.15 per share and received approximately $3,575,341.69.

44.     **Defendant Tyler Vance** ("Vance") served as a member of the OZK Board from 2015 until May 2016.  From 2015 until May 2015, Vance was chairman of the Trust Committee

10

and a member of the CRA/Fair Lending Committee, ALCO & Investments Committee, and IS Steering Committee.

45.     Although not an OZK director after May 2016, Vance remained as Chairman of the Trust Committee until his departure in May 2019. The OZK 2016 Proxy Statement states: "Mr. Vance will remain on the Company's Trust, CRA & Fair Lending, ALCO & Investments and IS Steering Committees after conclusion of his director term on May 16, 2016 in connection with his roles as Chief Operating Officer and Chief Banking Officer of the Company and Bank." In subsequent Company Proxy Statements, Vance is not listed as a member of any committee except as chairman of its Trust Committee.

46.     Vance joined the Company in 2006 and served as Senior Vice President from 2006 to 2009 and Executive Vice President of Retail Banking from 2009 to 2011. Vance served as Chief Banking Officer from 2011 to 2013 when he was promoted to Chief Operating Officer. However, the Company's 2019 Proxy Statement identifies Vance as "Chief Operating Officer." The 2018 Proxy Statement identifies Vance as "Chief Operating Officer" and "Chief Banking Officer." On March 25, 2019, Vance notified OZK of his decision to resign as Chief Operating Officer of the Bank effective May 3, 2019.

47.     Between February 19, 2016 and October 18, 2018 and with the benefit of insider information, through multiple transactions Vance sold 48,841 shares of OZK stock at a price ranging from $36.19 to $52.57 per share and received approximately $2,456,551.01.

48.     ***Defendant Linda Gleason*** ("L. Gleason") served as a member of the OZK Board from 1987 until May 2019. L. Gleason was a member of OZK's Trust Committee from at least 2015 until May 2019. L. Gleason was a member of OZK's Directors' Loan Committee from at least 2015 until October 2018. L. Gleason was a member of the CRA & Fair Lending Committee

from May 2016 until May 2019. From 1981 to 1996, L. Gleason served the Company in various positions in retail banking, investments, corporate administration and human resources, including as the head of human resources and, from 1992 to 1996, as Deputy Chief Executive Officer and Assistant Secretary. L. Gleason and Defendant G. Gleason are husband and wife.

49.     Between February 19, 2016 and October 18, 2018, and with the benefit of insider information, through multiple transactions L. Gleason sold 163,300 shares of OZK stock at a price ranging from $49.08 to $52.57 per share and received approximately $8,439,266.91.

50.     **Defendant John Carter** ("Carter") serves as Chief Credit Officer. Prior to assuming the title of Chief Credit Officer in June 2018, Carter served as the Director of Community Banking from February 2015 to June 2018. Carter joined the Bank in August 2009 and served as a Vice President from 2009 to June 2010, a Senior Vice President from June 2010 to June 2011, the Little Rock Market President from June 2011 to January 2014 and the Deputy Director of Community Bank Lending from January 2014 to January 2015. Though not a member of the Company's Board, Carter presently serves as the chairman of OZK's Directors' Loan Committee.

51.     Between February 19, 2016 and October 18, 2018 and with the benefit of insider information, through multiple transactions, Carter sold 13,591 shares of OZK stock at a price ranging from $36.19 to $52.57 per share and received approximately $636,164.69.

52.     **Defendant Darrel Russell** ("Russell") served as the Chief Credit Officer and Chairman of the Directors' Loan Committee (although he is not a member of the Company's Board of Directors). Prior to assuming his role as Chief Credit Officer and Chairman of the Directors' Loan Committee in 2011, Russell served as President of the Company's Central Division since 2001 and as Co-Chairman of the Directors' Loan Committee since 2007. He joined the OZK in 1983 and served as Executive Vice President of the Company from 1997 to 2001 and Senior Vice

12

President of the Company from 1992 to 1997. Prior to 1992, Russell served in various positions with the OZK.

53.     Between February 19, 2016 and October 18, 2018, and with the benefit of insider information, through multiple transactions, Russell sold 129,224 shares of OZK stock at a price ranging from $41.18 to $54.00 per share and received approximately $6,459,710.49.

54.     **Defendant Richard Cisne** ("Cisne") served as a member of the OZK Board from 2004 until May 2019. Cisne was a member of OZK's Audit Committee and ALCO Committee from at least 2015 until May 2019. Cisne was also a member of OZK's Risk Committee and CRA/Fair Lending Committee from August 2018 until May 2019.

55.     On March 3, 2018, and with the benefit of insider information, Cisne sold 4000 shares of OZK stock at a price of $50.87 per share and received approximately $203,480.00. Cisne also sold a total of 821 additional shares on November 28, 2017 and January 1, 2018, but no prices were disclosed

## Other Current Relevant Bank OZK Officers (Non-Parties)

56.     **Non-Party Paschall B. Hamblen** ("Hamblen") -- who is also known as Brannon Hamblen -- serves as President and Chief Operating Officer – Real Estate Specialties Group ("RESG"). Prior to assuming the roles of President – RESG in 2018 and Chief Operating Officer – RESG in 2017, Hamblen served as Director of Asset Management since 2012. Hamblen joined the Bank in 2008 as Senior Vice President, Originations and assumed leadership of RESG Asset Management in 2010.

57.     **Non-Party Scott Trapani** ("Trapani") serves as the Chief Risk Officer of the Company since March 2019.

58.     ***Non-Party Cynthia Wolfe*** ("Wolfe") -- who is also known as Cindy Wolfe -- serves as the Chief Banking Officer of the Company.  Prior to assuming the role of Chief Banking Officer, Wolfe served as Deputy Director of Community Banking since 2015 overseeing the Bank's Middle Market Commercial Real Estate business unit and offices across North Carolina and South Carolina.  Wolfe joined the Bank in 1997, opened the Bank's Charlotte loan production office in 2001, and served as Senior Vice President – Lending from 2001 to 2005, Executive Vice President – Lending from 2005 to 2012, Charlotte Market President from 2012 to 2014, and Carolinas Division President from 2014 to 2018.

## Other Former Relevant Bank OZK Directors and Officers (Non-Parties)

59.     ***Non-Party Henry Mariani*** ("Mariani") served as a member of the OZK Board from 1997 until May 2018, when he retired.  Mariani was chairman of the Audit Committee from at least 2015 until May 2018.  He was also a member of Executive Committee, ALCO Committee, and Directors' Loan Committee from at least 2015 until May 2018.  Mariani was also a member of the Nominating & Governance Committee from at least 2015 until May 2017.

60.     ***Non-Party R. L. Qualls*** ("Qualls") served as a member of the OZK Board from 1997 until May 2016, when he retired.  Qualls served on the Nominating and Governance Committee, Directors' Loan Committee and CRA & Fair Lending Committee from at least 2015 until the conclusion of his term of service effective May 16, 2016.

61.     ***Non-Party Sherece West-Scantlebury*** ("West-Scantlebury") served as a member of the OZK Board from 2012 until May 2016.  West-Scantlebury served on the Trust Committee and CRA & Fair Lending Committee from at least 2015 until the conclusion of her term of service effective May 16, 2016.

62.     ***Non-Party Edward Wydock*** ("Wydock") served as the Chief Risk Officer for OZK from June 2105 through April 2019.

63.     OZK's present (and former) executives are highly compensated.  In its 2019 Proxy Statement, OZK provided a "Summary Compensation Table for Fiscal Year 2018" which also included compensation information for 2017 and 2016 for Defendants Gleason, McKinney, Vance, and Hicks, and Hamblen:

| Name and Principal Position | Year | Salary ($)(1) | Bonus ($) | Stock Awards ($)(2) | Option Awards ($)(3) | Non-Equity Incentive Plan Compensation ($)(4) | Change in Pension Value and Non-Qualified Deferred Compensation Earnings ($)(5) | All Other Compensation ($)(6) | Total ($)(7) |
|---|---|---|---|---|---|---|---|---|---|
| George Gleason | 2018 | 1,088,942 | — | 3,038,243 | 513,270 | 1,372,836 | 303,966 | 55,094 | 6,372,351 |
| *Chairman and Chief* | 2017 | 1,000,000 | — | 2,556,975 | 749,515 | 1,833,400 | 274,807 | 480,138 | 6,894,835 |
| *Executive Officer* | 2016 | 1,000,000 | — | 2,550,000 | — | 2,000,000 | 248,012 | 504,352 | 6,302,364 |
| Greg McKinney | 2018 | 635,826 | — | 859,329 | 153,971 | 388,289 | — | 11,000 | 2,048,415 |
| *Chief Financial &* | 2017 | 617,307 | — | 767,093 | 224,853 | 550,020 | — | 10,800 | 2,170,073 |
| *Accounting Officer* | 2016 | 594,615 | — | 765,000 | — | 600,000 | — | 10,600 | 1,970,215 |
| Tyler Vance | 2018 | 635,826 | — | 859,329 | 153,971 | 388,289 | | 11,000 | 2,048,415 |
| *Chief Operating* | 2017 | 617,307 | — | 767,093 | 224,853 | 550,020 | — | 10,800 | 2,170,073 |
| *Officer* | 2016 | 594,615 | — | 765,000 | — | 600,000 | | 10,600 | 1,970,215 |
| Tim Hicks | 2018 | 631,287 | — | 859,329 | 49,830 | 388,289 | — | 11,000 | 1,939,735 |
| *Chief Admin Officer/* | 2017 | 419,231 | — | 248,250 | 62,456 | 133,500 | — | 10,449 | 873,886 |
| *Exec Dir of Investor Relations* | | | | | | | | | |
| Brannon Hamblen[(8)] | 2018 | 696,153 | 240,000 | 264,976 | 64,966 | — | — | 25,748 | 1,291,843 |
| *President and COO – RESG* | | | | | | | | | |

## THE COMPANY'S CORPORATE GOVERNANCE

64.     As members of the Company's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

65.     Presently, OZK maintains eleven committees; six Board-level committees and five additional committees.  Regarding the five additional committees, the  2019 Proxy Statement

states: "In addition to these committees of the Board, the Company has established certain committees comprised of directors and members of management to support the Board and management in the oversight of certain areas of the Company's business […]." The 2019 Proxy Statement describes these eleven committees in part and as follows:

**Board Level Committees**

> (a)   Audit Committee (Charter revised effective July 16, 2018) -- Assists the Board in fulfilling its oversight responsibilities relating to the Company's auditing, accounting and financial reporting processes.
>
> (b)   Personnel & Compensation Committee (Charter revised effective July 16, 2018) -- Reviews and approves the compensation programs for the Chief Executive Officer and other executive officers and, to the extent appropriate, other personnel.   Considers, reviews, approves and, when appropriate, recommends to the Board and/or the shareholders, incentive compensation plans and equity-based plans applicable to all officers and employees.
>
> (c)   Investment Committee (Charter revised effective July 16, 2018) -- Oversees management of the Company's investment portfolio relative to the policies, risk management guidelines and general strategy established by the Board.
>
> > (i)   The Investment Committee did not exist as a separate committee prior to 2017 but instead was part of and combined with the ALCO Committee. In the 2016 Proxy Statement, it is identified as the "ALCO & Investment Committee".

16

(d)    Risk Committee (Charter revised effective May 6, 2019) --
Provides oversight of the Company's enterprise-wide risk management
framework and the Company's corporate risk structure, including the
strategies, policies, processes, procedures and systems established by
management to identify, assess, measure, manage and monitor the
Company's significant financial, operational and other risk exposures.

> (i)    The Risk Committee did not exist prior to 2016. As stated
> in the 2016 Proxy Statement, "Effective May 16, 2016, Mr.
> Whipple will rotate off of the Trust Committee and will serve as
> Chairman of the Board's new Risk Committee (which is
> expected to be formed and become active after the Annual
> Meeting)."

(e)    Executive Committee (Charter revised effective August 10,
2018) -- Comprised of the Chairman of the Board (as Committee Chair), the
respective chairs of the Audit Committee, Compensation Committee,
Governance Committee and Risk Committee, and the presiding independent
director.    Annually reviews the Company's property/casualty and
management liability (including cyber liability, directors and officers,
professional, and fiduciary) insurance programs and approves the renewal
terms for such insurance programs. Exercises the powers and authority of
the Board, subject to applicable limitations, during the intervals between
meetings of the Board.

(f)     Nominating and Governance Committee (Charter revised effective July 16, 2018) -- Reviews and recommends candidates for Board election and nominees for Board committees.   Reviews the Corporate Governance Principles and advises the Board on corporate governance issues. Oversees the performance assessment of the Board and Board committees.   Reviews and approves certain transactions between the Company and its officers, directors or affiliates.

**Non-Board Level Committees**

(a)     ALCO Committee (Charter revised effective July 16, 2018) - Oversees management of the asset/liability (interest rate risk) position, liquidity, funds management and capital requirements of the Company.

(i)     The ALCO Committee did not exist as a separate committee prior to 2017 but instead was part of and combined with the Investment Committee.  In the 2016 Proxy Statement, it is identified as the "ALCO & Investment Committee."

(b)     CRA/Fair Lending Committee (Charter revised effective August 10, 2018) -- Responsible for overseeing the operation of the community development activities and compliance with applicable fair lending regulations of the Company

(c)     Directors' Loan Committee (Charter revised effective August 10, 2018) -- Responsible for reviewing and approving loans and aggregate loan relationships that exceed certain limits set forth in the Board-approved Loan Policy

(d)     Trust Committee (Charter revised effective July 16, 2018) --
Oversees the operation of the Trust and Wealth Management Division and
the administration of its trust accounts

(e)     IS Steering Committee (Charter revised effective August 10,
2018) -- Discharges the Board's responsibilities related to overseeing
Information Systems ("IS") activities.  Provides general reviews for the
Board regarding major IS projects and helps ensure proper business
alignment, effective strategic planning and oversight of IS performance.

66.     OZK has a charter for each of its committees.  As stated on the face of each, every
charter was revised at some time after the resignation of Thomas.  But only the Risk Committee
Charter and Code of Business Conduct and Ethics was revised or updated after OZK's October
18, 2018 disclosure as more fully discussed herein.

67.     OZK maintains a Code of Business Conduct and Ethics ("Code of Conduct", last
updated on May 6, 2019), which provides in relevant part:

**The OZK Way**

\* \* \*

We expect our team members to conduct themselves and our business with the
highest standards of honesty, ethics, integrity and fair dealing. In short, do right!

\* \* \*

**Introduction**

Bank OZK is committed to the highest standards of ethical and professional
conduct. The Code of Business Conduct and Ethics (our "Code" or this "Code")
sets forth the guiding principles by which we operate and conduct daily business
with shareholders, customers, vendors and all other persons with whom we
deal.  The Code provides basic guidelines of professional conduct that we
expect you to adopt and uphold and is designed to illustrate the high ethical

standards we expect of you. Please read our Code carefully, refer to it when needed, and ask questions when in doubt.

\* \* \*

**Who Must Follow the Code**

Our Code applies to everyone who works at the Bank and its affiliates, including our officers, employees and directors. Our officers, employees and directors are expected to observe the highest standards of ethics, conduct, professionalism, character and personal integrity at all times. You should demonstrate our values daily in each of your interactions. Anyone who violates our Code may face disciplinary action, up to and including termination, and may be subject to other actions available to the Bank pursuant to contracts, laws, regulations or policies.

\* \* \*

Our business shall be conducted in compliance with all applicable federal, state and local laws and regulations. This compliance does not comprise our entire ethical responsibility, but instead defines the absolute minimum level of performance.

\* \* \*

**Training on Code Content and Certification of Compliance**

\* \* \*

All employees, officers and directors are required to certify that they have read and understand the Code.

\* \* \*

**Accurate Records, Filings and Other Regulatory Reporting**

Each one of us is responsible for ensuring the information we record, process, analyze and disclose is:

- Complete, accurate and recorded in a timely manner.
- Handled according to applicable accounting standards, legal requirements and internal controls.
- Corrected immediately if errors occur.

This information includes accounting and audit records, loan documents...

68.     In addition to its Code of Conduct, OZK maintains Corporate Governance Principles, which provides in relevant part:

### Role of Independent Directors

* * *

The presiding independent director has the responsibility of presiding at all meetings of the Board's independent directors, consulting with the Chairman and Chief Executive Officer ("CEO") on Board and Committee meeting agendas, advising the Chairman and CEO on the efficiency of the Board meetings, and acting as a liaison between management and the independent directors to facilitate teamwork and communication between the independent directors and management.

* * *

### Director Access to Officers and Employees

Directors have full and free access to officers and employees of the Company. Any meetings or contacts that a director wishes to initiate may be arranged through the CEO or the Secretary or directly by the director. The directors will use their judgment to ensure that any such contact is not disruptive to the business operations of the Company and will, to the extent appropriate, copy the CEO on any written communications between a director and an officer or employee of the Company.

The Board welcomes regular attendance at each Board meeting of senior officers or other members of management of the Company who (i) can provide additional insight into the items being discussed because of personal involvement or expertise in these areas and/or (ii) are individuals who the senior officers believe have future potential and who should be given exposure to the Board. Board meetings may also be attended from time to time by outside advisors, to the extent such advisors' participation is deemed necessary and appropriate by the senior officers of the Company to assist the Board in understanding the material being presented to the Board.

* * *

### Risk Oversight

The Board should understand the principal risks associated with the Company's business on an ongoing basis and it is the responsibility of management to assure that the Board and its committees are kept well informed of these changing risks on a timely basis. It is important that the Board oversee the key

risk decisions of management, which includes comprehending the appropriate balance between risks and rewards. The Board reserves oversight of the major risks facing the Company and has delegated risk oversight responsibility to the appropriate Committees in the following areas: (i) the Audit Committee oversees risks relating to financial matters, financial reporting and auditing, (ii) the Personnel and Compensation Committee oversees risks relating to the design and implementation of the Company's compensation policies and procedures, (iii) the Nominating and Governance Committee oversees risks associated with the independence of the members of the Board and potential conflicts of interest, and (iv) the Risk Committee oversees the identification, assessment, management, monitoring, and reporting of all risks across the enterprise.

69.    OZK maintains an Audit Committee Charter which provides in relevant part:

**Responsibilities and Authority**

In carrying out its responsibilities, the Committee believes its policies and procedures should remain flexible, in order to best react to changing conditions and to ensure to the directors and shareholders that the corporate auditing, accounting and financial reporting practices of the Company are in accordance with all requirements and are of the highest quality.

In carrying out these responsibilities, the Committee will:

* * *

- Communicate, to the extent appropriate, throughout the year with senior management, other committee chairpersons and other key committee advisors, and external and internal auditors, as applicable, to strengthen the Committee's knowledge of relevant current and prospective business and financial issues.

* * *

- Review with the independent auditors, the Company's internal auditors, and financial and accounting personnel, the design and effectiveness of the Company's internal control over financial reporting and any significant deficiencies or material weaknesses in that internal control, any change that has materially affected or is reasonably likely to materially affect that internal control (including special steps adopted in light of such deficiency or weakness), and any fraud (whether or not material) that involves management or other employees who have a significant role in that internal control, that have been reported to the Committee, and elicit any recommendations for the improvement of such internal controls or particular areas where new or more detailed controls or procedures are desirable.

\* \* \*

- Review and assess, with the input of management, the Company's Code of Business Conduct and Ethics ("Code") and ensure that management has established an effective system to monitor and enforce such Code.

\* \* \*

- Review with management and the independent auditors the Company's financial statements contained in the annual report to shareholders to determine that the independent auditors are satisfied with the disclosure and content of the financial statements to be presented to the shareholders and that the independent auditors believe such financial statements reflect all material adjustments that have been identified by the independent auditors in accordance with GAAP and the rules and regulations of the SEC and FDIC.

- Review with management and the independent auditors the results of their timely analysis of significant financial reporting issues and practices, including changes in, or adoptions of, accounting principles and disclosure practices, and discuss any other matters required to be communicated to the Committee by the independent auditors.

- Review with management and the independent auditors their judgments about the quality, not just acceptability, of accounting principles, the consistency of application of the Company's accounting practices, and the clarity of the financial disclosure practices used or proposed to be used, and particularly, the degree of aggressiveness or conservatism of the organization's accounting principles and underlying estimates, and other significant decisions made in preparing the financial statements.

- In connection with filing the Company's annual report on Form 10-K, and, to the extent the Committee deems necessary or appropriate in connection with filing the Company's quarterly reports on From 10-Q, the Committee will review and discuss with appropriate members of management and the independent auditors the specific intended disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" to be included in the Company's annual report on Form reports on From 10-Q, as applicable.

- Discuss with management the Company's earnings press releases, including the use of "pro forma" or "adjusted" non-GAAP information. Such discussions may be in general terms that focus on the types of information to be disclosed and the type of presentations to be made.

70.    OZK maintains a one-page Investment Committee Charter which provides in relevant part:

**Committee Authority and Responsibilities**

1. The Committee shall oversee the investment policies and strategies for the corporate investment portfolio and establish objectives based on liquidity, profitability and safety and soundness standards set by the Board.

71. OZK maintains a Risk Committee Charter which provides in relevant part:

**Introductory Statement and Purpose**

The Risk Committee (the "Committee") of the Board of Directors (the "Board") of Bank OZK (the "Bank") is appointed by the Board to provide oversight of the Bank's enterprise-wide risk management framework and the Bank's corporate risk structure, including the strategies, policies, processes, procedures, and systems established by management to identify, assess, measure, manage, and monitor the Bank's significant financial, operational, and other risk exposures.

The Committee serves as the primary point of contact between the Board and the management-level committees that oversee the Bank's risk management activities. The Committee functions to assist the Board in its understanding of the risks faced by the Bank and helps the Board determine the effectiveness of the Bank's enterprise risk management program.

\* \* \*

**Responsibilities and Authorities**

The Committee will have the responsibility to:

1. Periodically review and approve the Bank's enterprise risk management and related frameworks, which outline the Bank's approach to risk management and the policies, processes, and governance structures used by management to execute its risk management strategy, including those relating to: the maintenance of a strong risk culture and the independence and stature of the Corporate Enterprise Risk Management Group; the establishment of policies, systems, and processes for risk data aggregation capabilities and model governance; the facilitation of appropriate credible challenge of business decisions; and the provision for the recruitment, development, retention, compensation, and succession planning of risk talent, as well as enterprise-wide incentive compensation practices that are consistent with the safety and soundness of the Bank and do not encourage excessive risk taking

2. Periodically review and approve the functional framework which defines the key risk types facing the Bank, including Strategic, Credit, Legal and

Regulatory, Operational, Financial (including liquidity and market risks), and Reputation.

3. Periodically discuss, review, and recommend to the Board the articulation of the Bank's risk appetite statements, and approve amendments to the risk appetite statements as appropriate.

4. Review and understand the significant risk exposures facing the Bank and the steps management has taken to mitigate, manage, and monitor such exposures according to the key risk categories defined by management.

5. Review the activities of the council's management has in place to manage and monitor the significant risks facing the Bank.

6. Review the Bank's Corporate Risk Profile, which considers the metrics and measurements contained in the risk appetite statements.

7. Review and approve designated enterprise policies that reflect the Bank's risk management philosophies, principles, and risk limits.

8. Review and understand the Bank's practices for identifying and assessing risks across the enterprise, the methods for managing or controlling risks, and the effectiveness of risk management activities.

9. Receive and review regular reports from the Chief Risk Officer and other members of management regarding emerging risks and other selected risk topics or enterprise-wide matters to enhance the Committee members' knowledge and awareness of key risks.

10. Periodically receive and review a report containing the details of all litigation involving the Bank.

11. Periodically review reports of other risk monitoring activities within the Bank, including: Corporate Compliance, evaluating the Bank's state of compliance with laws and regulations and the level of regulatory risk; Credit Review, evaluating the overall levels of risk within the Bank's loan portfolios and compliance with loan policies; Corporate Security, monitoring the level of risk to the Bank's physical plant and identifying and investigating instances of fraud against the Bank; Bank Secrecy Act ("BSA") Administration, monitoring transactions for compliance with BSA and anti-money laundering regulations; Business Resilience, overseeing and monitoring the Bank's business recovery, contingency planning and preparedness activities; and Other Bank units now existing or developed for the purpose of monitoring risks experienced by the Bank.

12. Annually review and recommend to the Board for approval the Bank's BSA and Credit Review Programs.

13. Review management's reports on the status of the Information Security Program including risks related to customer and Bank information, and significant third-party risk management activities.

14. Review management's recommendations and approve the appointment, termination or replacement of the Chief Risk Officer.

15. Review the performance of the Chief Risk Officer and approve annual salary adjustments and incentive awards.

72.     OZK maintains a Personnel and Compensation Committee Charter which provides

in relevant part:

**Introductory Statement and Purpose**

* * *

The Committee has overall responsibility for approving and evaluating all compensation plans, policies and programs of the Company as they affect the Chief Executive Officer ("CEO") and the Company's other executive officers (collectively, including the CEO, the "Executive Officers").

* * *

**Committee Authority and Responsibilities**

The Committee shall, at least annually, review and approve the annual base salaries and annual incentive opportunities of the Executive Officers....

The Committee shall, periodically and as and when appropriate, review and approve the compensation for the Executive Officers and to the extent the Committee deems appropriate, other personnel, including: (a) base salary, (b) incentive compensation arrangements, (c) bonus and equity-based awards, (d) employment agreements, severance arrangements, and change in control agreements/provisions, in each case as, when and if appropriate, and (e) any special or supplemental benefits, including supplemental retirement benefits and the perquisites provided to them during and after employment.

* * *

The Committee shall annually review and make recommendations to the Board with respect to the compensation of directors, including Board and committee

retainers, meeting fees, equity-based compensation and such other forms of compensation as the Committee may consider appropriate.

***The Committee shall annually review the potential risks to the Company from its compensation programs and policies, including any incentive plans, and whether such programs and policies incentivize unnecessary and excessive risk taking.*** [Emphasis added]

73. In its 2016 Proxy Statement, OZK states and represents that in January 2015 the Compensation Committee adopted an Executive Compensation Clawback Policy for recovery of incentive compensation from the Company's executive officers under certain circumstances. Each OZK Proxy Statement thereafter discusses and represents that it maintains this purported Clawback Policy. However, the Compensation Committee Charter does not include or mention any Clawback Policy. Additionally, OZK has provided differing descriptions of its Clawback Policy in its various Proxy Statements.

74. By way of example, the Company's 2019 Proxy Statement states in relevant part:

***Clawback Policy Applicable to All Employees.*** The Compensation Committee has adopted an Incentive Compensation Clawback Policy permitting the Company to obtain reimbursement or forfeiture of all or a portion of any incentive compensation awarded to an executive officer or employee of the Company in the event that: (i) the award, vesting or payment of the incentive compensation was predicated upon inaccurate financial statements or other performance metric criteria, such award, vesting or payment occurred or was received during the three-year period preceding the date on which the Company discovers the inaccuracy, and a smaller award, vesting or payment would have occurred or been made based on the corrected financial statements or other performance metric criteria; (ii) with respect to executive officers, the Company has an accounting restatement due to material noncompliance with any financial reporting requirement under the securities laws; or (iii) the executive officer or employee commits a legal or compliance violation in connection with his or her employment, including a violation of the Company's policies, and such violation causes or is reasonably expected to cause injury to the interests or reputation of such person's business area or the Company as a whole.

75. The Company's 2018 Proxy Statement also states in relevant part:

***Clawback Policy.*** The Compensation Committee has adopted an Incentive Compensation Clawback Policy for recovery of incentive compensation from

the Company's executive officers and other employees under certain circumstances. The Clawback Policy provides that the Company will, with respect to executive officers, require reimbursement or forfeiture of all or a portion of any incentive compensation awarded to an executive officer of the Company after the date of adoption of the Clawback Policy where the Compensation Committee has determined that all of the following factors are present: (i) the Company is required to prepare an accounting restatement due to material noncompliance with any financial reporting requirement under the securities laws, (ii) the award, vesting or payment of the incentive compensation was predicated upon the achievement of certain financial results that were the subject of the restatement and such award, vesting or payment occurred or was received during the three-year period preceding the date on which the Company is required to prepare the restatement, and (iii) a smaller award, vesting or payment would have occurred or been made to the executive officer based upon the restated financial results. In each such instance, the Company will seek to recover or cancel the amounts by which an executive officer's incentive compensation that was awarded, vested or paid during the three-year period referenced above exceeded the amounts that would have been awarded, vested or paid based on the restated financial results.

In January 2018, the Clawback Policy was amended to permit (but not require) the Company to obtain reimbursement or forfeiture of all or a portion of any incentive compensation awarded to an executive officer or employee of the Company after January 1, 2018, in the event that: (i) the award, vesting or payment of the incentive compensation was predicated upon inaccurate financial statements or other performance metric criteria, such award, vesting or payment occurred or was received during the three-year period preceding the date on which the Company discovers the inaccuracy, and a smaller award, vesting or payment would have occurred or been made based on the corrected financial statements or other performance metric criteria; or (ii) the executive officer or employee commits a legal or compliance violation in connection with his or her employment, including a violation of the Company's policies, and such violation causes or is reasonably expected to cause injury to the interests or reputation of such person's business area or the Company as a whole.

76.     The Company maintains a Nominating and Governance Committee Charter which

provides in relevant part:

**Introductory Statement and Purpose**

* * *

The Committee is to (1) assist the Board by identifying individuals qualified to become Board members, and recommend to the Board the director nominees for the next annual meeting of shareholders and the individuals to fill vacancies occurring between annual meetings of shareholders; (2) review

and recommend to the Board the Corporate Governance Principles applicable to the Company; (3) review the Company's management succession plans and make recommendations to the Board regarding such succession plans; (4) lead the Board in its annual review of the Board's performance; and (5) review and approve certain transactions between the Company and its officers, directors or affiliates.

\* \* \*

**Committee Authority and Responsibilities**

\* \* \*

Review and reassess the adequacy of the Corporate Governance Principles of the Company and recommend any proposed changes to the Board for approval.

\* \* \*

Draw on the expertise of the management and corporate staff and, when appropriate, hire outside legal, accounting or other experts or advisors to assist the Committee with its work.

77.     The conduct of Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Defendants were aware posed a risk of serious injury to the Company.

## DUTIES OF THE DEFENDANTS

78.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith. The obligations required Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner. Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

79.     Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or directors of a publicly held company, Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

80.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company.  By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)     Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC, Arkansas State Banking Department, FDIC and the investing public;

(b)     Conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     Properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company

maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)     Remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)     Ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)     Ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

81.     Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the business results and prospects of the Company.  As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits.

## **BREACHES OF FIDUCIARY DUTY**

82.     The conduct of Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of OZK, the absence of good faith on their part, and a reckless disregard for their duties to the Company that Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

83.     Defendants breached their fiduciary duties by allowing themselves to cause, or by themselves causing, the Company to engage in a scheme designed to mislead Plaintiff and the

investing public about its credit quality as alleged herein which resulted in the waste the Company's assets and caused OZK to incur substantial damage.

84.     Defendants, because of their positions of control and authority as officers and/or directors of OZK were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

85.     In committing the wrongful acts alleged herein, Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

86.     During all times relevant hereto, Defendants, collectively and individually, initiated or allowed a course of conduct that was designed to and did deceive the investing public, including stockholders of OZK, regarding its credit quality as discussed herein.  In furtherance of this plan, conspiracy, and course of conduct, Defendants, collectively and individually, took the actions set forth herein.

87.     Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, Defendants caused the Company to issue false and misleading press releases and other public filings as alleged herein.

88.     The purpose and effect of Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise Defendants' violations of law, breaches of fiduciary duty, and unjust enrichment; and to conceal adverse information concerning the Company's operations and financial condition.

89.     Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

90.     Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

## COMPANY BACKGROUND AND THE LOANS AT ISSUE

91.     OZK was founded in 1903 and describes itself as a "full-service Arkansas state-chartered bank." In 1979, Defendant Gleason purchased a controlling interest of OZK and assumed active management as its Chairman and CEO. OZK became a public company in 1997.

92.     In 2017, OZK pursued a strategy to no longer submit regulatory filings to the SEC. It accomplished this by merging with its holding company and filing a Form 15-15D with the SEC on July 7, 2017. As stated in a September 21, 2017 *Motley Fool* article[2]:

> It was only by folding Bank of the Ozarks' holding company into its subsidiary Arkansas-charted bank in a corporate reorganization earlier this year that the bank could avail itself of this exemption, as bank holding companies don't qualify.
>
> ***Another motivating factor for the reorganization was to shield the bank from the Federal Reserve's regulatory oversight***. As a state-chartered bank that isn't a member of the Federal Reserve system, Bank of the Ozarks' primary regulator

---

[2]     *See* "Bank of the Ozarks No Longer Submits Regulatory Filings to the SEC" at https://www.fool.com/investing/2017/09/21/bank-of-the-ozarks-no-longer-submits-regulatory-fi.aspx

is now the Arkansas State Banking Department, though it's subject to FDIC oversight as well. [Emphasis added]

93.     OZK's profitability was and is dependent to a large extent on net interest income ("NII"), which is the difference between interest income earned on loans and investment securities and interest expense paid on deposits, other borrowings, subordinated debentures and subordinated notes.

94.     OZK's growth has been supported through acquisitions and by its non-purchased loan portfolio, attributable to its Real Estate Specialties Group ("RESG"). The RESG focuses on commercial real estate ("CRE") and acquisition, construction and development lending. In 2003, Defendant Gleason and Thomas created this new lending unit (RESG). Thomas's leadership of RESG was credited for OZK's explosive growth and pristine credit quality. By way of example, in 2017 Defendant Hicks told analysts:

> ***Real Estate Specialties Group is our primary engine for loan growth in non purchased loans***. It was started in 2003 by Dan Thomas, nearly 14 years ago. Dan has extensive experience in real estate as a CPA and as an attorney and as a real estate developer himself. He's built this team from the ground up and now has a team – team members of 97 as of today. And consistent with what Tyler had mentioned, their priorities are: first, asset quality; second, profitability; and third, growth.
>
> Today, RESG loans are 70% of our funded nonpurchased loans and 92% of our unfunded loans. ***Over our 14-year history, only 2 loans have gone bad for a total net charge-off of $10.4 million***, which is an annualized loss ratio of 7 basis points. [Emphasis added]

95.     From 2003 to 2016, OZK acquired 16 banks as a means to fund its organic growth, by acquiring deposits.

96.     On information and belief, Plaintiff alleges that OZK entered into the SC Loan and added it to the OZK portfolio in 2007 and entered into the NC Loan and added it to the OZK portfolio in 2008. The SC Loan was secured by a regional mall that included anchor tenants Sears

and JC Penney.  The NC Loan was secured by a multi-phase land, residential lot and residential home project in North Carolina.

97.     OZK was required by GAAP and OZK's accounting policies to report the RESG problem loans as nonperforming, to stop accruing interest income, and to perform impairment testing.

98.     Under GAAP, a loan restructuring or modification constitutes a "troubled debt restructuring" ("TDR") "if the creditor for economic or legal reasons related to the debtor's financial difficulties grants a concession to the debtor that it would not otherwise consider."[3]

99.     Additionally, under OZK's accounting policies, "Loans for which the terms have been modified and for which (i) the borrower is experiencing financial difficulties and (ii) we have granted a concession to the borrower are considered troubled debt restructurings ('TDRs') and are included in impaired loans and leases."[4]  OZK evaluates all impaired loans individually.[5]

100.    Regardless of whether the SC Loan and/or the NC Loan met the technical definition of a TDR, they were each substantively nonperforming, and in any event should have been placed on nonaccrual status to stop the recognition of interest income on the SC Loan.  As stated in its 2019 Form 10-K[6]:

> The accrual of interest on non-purchased loans and purchased loans without evidence of credit deterioration at the date of acquisition is discontinued when, in management's opinion, the borrower may be unable to meet payments as they become due. We generally place a loan, excluding purchased loans with evidence of credit deterioration on the date of acquisition, on nonaccrual status when such loan is (i) deemed impaired or (ii) 90 days or more past due, or earlier when doubt exists as to the ultimate collection of payments.

---

[3]     ASC 310-40-15-5
[4]     *See, e.g.*, OZK 2016 Form 10-K at 43.
[5]     *Id.*
[6]     *See* 2019 Form 10-K, Item 7 (Management's Discussion and Analysis of Financial Condition and Results of Operation) at p. 44.  On information and belief, each of OZK's relevant earlier Form 10-K's contains substantially similar language.

101.     Regarding the SC Loan and as recounted in the Securities Class Action:

(a)     In 2007, RESG issued a $32.25 million CRE loan to JTL Rock Hill, LLC ("JTL") for the purchase of an enclosed retail shopping mall known as the Rock Hill Galleria (the "Galleria") in Rock Hill, South Carolina. Gleason approved the SC Loan.

(b)     Rock Hill is the fourth largest city in South Carolina. The Galleria served York, Chester, and Lancaster counties. Opened in 1991, the Galleria had space for five anchor tenants and about 70 specialty shops.  Between September 2009 and May 2011, OZK restructured the SC Loan five times, with each modification extending the SC Loan's maturity date.  In 2012 and 2013 online reviews, shoppers called the Galleria "empty" and a "dead mall."

(c)     In August 2011, OZK amended the SC Loan as a 3-year, $38.184 million, CRE loan to JTL, an affiliate of Cypress Equities, LLC ("Cypress").  Cypress is a Dallas-based retail real estate investor that sponsored the SC Loan, providing OZK a guarantee of JTL's debt.  Cypress also acted as the leasing agent and/or property manager for the Galleria.

(d)     By 2011, Cypress – and by extension JTL[7] – were extremely poor credits and Cypress was experiencing financial difficulties.  Since 2008, Cypress's revenues had plummeted, its employees were laid off, and its senior management salaries were reduced by up to 25%.

(e)     As a result, Cypress was unable to obtain new construction financing on its own and was in "full crisis mode," according to Cypress owner and CEO, Chris Maguire. For these reasons, repayment of the SC Loan was highly dependent upon full (or nearly

---

[7]     Cypress and its affiliate JTL are referred to collectively herein as "JTL/Cypress."

full) tenancy and/or an outright sale to a new buyer by August 2014.

(f)    Under the 2011 amendment, Cypress guaranteed its affiliate JTL would pay OZK the entire $38 million principal balance in three years, by August 2, 2014. By late July 2014, however, JTL/Cypress were unable to meet their financial obligations to OZK. To address JTL/Cypress's financial difficulties, OZK granted JTL/Cypress a concession by restructuring the SC Loan, extending the loan's maturity date three months to October 2014.

(g)    Effective August 2, 2014, the parties (OZK and JTL/Cypress) restructured the SC Loan by extending its maturity date to October 15, 2014 and further expressly agreed that after October 2014 there was no right to further extensions:

> *Borrower hereby agrees that on the October 2014 Maturity Date all the unpaid principal balance of the Note, together with all accrued but unpaid interest thereon, shall be due and payable.  Borrower hereby agrees it shall have no further right or option to extend the term of the Loan beyond the October 2014 Maturity Date*. [Emphasis added]

(h)    On October 15, 2014, JTL/Cypress defaulted on the SC Loan when the maturity date expired without final payment and without any further right of JTL to extend the loan's maturity date.  The October 2014 default and the previous August 2014 extension (to avoid an earlier default) each indicated that: (i) JTL/Cypress continued to have ongoing and material financial difficulties; and/or (ii) the rental income was insufficient to timely repay the SC Loan. There was also no buyer for the Galleria.

(i)    In late-December 2014, OZK granted JTL/Cypress a concession by modifying the SC Loan to extend the maturity date two more years, to October 15, 2016. OZK was not bound to provide this concession because the loan agreement effective August 2, 2014 expressly provided that all amounts were due and that JTL "shall have no

37

further right or option to extend the term of the Loan."

(j)      According to OZK, RESG kept a watchful eye on each of its loans, including "remodeling each of those projects on a monthly basis throughout the life of the loan." Thus, by late 2015 and early 2016, as the October 2016 maturity date approached, it was evident to Defendants that JTL/Cypress continued to have financial difficulties that prevented JTL from repaying any significant balance of the SC Loan without further financial concessions. Tenancy rates and cash flows had not improved to the point that JTL/Cypress could timely repay the SC Loan. And there were also no prospects for JTL/Cypress to sell the Galleria or otherwise raise nearly $30 million to pay off the SC Loan by the mid-October 2016 maturity date. In sum, the SC Loan was "nonperforming" and OZK should have performed impairment tests by the beginning of the Class Period to determine the amount of charge-offs for the SC Loan.

(k)      On October 15, 2016, and as RESG would have expected in its monthly models, JTL/Cypress again defaulted on the SC Loan when the maturity date expired without final payment from JTL/Cypress and without any further right of JTL to extend the loan term. The October 2016 default, the October 2014 default, and the August 2014 extension (to avoid an earlier default) each indicated that JTL/Cypress were having extensive, ongoing and material financial difficulties and/or otherwise repaying in full the SC Loan. In sum, the SC Loan continued to be "nonperforming" suffering probable losses throughout 2016.

(l)      In mid-December 2016, in an apparent attempt to mask the default and nonperforming nature of the RESG credit – creating the false appearance that the SC Loan was performing at year-end 2016 – OZK again granted JTL/Cypress a concession (that it

would not otherwise consider) by modifying the SC Loan (effective November 22, 2016) to extend the maturity date just a few weeks, to January 13, 2017.

(m)     At the time of this few-week extension that bridged the year-end reporting period, Defendants had no reasonable basis to conclude that JTL/Cypress would pay the entire loan balance by this new maturity date. The new maturity date was just weeks away and there would be no extraordinary change in RESG's monthly models that could reasonably project a full repayment of the SC Loan by January 13, 2017.

(n)     On January 13, 2017 – as Defendants expected – JTL/Cypress defaulted on the SC Loan when the maturity date again expired without final payment by JTL/Cypress and without any further right of JTL to extend the term of the SC Loan, indicating that the loan was nonperforming with probable losses at year-end 2016. The January 2017 default, and the previous three successive defaults, each indicated that JTL/Cypress were having extensive, ongoing and material financial difficulties, and/or that the Galleria could not generate sufficient cash flows, which prevented JTL/Cypress from timely repaying the SC Loan.

(o)     On March 2, 2017, in an apparent attempt to mask the January 2017 default and nonperforming credit, OZK again modified the SC Loan (effective February 22, 2017) to extend the maturity date, this time to April 15, 2017. By extending the maturity date just past the next reporting period, Defendants created the false appearance that the SC Loan was performing at quarter-end of the first quarter of 2017 ("1Q17").

(p)     On April 15, 2017, JTL/Cypress again defaulted on the SC Loan when the maturity date expired for the SC Loan without final payment and without any further right of the borrower to extend the term of the SC Loan.

(q)     In mid-May 2017, in an apparent attempt to mask the April 2017 default and conceal the nonperforming credit, OZK again modified the SC Loan to extend the maturity date a couple of months, this time to July 14, 2017.  By extending the maturity date just past the next reporting period, Defendants created the false appearance that the SC Loan was performing at quarter-end 2Q17.

(r)     Sometime during 2Q17, OZK risk-rated the SC Loan as "substandard," indicating the loan had deteriorated, yet OZK continued to improperly categorize the loan as "performing" when in fact it had been continuously defaulting and "nonperforming" since at least 2015.

(s)     On July 14, 2017, JTL/Cypress defaulted again on the SC Loan when the maturity date expired for the SC Loan without final payment and without any further right of the borrower to extend the term of the SC Loan.

(t)     Several days later, OZK again modified the SC Loan to extend the maturity date, this time to October 12, 2017, expressly noting: "BORROWER SHALL HAVE NO FURTHER RIGHT OR OPTION TO EXTEND THE TERM OF THE LOAN BEYOND THE FIFTH EXTENDED MATURITY DATE ABSENT OBTAINING THE CONSENT OF LENDER.  *LENDER DOES NOT INTEND TO EXTEND THE TERM OF THE LOAN BEYOND THE FIFTH EXTENDED MATURITY DATE*." By extending the maturity date just past the next reporting period, Defendants created the false appearance that the SC Loan was performing at quarter-end, 3Q17. [Emphasis added]

(u)     Just days after this amendment, on July 27, 2017, Thomas resigned abruptly as chief of RESG.

(v)     On October 12, 2017, the SC Loan maturity date arrived, again without

timely repayment of the SC Loan.  Although the previous extension indicated that OZK did not intend to grant any more extensions, those stated intentions were illusory because OZK would continue to grant extensions so long as the extensions masked the nonperforming nature of the SC Loan and OZK's expected loan losses.

(w)     To conceal the SC Loan's nonperformance and expected loan losses, OZK again modified the SC Loan to extend the maturity date, this time just past the year-end reporting period, to January 10, 2018, expressly noting: "BORROWER SHALL HAVE NO FURTHER RIGHT OR OPTION TO EXTEND THE TERM OF THE LOAN BEYOND THE SIXTH EXTENDED MATURITY DATE ABSENT OBTAINING THE CONSENT OF LENDER.  […]  LENDER DOES NOT INTEND TO EXTEND THE TERM OF THE LOAN BEYOND THE SIXTH EXTENDED MATURITY DATE."

(x)     On January 10, 2018, JTL/Cypress defaulted again on the SC Loan when the maturity date expired without final payment and without any further right of the borrower to extend the term of the SC Loan.

(y)     On January 23, 2018, OZK again modified the SC Loan to extend the maturity date, this time to July 9, 2018, just past the 2Q18 reporting period, expressly noting: "BORROWER SHALL HAVE NO FURTHER RIGHT OR OPTION TO EXTEND THE TERM OF THE LOAN BEYOND THE SEVENTH EXTENDED MATURITY DATE ABSENT OBTAINING THE CONSENT OF LENDER . . . . *LENDER DOES NOT INTEND TO EXTEND THE TERM OF THE LOAN BEYOND THE SEVENTH EXTENDED MATURITY DATE*." [Emphasis added]

(z)     On July 9, 2018, the maturity date again expired for the SC Loan without final payment and without any further right of the borrower to extend the loan term.

Several days later, OZK again modified the SC Loan to extend the maturity date, this time to October 15, 2018, expressly noting: "BORROWER SHALL HAVE NO FURTHER RIGHT OR OPTION TO EXTEND THE TERM OF THE LOAN BEYOND THE EIGHTH EXTENDED MATURITY DATE ABSENT OBTAINING THE CONSENT OF LENDER. [...] LENDER DOES NOT INTEND TO EXTEND THE TERM OF THE LOAN BEYOND THE EIGHTH EXTENDED MATURITY DATE."

(aa)    On October 15, 2018, JTL/Cypress defaulted again on the SC Loan when the maturity date expired for the SC Loan without final payment and without any further right of the borrower to extend the term of the SC Loan.  On or about April 17, 2019, OZK foreclosed on the SC Loan when JTL transferred by warranty deed title, to BOTO SC Properties, LLC (a subsidiary of OZK), a parcel at 2301 Dave Lyle Boulevard, Rock Hill, South Carolina, an enclosed retail mall known as the Rock Hill Galleria.

102.    Regarding the NC Loan:

(a)    In 2008, OZK issued a multi-million-dollar CRE loan (estimated to be at least $34.3 million fully funded) for the purchase of a multi-phased land, residential lot and residential home project in the Charlotte-Concord region of North Carolina.  The development project that secured the NC Loan was a part of a 20-year-old subdivision. Gleason approved the NC Loan.

(b)    Sometime during the fourth quarter of 2017 ("4Q17"), OZK risk-rated the NC Loan as "substandard," indicating that the loan had deteriorated, yet OZK continued to categorize the loan as "performing."

(c)    In recent years, the NC Loan borrower modified its business plan to include significant vertical construction of residential homes for sale.  As part of this plan, custom

42

homes were developed by individuals who had previously purchased lots in the development. In its October 18, 2018 "management comments," OZK stated that "the newly built homes and the lots owned by our borrower have not sold well recently, with sales seeming to have been undercut by cheaper pricing on existing homes and lots which have come to market as the sentiment around the project has improved."

(d)     But for some period of time, Defendants knew the NC Loan borrower could not meet its financial obligations to OZK as they came due, so OZK granted the NC Loan borrower a series of concessions (*i.e.*, forbearances) to address the NC Loan borrower's financial difficulties.

(e)     2018, collateral for the NC Loan was appraised at about $15.375 million contemporaneous with the NC Loan borrower's inability to make payments on the loan.

103.    Based on the foregoing, as of at least February 19, 2016, the SC Loan was impaired and/or nonperforming under OZK's accounting policies and GAAP because under OZK accounting policies and GAAP the SC Loan was a TDR and/or the SC Loan was otherwise deemed impaired and dependent upon collateral for repayment.

104.    Based on the foregoing, the NC Loan was impaired and/or nonperforming under OZK's accounting policies and GAAP because under OZK accounting policies and GAAP the SC Loan was a TDR and/or the SC Loan was otherwise deemed impaired and dependent upon collateral for repayment.

105.    In an absence of transparency and although OZK evaluates each impaired loan individually, OZK did not disclose identifying information about specific loans, including the SC Loan and NC Loan. Instead, OZK provided a breakout of loans by region and general type but did not (and does not) provide sufficient information to investors to analyze and evaluate specific

loans.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS

106. On February 19, 2016, Defendants caused the Company to file its 2015 Annual Report on Form 10-K (the "2015 10-K") with the SEC, falsely and materially understating OZK's "nonperforming loans" and "nonperforming assets" (excluding purchased loans) by at least $30 million, and falsely and materially understating related risk ratios because they did not include the nonperforming SC Loan:

| Reported Metric At 12-31-2015 | Falsely Reported Amount | Adding $30M SC Loan to "nonperforming" |
|---|---|---|
| Nonperforming loans and leases (NPLs) (in millions) | $13,194 | $43,194 |
| Nonperforming assets (NPAs) (in millions) | $36,064 | $66,064 |
| NPLs/Total Loans | 0.20% | 0.66% |
| NPAs/Total Assets | 0.37% | 0.67% |

107. The 2015 10-K reported that during the fourth quarter of 2015, the Company repurchased 133,492 shares of its common stock in connection with equity incentive plan awards at an average price per share of $51.37, adding that "213,200 shares of our common stock issued to certain of our senior officers under our Amended and Restated Restricted Stock and Incentive Plan vested on November 5, 2015 and were no longer subject to the vesting restriction or substantial risk of forfeiture. We withheld 133,492 of such shares to satisfy federal and state tax withholding requirements related to the vesting of these shares."

108. The 2015 10-K was signed by the Former Directors and also contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Gleason and McKinney attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

109.    By April 2016, Defendants knew, or recklessly disregarded, that the SC Loan had been and was expected to be in continuing default, and that OZK had granted the debtor concessions to address the debtor's financial difficulties.

110.    On April 12, 2016, OZK conducted a conference call with investment analysts.  On that call, Defendant Gleason stated:

> At March 31, 2016, excluding purchase loans, ***our non-performing loans and leases as a percent of total loans and leases were 15/100 of 1%. Our non-performing assets, as a percent of total assets, were 29/100 of 1%.***  And our loans and leases past due 30 days or more, including past-due non-accrual loans and leases to total loans and leases, were 23/100 of 1%.  These ratios of non-performing loans and leases and past due loans and leases are our best ever as a public company.
>
> While ***these ratios reflect the pristine nature of our asset quality***, the raw numbers may be even more illuminating.  For example, excluding purchase loans, our non-accrual loans and leases have declined from $21.1 million at year-end 2014 to $13.2 million at year-end 2015, and most recently to $11.4 million at March 31, 2016. [Emphasis added]

111.    These statements were false and/or misleading because the stated levels of nonperforming assets, related risk ratios and non-accrual loans were materially understated since Plaintiff is informed and believes they did not include the nonperforming SC Loan.

112.    Analysts responded immediately and positively to Gleason's claims of pristine and improving asset quality, with SunTrust Robinson Humphrey ("SunTrust") saying OZK "Asset quality remains pristine" and Merion Capital Group echoing "Pristine Asset Quality."

113.    On May 6, 2016, Defendants caused the Company to file its 1Q16 Quarterly Report on Form 10-Q ("1Q16 Form 10-Q") with the SEC, falsely and materially understating OZK's nonperforming loans and nonperforming assets (excluding purchased loans) by at least $30 million, and falsely and materially understating related risk ratios because the reported amounts did not include the nonperforming SC Loan:

| Reported Metric At 3-31-2016 | Falsely Reported Amount | Adding $30M SC Loan to "nonperforming" |
|---|---|---|
| Nonperforming loans and leases (NPLs) (in millions) | $11,374 | $41,374 |
| Nonperforming assets (NPAs) (in millions) | $33,622 | $63,622 |
| NPLs/Total Loans | 0.15% | 0.55% |
| NPAs/Total Assets | 0.29% | 0.56% |

114.    The 1Q16 Form 10-Q was signed by Defendant McKinney and also contained signed SOX certifications by Defendants Gleason and McKinney attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

115.    By the end of 2016, Defendants knew, or recklessly disregarded, that JTL/Cypress had already defaulted on the SC Loan and was unable to repay the SC Loan by the October 2016 maturity date. Under OZK's accounting policies and GAAP, the SC Loan was nonperforming.

116.    On July 11, 2016, OZK conducted a conference call with investment analysts. On that call, Defendant Gleason stated:

At June 30, 2016, excluding purchased loans, *our non-performing loans and leases as a percent of total loans and leases were just 0.09%. Our non-performing assets as a percent of total assets were just 0.25%.* And our loans and leases past due 30 days or more, including past due non-accrual loans and leases, to total loans and leases were just 0.22%.

These ratios of non-performing loans and leases, and past due loans and leases, are our best ever as a public company, setting new records for the second consecutive quarter. *These ratios clearly reflect our pristine asset quality*.

These recent ratios are a continuation of a multi-decade long commitment to excellent asset quality, which has resulted in our having asset quality consistently better than the industry as a whole. In our 19 years as a public company, our net charge-off ratio has averaged 37% of the industry's net charge-off ratio, and we have beaten the industry's net charge-off ratio in every single year. [Emphasis added]

117. Analysts responded immediately and positively to Defendant Gleason's claims of pristine and industry-beating asset quality, with SunTrust saying "RESG . . . maintaining pristine asset quality" and Wells Fargo echoing that OZK "asset quality remained pristine." On July 26, 2016, Sandler O'Neill added that "Ozarks credit quality remains pristine".

118. On August 8, 2016, Defendants caused the Company to file its 2Q16 Quarterly Report on Form 10-Q ("2Q16 Form 10-Q") with the SEC, falsely and materially understating OZK's nonperforming loans and nonperforming assets (excluding purchased loans) by at least $30 million because they did not include the nonperforming SC Loan:

| **Reported Metric At 6-30-2016** | **Falsely Reported Amount** | **Adding $30M SC Loan to "nonperforming"** |
|---|---|---|
| Nonperforming loans and leases (NPLs) (in millions) | $7,700 | $37,700 |
| Nonperforming assets (NPAs) (in millions) | $31,028 | $61,028 |
| NPLs/Total Loans | 0.09% | 0.46% |
| NPAs/Total Assets | 0.25% | 0.50% |

119. The 2Q16 Form 10-Q was signed by Defendant McKinney and also contained signed SOX certifications by Defendants Gleason and McKinney attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

120. By October 2016, Defendants knew, or recklessly disregarded, that JTL/Cypress had already defaulted and would not or could not repay the SC Loan by the October 2016 maturity date.

121. On October 11, 2016, OZK conducted a conference call with investment analysts. On that call, Defendant Gleason stated:

***[O]ur pristine asset quality were all clearly on display.***

*During our conference call in July, I was bragging about our* record net income in both the first and second quarters of this year, and our second- quarter records for net interest income, service charge income, and mortgage income, as well as our *excellent net interest margin efficiency ratio and asset quality*. We commented in July that we had, quote, continued to hit on all cylinders with our very conservative and disciplined business strategy, end quote.

*That analogy is still applicable* . . . . . [Emphasis added]

122.    Analysts responded immediately and positively to Defendant Gleason's claims of consistent pristine asset quality, with SunTrust stating: "Asset Quality Consistently Pristine" and Stephens Inc. echoing that "OZRK's credit quality remains in pristine condition." Piper Jaffray added, "We believe the current valuation of 13.0x 2017E EPS and 2.4x TBV is attractive given OZRK's 2016E-18E EPS growth of ~18%, ROTCE of 16%, and strong asset quality," and Sandler O'Neill concluded that "We have remained very bullish on the shares of OZRK in spite of the YTD weakness given our ardent belief in the bank's strong growth profile, exemplary profitability, and pristine asset quality, and 3Q results did nothing to deter these views Credit Metrics Remain Pristine."

123.    In fact, at this time, OZK credit was not pristine based on the facts as alleged herein.

124.    On November 8, 2016, Defendants caused the Company to file its 3Q16 Quarterly Report on Form 10-Q ("3Q16 Form 10-Q") with the SEC, again falsely and materially understating OZK's nonperforming loans and nonperforming assets (excluding purchased loans) by at least $30 million and related risk ratios because they did not include the nonperforming SC Loan:

| Reported Metric At 9-30-2016 | Falsely Reported Amount | Adding $30M SC Loan to "nonperforming" |
|---|---|---|
| Nonperforming loans and leases (NPLs) (in millions) | $7,428 | $37,428 |
| Nonperforming assets (NPAs) (in millions) | $51,678 | $81,678 |

| Reported Metric At 9-30-2016 | Falsely Reported Amount | Adding $30M SC Loan to "nonperforming" |
|---|---|---|
| NPLs/Total Loans | 0.08% | 0.43% |
| NPAs/Total Assets | 0.28% | 0.44% |

125.    The 3Q16 Form 10-Q was signed by Defendant McKinney and also contained signed SOX certifications by Defendants Gleason and McKinney attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

126.    By January 13, 2017, Defendants knew, or recklessly disregarded, that JTL/Cypress had defaulted three times on the SC Loan, and Defendants had no reasonable basis to believe that JTL/Cypress would be able to repay the $30-plus million balance by July 2017.

127.    Notwithstanding with this knowledge (or recklessly disregarding it), on January 17, 2017, OZK conducted a conference call with analysts. On that conference call, Gleason stated:

> Asset quality was among the numerous highlights of our 2016 results.  Most of our asset quality ratios were at or near record levels throughout the year.  For example, our net charge-off ratio for total loans and leases for 2016 was a record 0.07%, after having varied only slightly from 5 to 9 basis points annualized in each quarter of 2016.  This was our lowest annual net charge-off ratio in our 19 years as a public company.

> * * *

> The extremely low leverage of [the RESG] portfolio exemplifies our very conservative credit culture and is one of the many reasons we have such confidence in the quality and durability of our loan and lease portfolio.

> * * *

> [RESG's] priorities have always been first, on asset quality; second, on profitability; and third, on growth.  As a result of the emphasis on quality, RESG has had only two loans result in losses in 14 years. RESG's total credit losses since inception are $10.4 million, which is just a 7 basis point average annualized loss ratio over its entire history.

> * * *

In recent years, RESG has tended to be even more conservative. Given the exceptional track record of this division and the low leverage and the significant diversification of its portfolio by both geography and product type, you can see why we are so confident in how well our asset quality will hold up under a broad array of economic and real estate market scenarios.

128.    Analysts responded in glowing terms.  For example, a Merion Capital Group analyst noted: "Asset quality remains very strong," and a Stephens Inc. analyst reported, "Excellent Credit Continues. OZRK's credit quality remains in pristine condition . . . . Notably, 2016 net charge-offs of 13 bps have been at the midpoint of 2016 guidance in the range of 5-20 bps and better than 2014 (16 bps) and 2015 (17 bps).  OZRK remains conservative in its credit underwriting of construction loans as its current loan to cost is 48%, which compares to our estimate of industry average range of 70%-90%."

129.    On March 1, 2017, OZK filed its Annual Report for the fiscal year ending December 31, 2016 on Form 10-K (the "2016 10-K") with the SEC, falsely and materially understating OZK's nonperforming loans and nonperforming assets (excluding purchased loans) by at least $30 million and falsely and materially understating related risk ratios because they did not include the nonperforming SC Loan:

| Reported Metric At 12-31-2016 | Falsely Reported Amount | Adding $30M SC Loan to "nonperforming" |
|---|---|---|
| Nonperforming loans and leases (NPLs) (in millions) | $14,371 | $44,371 |
| Nonperforming assets (NPAs) (in millions) | $58,073 | $88,073 |
| NPLs/Total Loans | 0.15% | 0.46% |
| NPAs/Total Assets | 0.31% | 0.47% |

130.    The 2016 10-K reported that during the fourth quarter of 2016, the Company repurchased 91,314 shares of its common stock in connection with equity incentive plan awards

at an average price per share of $36.1875, adding that "202,600shares of our common stock issued to certain of our senior officers under our Amended and Restated Restricted Stock and Incentive Plan vested on November 4, 2016 and were no longer subject to the vesting restriction or substantial risk of forfeiture. We withheld 91,314 of such shares to satisfy federal and state tax withholding requirements related to the vesting of these shares."

131.     The 2016 10-K was signed by the Former Directors and also contained signed SOX certifications by Defendants Gleason and McKinney attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

132.     On March 7, 2017, Defendants Vance and Hicks spoke behalf of OZK at the Raymond James Institutional Investors Conference, and made the following statements and representations:

> **Vance:**
>
> The second discipline we excel in is asset quality, a real hallmark of our company. Since going public in 1997, our annual net charge-off ratio has been below the industry average every year. And over those 20 years, our net charge-off ratio has been only 35% of the industry average.
>
> &ast; &ast; &ast;
>
> So as you can see, when you combine a superb net interest margin, again, greater than 5% in Q4, industry-leading asset quality ratios, which I just showed you, and this top decile efficiency ratio, exceptional results can be achieved....
>
> We have also achieved these exceptional results by adhering to our conservative credit principles, long-standing principles that we hold as a company....
>
> **Hicks:**
>
> Over our 14-year history, only 2 loans have gone bad for a total net charge- off of $10.4 million, which is an annualized loss ratio of 7 basis points.

We're extremely conservative in our leverage and even more so today than we were just 10 years ago.

* * *

And we believe we may be the most conservative CRE portfolio in the country.

The RESG business model emphasizes industry-leading excellence throughout the life of the loan.

* * *

But our asset managers are managing it from the day we close to the day it's paid off. So even though we have funded the dollar, our asset managers are remodeling each of those projects on a monthly basis throughout the life of the loan. *And that discipline and culture that we have with those asset managers provide us conservative – really conservative metrics and allow us to have pristine asset quality*. [Emphasis added]

133.    By April 2017, Defendants knew, or recklessly disregarded, that JTL/Cypress had already defaulted, and Defendants expected JTL/Cypress to again default on the SC Loan, as the SC Loan was nonperforming, deeply distressed and impaired.

134.    On April 11, 2017, OZK conducted a conference call with investment analysts. On that conference call, Defendant Gleason stated:

Asset quality continued to be a highlight in the quarter just ended. Most of our asset quality ratios were at or near record levels.

* * *

These ratios reflect our long-standing commitment to conservative underwriting standards and excellent asset quality, which has resulted in our having asset quality consistently better than the industry as a whole.

* * *

Likewise, our extremely low loan to cost and loan to value ratios are probably more conservative than just about every other CRE lender in the country. Accordingly, we believe our CRE portfolio may be the lowest risk CRE portfolio in the industry.

\* \* \*

> Our track record, including our record through the Great Recession, speaks for itself. Our significant expertise and the conservatism we employ in our CRE lending are significant factors in our asset quality.

135.    Despite its high concentration of CRE loans, Defendant Gleason insisted that OZK – and RESG in particular – was perhaps the most conservative commercial real estate lender in the entire industry:

> Simply stated, we have the lowest risk position in the capital stack.
>
> Likewise, our extremely low loan-to-cost and loan-to-value ratios are probably more conservative than just about every other CRE lender in the country. Accordingly, we believe *our CRE portfolio may be the lowest risk CRE portfolio in the industry*. [Emphasis added]

136.    Investors responded positively to Defendant Gleason's statements that OZK's loan book was the "lowest risk" and "pristine." For example, following the April 11, 2017 earnings call, a Stephens Inc. analyst said he remained bullish on OZK, because, among other reasons, "OZRK's credit quality remains in pristine condition." Merion Capital Group stated, "[w]e believe that OZRK's strong loan growth, pristine asset quality, outstanding efficiency and high margin warrant a premium valuation." And SunTrust reported: "Asset Quality Still Very Strong Originated NPAs as a percentage of loans were 0.25%, down from 0.31% from last quarter. Given these trends, we are now more optimistic about OZRK's credit outlook."

137.    On August 8, 2017, Defendants caused the Company to file its 2Q17 Quarterly Report on Form 10-Q ("2Q17 Form 10-Q") with the FDIC, again falsely and materially understating OZK's nonperforming loans and nonperforming assets (excluding purchased loans) by at least $30 million and related risk ratios because they did not include the nonperforming SC Loan:

| Reported Metric At 6-30-2017 | Falsely Reported Amount | Adding $30M SC Loan to "nonperforming" |
|---|---|---|
| Nonperforming loans and leases (NPLs) (in millions) | $11,628 | $41,628 |
| Nonperforming assets (NPAs) (in millions) | $45,628 | $75,628 |
| NPLs/Total Loans | 0.11% | 0.38% |
| NPAs/Total Assets | 0.23% | 0.38% |

138.   The 2Q17 Form 10-Q was signed by Defendant McKinney and also contained signed SOX certifications by Defendants Gleason and McKinney attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

139.   On September 11, 2017, Defendant Gleason spoke on behalf of OZK at the Barclays Global Financial Services Conference.  At this conference, Defendant Gleason stated and represented:

> Well, it's not so much a fresh look for me because in 14 years we've had Real Estate Specialties Group, I have approved every single loan originated in 14 years. So I'm looking at things sometimes a few days or a week or 2 earlier than I might have looked at before, but I've been intimately involved in the details of RESG from its inception 14 years ago.
>
> * * *
>
> And in the 14-year history of RESG, we've had 2 losses, 2 credits result in losses that were about $10.5 million, I think a little less than $10.5 million in total losses in 14 years, which equates to about a 6 basis point average annualized net charge-off ratio for RESG. And it is a much bigger percentage of the portfolio today than it was then.  So it's hard for me to understand what else we have to do to make a compelling case that our asset quality is pristine. Our past-due ratios, I think, for the last 4 or 5 quarters have been the lowest quarterly past-due ratios in the 20-year history of our company as public company. Our nonperforming asset ratios, our nonperforming loan ratios are near record lows in the history of the company. Again, I'd point to that 4 basis point charge-off ratio. And even if it quadruples, you're still at a 16 basis point net charge-off ratio that would be the exceptional compared to the industry.  So we feel extremely good about our asset quality.

140.    On October 11, 2017, OZK participated in a conference call with investment

analysts.  On that conference call, Defendants Hicks and Gleason stated in relevant part:

**Hicks:**

At September 30, 2017, the RESG portfolio accounted for 66% of the funded
balance and 94% of the unfunded balance of our total non-purchased loans and
leases. At quarter end, our average loan-to-cost for the RESG portfolio was a
conservative 48.9%, and our average loan to appraised value was even lower at
just 41.5%. The very low leverage of this portfolio exemplifies our conservative
credit culture and is one of the many reasons we have such confidence in the
quality of our loan and lease portfolio.

**Gleason:**

Our asset quality metrics during the quarter were excellent. These ratios reflect
our long-standing commitment to conservative underwriting standards and
excellent asset quality, which has resulted in our having asset quality
consistently better than the industry as a whole.

Our annualized net charge-off ratios during the quarter just ended were 8 basis
points for non-purchased loans and leases and 9 basis points for total loans and
leases. In our 20 years as a public company, our net charge-off ratio has
averaged about 34% of the industry's net charge-off ratio, and we have beaten
the industry's net charge-off ratio in every year.

Our outperformance has been even better recently as evidenced by the fact that
our net charge-off ratio was just 13% of the industry's net charge-off ratio last
year and just 12% of the industry's net charge-off ratio for the first 6 months of
this year.

* * *

At quarter end, excluding purchased loans, our nonperforming loans and leases
as a percent of total loans and leases were just 11 basis points. Our
nonperforming assets as a percent of total assets were just 20 basis points and
our loans and leases past due 30 days or more, including past-due nonaccrual
loans and leases to total loans and leases, were a record low 12 basis points.
This was our seventh consecutive quarter of reporting a record low past due
ratio, reflecting the outstanding work of our loan and lease teams.

141.    On November 7, 2017, Defendants caused the Company to file its 3Q17 Quarterly

Report on Form 10-Q ("3Q17 Form 10-Q") with the FDIC, again falsely and materially

understating OZK's nonperforming loans and nonperforming assets (excluding purchased loans) by at least $30 million and related risk ratios because they did not include the nonperforming SC Loan:

| Reported Metric At 9-30-2017 | Falsely Reported Amount | Adding $30M SC Loan to "nonperforming" |
|---|---|---|
| Nonperforming loans and leases (NPLs) (in millions) | $13,269 | $43,269 |
| Nonperforming assets (NPAs) (in millions) | $41,285 | $71,285 |
| NPLs/Total Loans | 0.11% | 0.36% |
| NPAs/Total Assets | 0.20% | 0.34% |

142.    The 3Q17 Form 10-Q was signed by Defendant McKinney and also contained signed SOX certifications by Defendants Gleason and McKinney attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

143.    On January 16, 2018, OZK participated in a conference call with investment analysts. During that conference call, Defendant Gleason stated in relevant part:

> At quarter end, excluding purchased loans, our nonperforming loans and leases as a percent of total loans and leases were just 11 basis points. Our nonperforming assets as a percent of total assets were just 20 basis points and our loans and leases past due 30 days or more, including past-due nonaccrual loans and leases to total loans and leases, were a record low 12 basis points. This was our seventh consecutive quarter of reporting a record low past due ratio, reflecting the outstanding work of our loan and lease teams.
>
> Our asset quality metrics throughout 2017 were excellent. These ratios reflect our longstanding commitment to conservative underwriting standards and excellent asset quality, which has resulted in our having asset quality consistently better than the industry as a whole.
>
> In our 20 years as a public company, our net charge-off ratio has averaged about 34% of the industry's net charge-off ratio and we have beaten the industry's net charge-off ratio in every year. Recently, our outperformance has been even better, as evidenced by the fact that our net charge-off ratio was just 13% of the

industry's net charge-off ratio in both 2016 and the first 9 months of 2017. Our net charge-off ratios for 2017 were identical to such ratios for 2016, being just 6 basis points for non-purchased loans, 9 basis points for purchased loans and 7 basis points for total loans. As we've noted, we've long enjoyed excellent asset quality as compared to the industry, but our net charge-off ratios for the past 2 years have been exceptional. At year-end, excluding purchased loans, our nonperforming loans as a percent of total loans were just 10 basis points; our nonperforming assets as a percent of total assets were just 18 basis points; and our loans past due 30 days or more, including past-due nonaccrual loans, to total loans were 15 basis points.

. . . Some people have referred to us as aggressive lenders, which they apparently conclude based on our growth rate and the fact that we are among the most active lenders nationally in commercial real estate finance. We've been doing this business for a long time. Our excellent loan loss ratios both in recent years and for decades before, along with our consistently excellent asset quality ratios, some of which I just mentioned, support our view that we are very conservative in our lending.

\* \* \*

What I can tell you is we feel obviously pretty good about asset quality, given the nonperforming loan, nonperforming asset and past due ratios we've been consistently posting over the last several years.

144. On February 27, 2018, Defendants caused the Company to file its Annual Report for the fiscal year ending December 31, 2017 on Form 10-K (the "2017 10-K") with the FDIC, falsely and materially understating OZK's nonperforming loans and nonperforming assets (excluding purchased loans) by at least $30 million and falsely and materially understating related risk ratios because they did not include the nonperforming SC Loan:

| Reported Metric At 9-30-2017 | Falsely Reported Amount | Adding $30M SC Loan to "nonperforming" | Adding $60M Carolina Loans to "nonperforming" |
|---|---|---|---|
| Nonperforming loans and leases (NPLs) (in millions) | $12,899 | $42,899 | $72,899 |
| Nonperforming assets (NPAs) (in millions) | $38,256 | $68,256 | $98,256 |
| NPLs/Total Loans | 0.10% | 0.36% | 0.57% |

| Reported Metric At 9-30-2017 | Falsely Reported Amount | Adding $30M SC Loan to "nonperforming" | Adding $60M Carolina Loans to "nonperforming" |
|---|---|---|---|
| NPAs/Total Assets | 0.18% | 0.33% | 0.46% |

145.    The 2017 10-K was signed by the Former Directors and also contained signed SOX certifications by Defendants Gleason and McKinney attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

146.    On March 6, 2018, OZK participated in the Raymond James Institutional Investors Conference.  During that conference, Defendants Hicks and Vance stated in relevant part:

**Hicks:**

Asset quality, excellent track record over our 21 years as a public company. I can't emphasize our discipline and approach here enough. Our – we've never had a year since 1997 where our charge-off ratio hasn't beaten the industry, and we've averaged 34% of the industry's net charge-off ratio. That doesn't come by happenstance. That comes with a discipline and approach at every level, a culture at every level within our lending organization. That asset quality is paramount and extreme importance to our lending.

* * *

And because of this focus right here, we've really experienced very little losses over the 15-year history at RESG, an average of 5 basis points of losses, and just a couple of loans that incurred those losses over its history. So excellent track record.

One part of RESG that, again, is not emphasized enough is our asset management team. We have over 40% of our staff in our asset management and servicing team. These are individuals that monitor these projects on a monthly basis. And so they identify any issues, if there are any issues, very early on in a project. And that's a huge differentiator for us. And I don't know that it gets emphasized enough.

**Vance:**

You can see the fourth quarter highlights, here, record quarterly net income of $146.2 million, a very low ratio of nonperforming loans at 10 basis points, a

very low ratio of past due loans at 15 basis points and a very low ratio of net charge-offs, as Tim mentioned earlier, at just 8 basis points.

147.   On April 12, 2018, OZK participated in a conference call with investment analysts. During that conference call, Defendant Gleason stated in relevant part:

But clearly, it's a very competitive environment. What we had to do and have always done in a very competitive environment is keep our focus on our priorities. And priority number one is asset quality. So giving on credit terms or getting competitive on credit terms is really a nonnegotiable thing for us. We protect credit quality as our paramount mission. Secondly is to maintain profitability. And we will make adjustments to our pricing as we think were appropriate based on return on equity and so forth and you have a little room to move, but you don't have a ton of room to move and still meet our profitability standards. And then growth is the tertiary consideration. So, if we're faced with a situation where we have to give on credit quality to achieve growth, we're not going to do it. If we're faced on a situation where we're going to have to get on pricing to achieve growth, we're only going to do it if we can still achieve our target minimum return on equity numbers. So you just got to be disciplined and continue to execute well. I think the one thing that really helps us is that our ability to execute for our customers and the confidence that our customers have in us being able to deliver what we say we're delivering to execute with excellence and the transactions gets us paid more than our competition in many, many transactions. So, we're relying on the reputation of relationship, our execution and expertise, our discipline to continue to maintain our credit quality and our profit margins in whatever sort of competitive environment we're in.

148.   On May 8, 2018, Defendants caused the Company to file its 1Q18 Quarterly Report on Form 10-Q ("1Q18 Form 10-Q") with the FDIC, again falsely and materially understating OZK's nonperforming loans and nonperforming assets (excluding purchased loans) by at least $30 million to $60 million and related risk ratios because they did not include the nonperforming SC Loan:

| Reported Metric At 3-31-2018 | Falsely Reported Amount | Adding $30M SC Loan to "nonperforming" | Adding $60M Carolina Loans to "nonperforming" |
|---|---|---|---|
| Nonperforming loans and leases (NPLs) (in millions) | $12,471 | $42,471 | $72,471 |

| Reported Metric At 3-31-2018 | Falsely Reported Amount | Adding $30M SC Loan to "nonperforming" | Adding $60M Carolina Loans to "nonperforming" |
|---|---|---|---|
| Nonperforming assets (NPAs) (in millions) | $34,402 | $64,402 | $94,402 |
| NPLs/Total Loans | 0.09% | 0.35% | 0.53% |
| NPAs/Total Assets | 0.16% | 0.31% | 0.43% |

149.     The 1Q18 Form 10-Q reported that during the first quarter of 2018, the Company repurchased 70,931 shares of its common stock in connection with equity incentive plan awards at an average price per share of $52.575, adding that "177,825 shares of our common stock issued to certain of our senior officers under our Amended and Restated Restricted Stock and Incentive Plan vested on January 13, 2018 and were no longer subject to the vesting restriction or substantial risk of forfeiture. We withheld 70,931 of such shares to satisfy federal and state tax withholding requirements related to the vesting of these shares."

150.     The 1Q18 Form 10-Q was signed by Defendant McKinney and also contained signed SOX certifications by Defendants Gleason and McKinney attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

151.     On July 12, 2018, OZK participated in a conference call with investment analysts. During that conference call, Gleason stated in relevant part:

> We have always said, and no one should be surprised at our actions in this regard, we've always said that asset quality is the most important in the asset quality pricing growth equation for us, and that growth is a tertiary consideration. So the way we have approached it and will continue to approach it is we're going to hold very firmly to our longstanding asset quality standards. Those are not negotiable.
>
> . . . So, we're quite content to have less growth unless we can get that growth on credit quality and pricing standards that makes sense to us.

And I would hope that any thoughtful holder of our company's stock would applaud that approach, that credit quality is just not something that you want to play with or take chances on. And return on equity is not something you want to get below a minimum target level, and if growth suffers because you're being disciplined, then so be it.

152.    On August 7, 2018, Defendants caused the Company to file its 2Q18 Quarterly Report on Form 10-Q ("2Q18 Form 10-Q") with the FDIC, again falsely and materially understating OZK's nonperforming loans and nonperforming assets (excluding purchased loans) by at least $30 million to $60 million and related risk ratios because they did not include the nonperforming SC Loan:

| Reported Metric At 6-30-2018 | Falsely Reported Amount | Adding $30M SC Loan to "nonperforming" | Adding $60M Carolina Loans to "nonperforming" |
|---|---|---|---|
| Nonperforming loans and leases (NPLs) (in millions) | $13,543 | $43,543 | $73,543 |
| Nonperforming assets (NPAs) (in millions) | $34,4205 | $64,205 | $94,205 |
| NPLs/Total Loans | 0.10% | 0.36% | 0.52% |
| NPAs/Total Assets | 0.15% | 0.31% | 0.42% |

153.    The 2Q18 Form 10-Q reported that during the second quarter of 2018, the Company repurchased 819 shares of its common stock in connection with equity incentive plan awards at an average price per share of $48.19, adding that "2000 shares of our common stock issued to certain of our senior officers under our Amended and Restated Restricted Stock and Incentive Plan vested on May 12, 2018 and were no longer subject to the vesting restriction or substantial risk of forfeiture.   We withheld 819 of such shares to satisfy federal and state tax withholding requirements related to the vesting of these shares."

154.    The 2Q18 Form 10-Q was signed by Defendant McKinney and also contained signed SOX certifications by Defendants Gleason and McKinney attesting to the accuracy of

financial reporting, the disclosure of any material changes to the Company's internal controls over

financial reporting, and the disclosure of all fraud.

155.    On September 13, 2018, OZK participated in the Barclays Global Financial

Services Conference.  During that conference, Defendant Gleason stated in relevant part:

> And we said, and I'm very proud of the fact we said this, because we'd lived this format 39 years as Chairman and CEO, that asset quality, our standards and principles, they are non-negotiable. We won't deviate from those.

> * * *

> And the reality is, if you run a very disciplined credit book, which we do, we – every year since we went public, we've beaten the industry's charge-off ratio every single year. And we've averaged about 32% at the industry's charge-off ratio. If you put credit first and profitability second and growth is a tertiary consideration, that growth number is going to swing around from quarter-to-quarter. And if you're time profile for a company is 1 quarter or 2 or 3 quarters, that may be disconcerting to you. But if your time profile for the company is longer term, then you're going to look at it and say, "Well, I want to be invested in a company that's going to maintain their discipline and not try to achieve a constant growth rate, but try to achieve constant credit quality." And as economic conditions ebb and flow, your growth rate's going to ebb and flow with that. And so we're going to make every good-quality, good-yielding loan that we can make that's consistent with all of our credit standards. And if that's a $1 billion of new originations in a quarter, that's great. And if that's $3 billion or $4 billion of new originations in a quarter, that's great. But we're not going to change our credit standards just because other people do.

> * * *

> And as a result of that in the 15-year history of Real Estate Specialties Group, we have not had a single loan, not one loan, wherein we've gotten at the end of the project and we've not had the project completed with the funds that remained in the loan. So that requires a very effective completion guarantee structure, where your sponsor's going to cover cost overruns and do it immediately. It requires a very effective asset management servicing structure, where you identify issues that will create budget problems early on in the process, where you still got the leverage to require the sponsor to fix that. And it requires sponsors of high quality and projects of high quality. So we've been very successful in totally avoiding that risk.

156.    The statements referenced above were materially false and/or misleading because

they misrepresented and/or failed to disclose the following adverse facts pertaining to the Company's business, operational, and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose (1) OZK's true and accurate charge-off ration; (2) OZK's true and accurate ratio of nonperforming loans; (3) that OZK knew or recklessly disregarded the actual condition of the SC Loan and NC Loan; (4) that OZK was providing loan modifications and/or forbearances for the SC Loan and/or NC Loan; (5) OZK was performing worse than reported; and (6) as a result, OZK's public statements were materially false and misleading at all relevant times.

157.   During this time until the truth begins to emerge (from February 19, 2016 to October 18, 2018) and with the benefit of insider information, Defendants East, Freedberg, Gleason, Kenny, Mullen, Proost, Hicks, McKinney, Vance, and Thomas sold shares of OZK stock. Also, during this time and with the benefit of insider information, current OZK officer Carter sold shares of OZK stock. Additionally, during this time and with the benefit of insider information, former OZK officers and directors Cisne, L. Gleason, and Russell sold shares of OZK stock. These stock sales occurred while the SC Loan was repeatedly in default and modified without disclosure of these events to Plaintiff and the investing public as follows:

| Date | South Carolina Loan Event Description | Officer / Director who Sold or Acquired OZK Stock | Director / Officer |
|---|---|---|---|
| 10/15/16 | **Loan default** | | |
| 11/04/16 | 5,799 shares sold | Vance | Former Director Former Officer |
| 11/04 16 | 1,075 shares sold | Carter | Current Officer |
| 11/08/16 | 1,125 shares sold | Carter | Current Officer |
| 11/10/16 | 2,200 shares sold ($42.55) | Carter | Current Officer |
| 11/10/16 | 1,000 shares sold ($41.18) 6,600 shares sold ($41.25) | Russell | Former Officer |

| Date | South Carolina Loan Event Description | Officer / Director who Sold or Acquired OZK Stock | Director / Officer |
|---|---|---|---|
| 11/14/16 | 3,000 shares sold ($46.84) | Hicks | Current Officer |
| 11/15/16 | 19,884 shares sold | Freedberg | Current Director |
| 12/08/16 | 3,000 shares sold ($52.12) 13,000 shares sold ($52.20) | Vance | Former Director Former Officer |
| Mid 12/16 | **Loan extension to 01/13/17** | | |
| 12/14/16 | 12,000 shares sold | Freedberg | Current Director |
| 01/13/17 | **Loan default** | | |
| 01/24/17 | 10,000 shares sold ($54.00) | Russell | Former Officer |
| 01/25/17 | 4,000 shares sold | Cisne | Former Director |
| 01/27/17 | 2,700 shares sold ($55.80) 900 shares sold ($55.83) | Hicks | Current Officer |
| 02/13/17 | 4,000 shares sold ($55.72) | East | Current Director |
| 02/16/17 | 1,544 shares sold | Kenny | Current Director |
| 03/02/17 | **Loan modification to 04/15/17** | | |
| 03/07/17 | 7,839 shares sold | Freedberg | Current Director |
| 04/15/17 | **Loan default** | | |
| 05/02/17 | 19,737 shares sold | Thomas | Former Director Former Officer |
| Mid 05/17 | **Loan modification to 07/14/17** | | |
| 05/15/17 | 1,034 shares sold | Mullen | Current Director |
| 05/17/17 | 1,034 shares sold | Kenny | Current Director |
| 07/14/17 | **Loan default** | | |
| 07/14/17 | 56,000 shares sold ($47.15) | **Thomas** | Former Director Former Officer |
| Mid 07/17 | **Loan modification to 10/12/17** | | |
| 07/27/17 | **THOMAS RESIGNATION** | | |
| 10/12/17 | **Loan default** | | |

| Date | South Carolina Loan Event Description | Officer / Director who Sold or Acquired OZK Stock | Director / Officer |
|---|---|---|---|
| 10/23/17 | 5210 shares sold | Freedberg | Current Director |
| 11/29/17 | 3,500 shares sold ($48.27) | Carter | Current Officer |
| 11/30/17 | 24,722 shares sold | Gleason | Current Director Current Officer |
| 11/30/17 | 7,000 shares sold ($48.75) 40,284 shares sold ($48.85) | Russell | Former Officer |
| Unknown | **Loan modification to 01/10/18** | | |
| 01/10/18 | **Loan default** | | |
| 01/13/18 | 7,062 shares sold | Vance | Former Director Former Officer |
| 01/13/18 | 9,344 shares sold | McKinney | Current Officer |
| 01/13/18 | 1,831 shares sold | Hicks | Current Officer |
| 01/13/18 | 2,579 shares sold | Russell | Former Officer |
| 01/18/18 | 4,806 shares sold ($51.29) | Carter | Current Officer |
| 01/18/18 | 9,662 shares sold ($51.26) 40,477 shares sold ($51.26) 2,688 shares sold (51.08) | Russell | Former Officer |
| 01/22/18 | 96,171 shares sold 14,578 shares sold | L. Gleason | Former Director |
| 01/23/18 | 20,000 shares sold ($52.51) | Vance | Former Director Former Officer |
| 01/23/18 | 16,000 shares sold ($52.51) | McKinney | Current Officer |
| 01/23/18 | **Loan modification to 07/09/18** | | |
| 01/26/18 | 1,000 shares sold | Kenny | Current Director |
| 01/30/18 | 10,044 shares sold | Proost | Current Director |
| 02/20/18 | 4,000 shares sold ($50.41) | East | Current Director |
| 03/05/18 | 4,000 shares sold ($50.87) | Cisne | Former Director |
| 03/13/18 | 1303 shares sold | Freedberg | Current Director |
| 04/17/18 | 4,000 shares sold ($46.63) | Kenny | Current Director |

| Date | South Carolina Loan Event Description | Officer / Director who Sold or Acquired OZK Stock | Director / Officer |
|------|---------------------------------------|---------------------------------------------------|--------------------|
| 07/09/18 | Loan default<br>Loan modification to 10/15/18 | | |
| 10/15/18 | Loan default | | |
| 10/18/18 | THE TRUTH EMERGES | | |

## THOMAS UNEXPECTEDLY RESIGNS FROM OZK

158.    On July 27, 2017, RESG's lead executive and anchor, Defendant Thomas, abruptly resigned, without explanation.

159.    On this news, shares of OZK dropped $5.65 per share, or 12%, to close at $40.50 per share on volume of 9.1 million shares.

160.    In reaction to Thomas's resignation, Morgan Stanley stated that "[o]ne potential concern with Mr. Thomas leaving the bank is that RESG credit quality could deteriorate or *may not maintain its pristine standards going forward*." On July 28, 2017, a Stephens Inc. analyst downgraded OZK to equal-weight rating from "overweight" and cutting his price target to $48 per share from $58 per share (*i.e.*, 17%).

161.    Following the negative stock and analyst reactions to Thomas's resignation, Gleason attempted to respond to investors' concerns during investor meetings. On August 7, 2017, Sandler O'Neill issued a report reiterating its "Buy" rating, reporting that on August 2, 2017 it hosted Gleason for investor meetings in Montreal and Toronto. The analyst stated:

> We came away from these meetings with greater perspective around the recent departure of leadership in the bank's RESG segment and an affirmed belief that the forward trajectory of Ozarks remains extremely high. Besides Mr. Thomas' departure, the meetings focused on the remaining RESG team and its potential, overall forward loan growth trends, core deposit generation capabilities, and the direction of the NIM.

162.    The analyst further reported that Defendant Gleason would be "taking up most of

the slack from Mr. Thomas's departure," and that Gleason had "always been deeply involved" with

[RESG]." He noted:

> Mr. Gleason commented that 3-4 years ago, Mr. Thomas's departure could have
> been highly disruptive, but since then, Mr. Thomas built such a deep and talented
> team that RESG will be able to grow and thrive with the other 107 employees
> left behind.  At the end of the day, we believe that Mr. Thomas was highly
> talented, and a very valuable asset, but he was still 1 of 34 people within the
> RESG team that structured and originated loans – and even if he was the best of
> those 34, we think along with Mr. Gleason's leadership within the team his
> departure presents a manageable hurdle. All said, we do not
> expect to see any tangible disruption from this departure and the bank should
> continue to meet its growth targets through 2018 at a minimum.

163.    In September 2017, Gleason again reassured analysts that Thomas's resignation

was not a red flag about RESG's credit quality, where, in all respects, RESG was "business as usual"

with a "strong and deep team."  Defendant Gleason added:

> I've said many times that [RESG] is our best unit in every aspect of what we do.
> It's our best underwritten loans, our best documented loans, our most precisely
> closed loans, our lowest leveraged, best sponsors, best projects, best serviced
> loans to Brannon Hamblen's Asset Management team. *So they're our best*
> *credits in every respect*.  [Emphasis added].

164.    Gleason's reassurances were materially misleading about Thomas's abrupt

resignation not affecting credit quality.  By this time the SC Loan was deeply impaired, the

likelihood of loss was probable, and there was significant doubt that OZK would collect payments

due under the loan agreement.   Defendants knew or should have known that the debtor had

defaulted on the SC Loan for nonpayment by the due date at least four times with no indication of

improved credit worthiness.

165.    On October 25, 2017, the *Motley Fool* published an article entitled "Why Did Bank

of Ozarks' Chief Lending Officer Resign?"[8] stating in relevant part:

> If I were a shareholder of Bank of the Ozarks (NASDAQ: OZRK), I would
> want to know why one of its highest-ranking executives, second only to CEO

---

[8]    *See* https://finance.yahoo.com/news/why-did-bank-ozarks-chief-224200133.html

George Gleason, resigned on July 27. The departure caused the bank's stock to drop 12% in a single day and has yet to be explained by the bank.

I'm talking about Dan Thomas, who served in three critical capacities at Bank of the Ozarks. He was its chief lending officer, vice chairman of its board of directors, and president of its real estate specialties group, or RESG, which is responsible for most of the bank's growth since 2012.

Thomas was the second-highest paid executive at the bank. In 2015, he was paid $4.1 million, ranking in the 98th percentile among similarly situated executives in Bank of the Ozarks' peer group. The following year, he earned $4.7 million, ranking "above the 90th percentile," according to the bank's latest proxy statement.

Yet, despite his leadership roles and resplendent compensation, Thomas rarely (if ever) engaged with the media, analysts, or investors. He wasn't on the bank's quarterly conference calls. He didn't meet with stock analysts. And, as far as I can tell, he rarely, if ever, did media interviews.

This is unusual. Bank of the Ozarks doesn't keep its other executives under a similar quarantine. On its latest conference call, four of its executives offered lengthy, substantive remarks about Bank of the Ozarks' performance in the third quarter. Indeed, most banks go out of their way to connect executives with analysts and members of the media -- I get emails every day from banks and fintech companies offering to line up interviews with their executives.

Making all of this even more unusual was the timing of Thomas' resignation. It happened three weeks after the bank stopped submitting regulatory filings to the Securities & Exchange Commission, which is where analysts and investors learn about publicly traded companies like Bank of the Ozarks....

* * *

It also seems relevant that Gleason heaped praise on Thomas earlier in the year. "RESG, under the expert leadership of Dan Thomas, continued to be the primary driver of our loan growth in the quarter just ended, as it has been in most quarters and recent years," said Gleason on a conference call in January. Gleason went on to laud the ostensibly conservative underwriting philosophy of RESG under Thomas. "Dan started this team for us 14 years ago. Its priorities have always been first, on asset quality; second, on profitability; and third, on growth," said Gleason.

* * *

Further thickening the plot is the fact that Gleason, who has been CEO of Bank of the Ozarks since buying a controlling interest in it as a 25-year-old attorney

in 1979, announced a few months ago that he would be dedicating 75% of his time to running RESG, a single unit of the bank. He handed off six of his direct reports earlier this year and will now, presumably, spend most of his time at RESG's office in Dallas, Texas -- about 300 miles from Bank of the Ozarks' headquarters in Little Rock, Arkansas.

Yet again, this is highly unusual. I've studied banks for years and have never heard of a bank CEO who has done this. When positions down the chain of command come open, a CEO fills them with someone else. That's what CEOs do. In no instance that I'm aware of has a CEO effectively demoted himself in this way.

## THE TRUTH BEGINS TO EMERGE

166.    On October 18, 2018, OZK published an earnings release and Management Comments announcing its 3Q18 financial results.  Defendants surprised investors when they disclosed that OZK had lost $45.5 million on two loans originated by RESG; the SC Loan and the NC Loan. OZK's disclosures did not specify the loans involved or itemize their losses but described the loans generally as:

> These two unrelated projects are in South Carolina and North Carolina and have been in our portfolio since 2007 and 2008, respectively. Both credits were previously classified as substandard but *continued to be performing credits until the third quarter 2018*.
>
> The South Carolina credit … is secured by a regional mall…
>
> The North Carolina credit was originated in 2008 and is secured by a multi-phase land, residential lot and residential home project . . . . [Emphasis added]

167.    In its Management Comments, OZK further admitted:

> As mentioned, these two credits [the SC Loan and NC Loan] have previously been classified as substandard with combined allowance allocations totaling $19.1 million as of June 30, 2018. During the quarter just ended, we obtained updated appraisals on both projects. The new appraisals and the assumptions therein reflected the recent poor performance of each project. As a result, the new appraised values were much lower than those reflected by the appraisals obtained in the past two years. *We have written each credit down to approximately 80% of its recent appraised value*, which should allow us flexibility to resolve these credits without further loss. *The combined charge-offs on these two credits in the quarter just ended were $45.5 million*, which

69

required related provision expense of $26.4 million in the quarter just ended, in addition to the previous allowance allocations of $19.1 million. ***Both credits were placed on non-accrual status in the quarter just ended, which resulted in the reversal of the outstanding accrued interest***. The combined remaining balance on these two credits, after the charge-offs, is $20.6 million. [Emphasis added]

168.    OZK did not disclose the SC Loan or NC Loan beginning balances, if the beginning balances of each loan was fully funded, if any and how much principal had been paid down on the SC Loan or NC Loan, and/or how much interest had accrued and/or was recognized as income during the life of the SC Loan or NC Loan.

169.    After OZK's disclosure, UBS said in relevant part:

the "pivotal question []" was "*[c]an OZK successfully manage credit risk*,"

* * *

these "[l]osses highlight the weakness of an appraisal which *only confirms what should have been known* – especially for credits as large as these."

* * *

[t]hese were 2 cash flowing loans in the portfolio for a decade, *why were they not restructured in a manner that produced a lower loss content?* ... We expect a very sharply negative reaction as emergence of credit if not already a widespread performance issue, something that becomes more widely discussed. [Emphasis added]

170.    Other analysts were also surprised by OZK's disclosure:

(a)    Morgan Stanley reported on October 19, 2018:

Highly disappointing 3Q18 results. Bank OZK reported 3Q18 earnings that came in far worse than expected.

* * *

The bigger impact of these credit losses, however, is on sentiment and how the market is likely to perceive the company's credit quality going forward.

* * *

We believe the OZK shares will continue to trade at a substantial discount to peers for the foreseeable future, given the company seems to have lost investor confidence after posting a significant drop in net interest income and margin in 3Q18, reduced its loan growth guidance, and posted a surprise credit loss on two of its RESG loans originated over 10 years ago.

(b)     Sandler O'Neill reported on October 19, 2018:

Two Large RESG NCOs Drive the Lion's Share of the 3Q18 Miss – OZK took a $26.4M incremental provision on $45.5M in NCOs related to two substandard RESG loans. *These current losses will further sour the well around the shares* and we think that we may need to work through a credit cycle before OZK will be able to *earn back confidence in its current business model.* [Emphasis added].

171.    On November 8, 2018, Defendants caused the Company to file its 3Q18 Quarterly Report on Form 10-Q ("3Q18 Form 10-Q") with the FDIC which was signed by Defendant McKinney and also contained signed SOX certifications by Defendants Gleason and McKinney. During the quarter ended September 30, 2018, OZK began classification of the SC Loan as non-accrual and previously accrued interest was reversed.

172.    On January 18, 2019, OZK participated in a conference call with analysts. Defendants Gleason, Hicks, McKinney, and Vance were part of this exchange.  During this conference call and regarding the SC Loan and NC Loan Defendant Gleason admitted to analysts that: "We're actively in a dialogue with the sponsors on each of those we've been operating this last quarter under a series of short-term forbearance agreements on each one, and we've been working with the sponsors. And looking at other opportunities and strategies to liquidate those in the most cost-effective manner and the most beneficial manner possible." Defendant Gleason also said that for a "long, long time" OZK had swept surplus cash flow on one project because the borrower was unable to make payments.

173.    As detailed herein, the history of forbearance agreements and loan modifications

demonstrated that OZK knew or recklessly disregarded that the SC Loan and NC Loan were nonperforming for a "long, long time," and thus should have been reflected in OZK's nonperforming asset ratio earlier.

174.    On May 2, 2019, OZK provided investors an updated chart from the 3Q18 chart provided previously. This chart indicated that the SC Loan's LTV had changed slightly, but the NC Loan's LTV was unchanged at a remaining balance of $12.3 million. This information, combined with the 3Q18 revelation of the remaining balances for both the SC Loan and NC Loan ($20.6 million) and Gleason's January 18, 2019 comments – that the SC Loan's appraised value had not changed despite a slight reduction in the loan balance – revealed that the 3Q18 ending balance was about $12.3 million for the NC Loan and about $8.3 million for the SC Loan (*i.e.*, $20.6 million less $12.3 million).

175.    Based on this data and analyses, the estimate itemized "nonperforming" and loss amounts for each of the two loans are as follows: (1) For the SC Loan, the loss (or charge-off) is estimated to be about $20 million.  Even assuming no $20 million charge-off, the SC Loan's "nonperforming" level to be reported to investors would have been at least $30 million ($38.2 million less $6.9 million) and (2) For the NC Loan, the nonperforming amount is estimated to be at least $30 million (*i.e.*, the beginning balance) and the loss (or charge- off) later recognized is estimated to be about $22 million.  The charge off (or loan loss) to the 3Q18 ending loan balance is:

| Analysis of $45.5 Million RESG Loan Amounts (in millions) | | | |
|---|---|---|---|
| | **Reported Amts. 3Q18** | **South Carolina Loan** | **North Carolina Loan** |
| Beg. balance, when fully funded | Not disclosed | $38.2 | No less than $34.3 |
| Est. principal payments and/or unfunded amount | Not disclosed | ($6.9) | Not estimated |
| Loan losses | ($45.1) | ($23.0) | ($22.0) |

| 3Q18 loan balance | $20.6 | $8.3 | $12.3 |
| Appraisal at 80% LTV | $25.75 | $10.375 | $15.375 |

176.    By failing to disclose to investors the adverse facts detailed herein, Defendants presented a misleading picture of OZK's business and prospects.   When the truth about the Company was partially revealed to the market after the close of trading on July 27, 2017 (the date the public learned of Thomas's surprise resignation), the price of OZK common stock fell dramatically. The price of OZK common stock fell further after the full truth was revealed to the market after the close of trading on October 18, 2018.

## IN REPURCHASING STOCK, OZK RELIED ON DEFENDANTS GLEASON AND McKINNEY'S FALSE OR MISLEADING STATEMENTS

177.    In repurchasing common stock, OZK relied on Defendants Gleason and McKinney's false or misleading statements, either directly or through the "fraud on the market" doctrine articulated in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398 (2014), or through the doctrine articulated in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).

178.    Throughout the Relevant Period, OZK justifiably expected Defendants Gleason and McKinney to disclose material information as required by law and SEC regulations in the Company's periodic filings with the SEC and in statements made to the investing public.   OZK would not have purchased its securities at artificially inflated prices had Defendant Gleason and McKinney disclosed all material information known to them or that was so obvious it should have been known to them, as detailed herein.   Thus, reliance by OZK should be presumed with respect to Defendants Gleason and McKinney omissions of material information as established by the *Affiliated Ute* presumption of reliance.

179.    Additionally, the "fraud on the market" presumption applies to Defendants Gleason

and McKinney's misstatements of material facts or failures to disclose material facts.

180.    At all relevant times, the market for OZK stock was efficient market for the following reasons, among others:

(a)    OZK stock met the requirements for listing, and was listed and actively traded on NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, OZK filed periodic public reports with the SEC and NASDAQ;

(c)    OZK's common-stock trading value was substantial on a daily basis, exceeding millions of shares per day throughout the Relevant Period;

(d)    OZK regularly and publicly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(e)    OZK was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace; and

(f)    The market price of OZK's stock reacted rapidly to new information entering the market.

181.    As a result of the foregoing, the market for OZK stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of OZK's common stock. The foregoing facts indicate the existence of an

efficient market for trading of OZK's stock and support application of the fraud-on the market doctrine.

182.    OZK relied on the integrity of the market price for the repurchase of its common stock and is entitled to a presumption of reliance with respect to the Defendants Gleason and McKinney's misstatements and omissions alleged herein.

183.    Had OZK known of the material adverse information not disclosed by Defendants Gleason and McKinney or been aware of the truth behind Defendants Gleason and McKinney's material misstatements, the Company would not have purchased OZK stock at artificially inflated prices.

### NEITHER THE STATUTORY "SAFE HARBOR" NOR THE "BESPEAKS CAUTION" DOCTRINE APPLIES TO DEFENDANTS GLEASON AND McKINNEY'S MISREPRESENTATIONS

184.    Neither the safe-harbor provision of the Private Securities Litigation Reform Act of 1995 ("PSLRA") nor the judicially created "bespeaks caution" doctrine applicable to forward looking statements under certain circumstances applies to any of the false or misleading statements pleaded herein.  None of the subject statements constituted a forward-looking statement; rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about (1) OZK's charge off ration; (2) OZK's ratio of nonperforming loans; (3) the actual condition of the SC Loan and NC Loan; (4) loan modifications and/or forbearances for the SC Loan and/or NC Loan; and (5) OZK performance.

185.    Alternatively, to the extent any of the false or misleading statements pleaded herein could be construed as forward-looking statements, they were not accompanied by any meaningful cautionary language identifying important fact that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Further, to the extent the PSLRA's safe

harbor would otherwise apply to any forward-looking statements pleaded herein, Defendants Gleason and McKinney are liable for those false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speakers knew the statements were false or misleading, or the statements were authorized and/or approved by an executive officer of OZK who knew that the statements were materially false or misleading when made. None of the historic or present tense statements made by Defendants Gleason and McKinney were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants Gleason and McKinney expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

186. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by Defendants.

187. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

188. Plaintiff is a current owner of the Company stock and has continuously been an owner of Company stock during all times relevant to the Defendants' wrongful course of conduct alleged herein. Plaintiff understands her obligation to hold stock throughout the duration of this action and is prepared to do so.

189.    During the illegal and wrongful course of conduct at the Company and through the present, the Board consisted of the Director Defendants. Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act.

190.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

191.    The OZK Board presently is comprised of the following sixteen (16) individuals: Gleason, Brown, Cholmondeley, Cole, East, Franklin, Freedberg, Gearhart, Kenny, Koefoed, Mullen, Orndorff, Proost, Reynolds, Sadoff, and Whipple. Thus, Plaintiff is required to show that a majority of the Director Defendants, *i.e.*, eight (8), cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action

192.    The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

193.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

194.    Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders,

authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

195.    Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

196.    On information and belief, Plaintiff alleges that all of the Director Defendants are beholden to Defendant Gleason because (1) he is the *de facto* founder of OZK and holds an outsized shareholder interest in the Company, (2) as CEO and chairman of the Board, Defendant Gleason was and is in unique position to know the details of the condition of loans (and in particular, the condition of the SC Loan and NC Loan), (3) based on Defendant Gleason's unique position and knowledge, the Director Defendants would and did "bend to his will" regarding all modifications to the SC Loan and NC Loan, the timing of any loan modification, risks associated with the modifications, and the impact of financial reporting on those modifications.

## The Director Defendants Are Not Independent or Disinterested

**Defendant Gleason**

197.    Defendant Gleason is not disinterested or independent, and therefore, is incapable of considering demand because Gleason, as CEO, is an employee of the Company who derives substantially all his income from his employment with OZK, making him not independent.  In its 2019 Proxy Statement, OZK acknowledges that Gleason is not independent.  Additionally, Defendant Gleason (with his wife) beneficially owns approximately 4.8% of OZK stock.  Further, Gleason was directly involved in the wrongdoing as alleged herein.

198.   As such, Defendant Gleason cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

**Defendant Kenny**

199.   In addition to his responsibilities as a member of OZK's Compensation Committee, Nominating & Governance Committee, Investment Committee (serving as its Chair), ALCO Committee, and Directors' Loan Committee, Kenny is and has been designated as OZK's Independent Presiding Director since at least 2015.   In its 2019 Proxy Statement, OZK describes the responsibilities of the Independent Presiding Director as follows:

> [The Presiding Independent Director] has the responsibility of presiding at all meetings of the Board's independent directors, consulting with the Chairman and Chief Executive Officer on Board and committee meeting agendas, acting as a liaison between management and the non-management directors, including maintaining frequent contact with the Chairman and Chief Executive Officer and advising him on the efficiency of the Board meetings, and facilitating teamwork and communication between the non-management directors and management, as well as additional responsibilities that are more fully described in the Company's Corporate Governance Principles.

200.   The only Presiding Independent Director ". . . additional responsibilities that are more fully described in the Company's Corporate Governance Principles" is a single listed additional responsibility; ". . . maintaining frequent contact with the Chairman and Chief Executive Officer".

201.   On information and belief, Kenny breached his fiduciary duties as OZK's Presiding Independent Director, including but not limited to, failing to act as a liaison between management and the non-management directors and failing to facilitate teamwork and communication between the non-management directors and management specifically related to the NC loan and SC loan.

202.    Therefore, Defendant Kenny faces a substantial likelihood of liability for his breach of fiduciary duties and any demand upon him is futile.

### Risk Committee Members
### (Defendants Cole, Mullen, Sadoff, East, Franklin, Whipple)

203.    The Risk Committee was created on or about May 16, 2016 and did not exist before this date.

204.    As listed on its website as of July 2019, the Risk Committee is presently comprised of Defendants Cole, Mullen, Sadoff, and Whipple (who is the Chair of this committee).

205.    OZK's 2019 Proxy Statement identifies the Risk Committee members as Defendants Whipple, Mullen, East (until December 2018), Franklin (until August 2018), Cole (since August 2018) and Sadoff (since August 2018).

206.    From on or about May 16, 2016 to August 2018, the Risk Committee was comprised of Defendants Whipple (who served as chair of this committee), East, Franklin, and Mullen.

207.    Pursuant to the Company's Risk Committee Charter, the members of the Risk Committee are responsible for, *inter alia*, providing oversight of the OZK's enterprise-wide risk management framework and its corporate risk structure, including the strategies, policies, processes, procedures, and systems established by management to identify, assess, measure, manage, and monitor OZK's significant financial, operational, and other risk exposures.

208.    Defendants Cole, Mullen, Sadoff, East, Franklin, and Whipple breached their fiduciary duties of due care, loyalty, and good faith, because the Risk Committee, *inter alia*, (1) failed to review and understand the significant risk exposures facing the Bank and the steps management has taken to mitigate, manage, and monitor such exposures according to the key risk categories defined by management, (2) failed establish a structure or system to facilitate

appropriate credible challenge of business decisions; (3) failed to review and understand OZK's practices for identifying and assessing risks across the enterprise, the methods for managing or controlling risks, and the effectiveness of risk management activities; (4) failed to adequately review and consider regular reports from the Chief Risk Officer and other members of management (if any) regarding emerging risks and other selected risk topics or enterprise-wide matters to enhance the Committee members' knowledge and awareness of key risks; (5) failed to consider and take action relating to risks associated with insider transactions as detailed herein; and (5) failed to adequately evaluate the performance of the Chief Risk Officer.

209. Therefore, Defendants Cole, Mullen, Sadoff, and Whipple face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

### Audit Committee Members
### (Defendants Gearhart, Koefoed, Orndorff, Proost, East)

210. As listed on its website as of July 2019, the Audit Committee is presently comprised of Defendants Gearhart, Koefoed (who is the chair of this committee), Orndorff, and Proost. OZK's 2019 Proxy Statement is consistent but adds that Defendants Gearhart and Orndorff joined the Audit Committee in May 2018 and Cisne was a member of the Audit Committee until the 2019 annual meeting when he retired from the Board.

211. Defendant East was a member of the Audit Committee from at least 2015 to May 16, 2016 when he rotated off the Audit Committee and became a member of the Board's new Risk Committee.

212. From at least 2015 to 2018, the Audit Committee was comprised of Defendants Koefoed and Proost with former Directors Cisne and Mariani (who was the Chair of this committee until his term as an OZK director expired at the 2018 annual meeting).

213. Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee are responsible for, *inter alia*, reviewing the Company's financial statements, press releases, and assuring the adequacy and effectiveness of disclosure controls, ensure ethical compliance, and otherwise meet their responsibilities as set forth in the Audit Committee Charter.

214. Defendants Gearhart, Koefoed, Orndorff, Proost, and East breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above.

215. Therefore, Defendants Gearhart, Koefoed, Orndorff, and Proost face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

## Personnel and Compensation Committee Members
## (Defendants Brown, Cholmondeley, Franklin, Kenny, Reynolds

216. As listed on its website as of July 2019, the Compensation Committee is presently comprised of Defendants Brown (who is the Chair of this committee), Cholmondeley, Franklin, and Kenny. OZK's 2019 Proxy Statement is consistent but adds that Defendant Franklin joined the Compensation Committee in August 2018.

217. Defendant Reynolds was a member of the Compensation Committee from at least 2015 to May 8, 2017 when he rotated off the Personnel and Compensation Committee and became a member of the Trust Committee.

218. Defendants Brown (as committee Chair) and Kenny have been members of the Compensation Committee since at least 2015. Defendant Cholmondeley has been a member of the Compensation Committee since some time in 2016 and after her nomination to the Board of Directors in May 2016.

219.    Pursuant to the Company's Personnel and Compensation Committee Charter, the members of the Audit Committee are responsible for, *inter alia*, approving and evaluating all compensation plans (including its Restricted Stock and Incentive Plan ("RSIP")) and any other incentive compensation plans and equity-based plans, policies and programs of the Company as they affect the CEO and the Company's other executive officers (collectively, including the CEO, the "Executive Officers"), reviewing the potential risks to the Company from its compensation programs and policies, and evaluating the applicability of the Clawback Policy to any and all Company employees.

220.    Defendants Brown, Cholmondeley, Franklin, Kenny, and Reynolds breached their fiduciary duties of due care, loyalty, and good faith, because the Personnel and Compensation Committee, *inter alia*, (1) approved excessive compensation plans to the Company's executives and directors; (2) failed to review and evaluate the potential risks to the Company from its compensation programs and policies including any incentive plans, and whether such programs and policies incentivize unnecessary and excessive risk taking; (3) failed to evaluate or otherwise fulfill its responsibilities of the insider transactions as detailed herein, and (4) failed to evaluate and act on the applicability of the Clawback Policy to any and all Company employees and relating to the NC loan and SC loan.

221.    Therefore, Defendants Brown, Cholmondeley, Franklin, and Kenny face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

**Nominating and Governance Committee Members
(East, Franklin, Freedberg, Kenny)**

222.    As listed on its website as of July 2019, the Nominating and Governance Committee is presently comprised of Defendants East (who is the Chair of this committee), Franklin, Freedberg, and Kenny.  OZK's 2019 Proxy Statement is consistent with OZK's website.

223.    Qualls was a member of the Nominating and Governance Committee from at least 2015 to May 16, 2016 which was the conclusion of his term as a member of the Board.

224.    Defendant Franklin has been a member of the Nominating and Governance Committee continuously from approximately May 7, 2017 to the present.

225.    Defendants East (who is and has been the Chair of this committee), Freedberg, and Kenny have been members of the Nominating and Governance Committee since at least 2015.

226.    Pursuant to the Company's Nominating and Governance Committee Charter, the members of the Nominating and Governance Committee are responsible for, *inter alia*, reviewing and reassessing the adequacy of the Corporate Governance Principles of the Company and drawing on the expertise of the management and corporate staff to assist the Committee with its work.

227.    Defendants East, Franklin, Freedberg, Kenny breached their fiduciary duties of due care, loyalty, and good faith, because the Nominating and Governance Committee, *inter alia*, failed to ensure that adequate Corporate Governance Principles of the Company were in place to protect the shareholders from the events alleged herein relating to the SC loan and NC loan.

228.    Therefore, Defendants East, Franklin, Freedberg, and Kenny face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

### Defendants Gleason, East, Freedberg,
### Kenny, Mullen, and Proost

229.    Defendants Gleason, East, Freedberg, Kenny, Mullen, and Proost each sold shares of OZK stock as insiders and during the time of loan defaults and modifications to the SC Loan, which events were not disclosed to Plaintiff and the investing public.

230.    Defendants Gleason, East, Freedberg, Kenny, Mullen, and Proost profited and/or

sought to profit using inside information for their personal benefit and to the detriment of Plaintiff

and the investing public.

231.    Therefore, these Defendants face a substantial likelihood of liability for their breach

of fiduciary duties and any demand upon them is futile.

**All Director Defendants (Gleason, Brown, Cholmondeley,
Cole, East, Franklin, Freedberg, Gearhart, Kenny, Koefoed, Mullen,
Orndorff, Proost, Reynolds, Sadoff, and Whipple)**

232.    In its 2018 Proxy Statement, published and sent to all shareholders before OZK's

admissions relating to the SC loan and NC loan on October 18, 2018, OZK represents that its full

Board of Directors is responsible for risk oversight, stating in relevant part:

**Board Role in Risk Oversight**

The Board has an active role, as a whole and at the committee level, in the
Company's risk oversight process. The Board receives regular reports from
members of senior management on areas of material risk to the Company,
including operational, financial, legal/compliance, credit, strategic and
reputational risks....

While each committee is directly responsible for evaluating certain enumerated
risks and overseeing the management of such risks, the entire Board is generally
responsible for and is regularly informed through committee reports about such
risks and any corresponding remediation efforts designed to mitigate such risks.
In addition, appropriate committees of the Board receive reports from senior
management within the organization to enable the Board to understand risk
identification, risk management and risk mitigation strategies. When a
committee receives such a report, the committee chairman (or another
designated person) reports on the discussion to the full Board at the next Board
meeting. This enables the Board and its committees to coordinate the risk
oversight role.

The Board's discharge of its risk oversight role has not specifically affected the
Board's leadership structure discussed above. Rather, in establishing the current
leadership structure of the Board, risk oversight was one factor among many
considered. The Board regularly reviews its leadership structure and evaluates
whether it, and the Board as a whole, are functioning effectively. If in the future
the Board believes that a change in its leadership structure is required to, or

potentially could, improve the Board's risk oversight role, it may make any change it deems appropriate.

233.     The Director Defendants breached their fiduciary duties of due care, loyalty, and good faith, *inter alia*, because they (individually and as a group) failed to evaluate and adequately oversee the management of risks associated with the SC loan and NC loan.  Additionally, the Director Defendants breached their fiduciary duties of due care, loyalty, and good faith because they failed to take appropriate action on each of the breaches by each OZK committee as alleged herein.

234.     Therefore, Defendants Gleason, Brown, Cholmondeley, Cole, East, Franklin, Freedberg, Gearhart, Kenny, Koefoed, Mullen, Orndorff, Proost, Reynolds, Sadoff, and Whipple face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

235.     Additionally, the Director Defendants were interested in the transactions at issue and discussed herein because maintaining these loans in good standing supported OZK's artificially strong financial statements which in turn kept the stock of OZK at unearned high value. Both outcomes benefitted the Director Defendants; in particular each director's OZK stockholding.

## COUNT I

### (Against the Director Defendants for Breach of Fiduciary Duty)

236.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

237.     Director Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, Director Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

238.    Director Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

239.    Director Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, Director Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent the Company's publicly reported business performance, as alleged herein. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

240.    As a direct and proximate result of Director Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct alleged herein, Director Defendants are liable to the Company.

241.    As a direct and proximate result of the Director Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, and reputational harm.

## COUNT II

### (Against the Director Defendants for Gross Mismanagement)

242.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

243.    By their actions alleged herein, Director Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard

to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

244.   As a direct and proximate result of the Director Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of hundreds of millions of dollars.

245.   Because of the misconduct and breaches of duty alleged herein, the Director Defendants are liable to the Company.

## COUNT III

### (Against the Director Defendants for Waste of Corporate Assets)

246.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

247.   The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going from at least February 19, 2016 to the present. It resulted in continuous, connected, and ongoing harm to the Company.

248.   As a result of the misconduct described above, Director Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions.

249.   As a result of the waste of corporate assets, the Director Defendants are liable to the Company.

250.   Plaintiff, on behalf of the Company, has no adequate remedy at law.

## COUNT IV

### (Against Defendants Gleason, East, Freedberg, Kenny,
### Mullen, Proost, Thomas, Hicks, McKinney, Vance,
### Carter, Cisne, L. Gleason, and Russell for Unjust Enrichment)

251.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

252.    By their wrongful acts and omissions, Defendants Gleason, East, Freedberg, Kenny, Mullen, Proost, Thomas, Hicks, McKinney, and Vance; and Carter, Cisne, L. Gleason, and Russell were unjustly enriched at the expense of and to the detriment of OZK. These Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to OZK. These Defendants were unjustly enriched by the excess consideration they received from OZK.

253.    Plaintiff, as a stockholder and representative of OZK, seeks restitution from these Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

254.    Plaintiff, on behalf of OZK, has no adequate remedy at law.

## COUNT V

### (Against the Director Defendants for Breach of
### Fiduciary Duty for Failure to Take Action Against Illicit Insider Trading)

255.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

256.    The Director Defendants each owe OZK the fiduciary duties of good faith and loyalty. Each had a duty to prevent illicit insider trades from happening and ensuring the

Company's Code of Business Conduct was followed.  Further, upon learning of the illicit trading, the Director Defendants each had an affirmative duty to the Company to respond.

257.    Yet, the Director Defendants took no action to prevent or respond to these illicit trades.  Critically, the Director Defendants knew, or should have known, that Defendants Gleason, East, Freedberg, Kenny, Mullen, Proost, Thomas, Hicks, McKinney, and Vance; and Carter, Cisne, L. Gleason, and Russell were liquidating large amounts of the Company's stock while in possession of material, adverse, nonpublic information, in light of the publicly filed forms disclosing the size and scope of the trades.

258.    In other words, after failing to prevent the improper trades from taking place in the first place, the Director Defendants have now known—for months—of the Insider trading as alleged herein, and have taken no action whatsoever, in violation of the Board's fundamental fiduciary duties of loyalty and good faith to OZK.  As a direct and proximate result of the foregoing breaches of fiduciary duties by the Director Defendants, the Company has suffered significant damages, as alleged herein.

**COUNT VI**

**(Against the Director Defendants and Defendants McKinney, Hicks, and Vance for Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5)**

259.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

260.    During the Relevant Period, the Director Defendants and Defendants McKinney, Hicks, and Vance disseminated or approved public statements that misrepresented or failed to disclose (a) the true condition of the SC Loan and/or NC Loan; (b) the impact of these loans on OZK's financial condition and performance; and (c) the Company's public statements were false and misleading and/or lacked a reasonable basis at all relevant times.  Thus, the price of the

Company's shares was artificially inflated due to the deception of these Defendants. Despite this artificial inflation in the price of the Company's shares, these Defendants caused and/or allowed the Company to repurchase tens of thousands of shares of Company stock, thereby causing financial harm to the Company.

261.     As alleged herein, the Director Defendants and Defendants McKinney, Hicks, and Vance acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, these Defendants, by virtue of their receipt of information reflecting the true facts regarding the SC Loan and NC Loan, their control over, and/or receipt and/or modification of OZK's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning OZK and these loans, participated in the fraudulent scheme alleged herein.

262.     The Director Defendants and Defendants McKinney, Hicks, and Vance knew and/or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Relevant Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including these Defendants.

263.   The Director Defendants were each members of OZK's Board during the aforesaid time period.  Based on their roles at OZK, each of the Director Defendants would have been involved with, or knowledgeable about, the wrongdoing alleged herein.

264.   Defendants McKinney, Hicks, and Vance were each executive officers of OZK during the aforesaid time period.  Based on their roles at OZK, each of these Defendants would have been involved with, or knowledgeable about, the wrongdoing alleged herein.

265.   At a minimum, the Director Defendants and Defendants McKinney, Hicks, and Vance failed to review or check information that they had a duty to monitor or ignored obvious signs that their statements were materially false and misleading or contained material omissions. Given the nature and extent of the problems with the SC Loan and NC Loan, these Defendants knew and/or recklessly disregarded the extent and scope of their statements during the Relevant Period.

266.   Likewise, the Director Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company and its business, operations, financial statements, and financial condition, as alleged herein.  The Director Defendants had the ultimate authority over and were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements regarding the Company were being issued, and approved or ratified these statements, in violation of the federal securities laws.

267.   By concealing these material facts from investors, the Director Defendants caused and/or permitted OZK to maintain and/or increase its artificially inflated common stock price throughout the Relevant Period.

268.   As such, these Defendants caused the Company to violate section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

(a)   employed devices, schemes, and artifices to defraud; and

(b)   made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

269.   As a result of these Defendants' misconduct, the Company is suffering litigation expense and reputational harm in the marketplace in violation of section 10(b) of the Exchange Act and SEC Rule 10b-5.

## COUNT VII

### (Derivative Claim for Violations of Section 20(a) of the Exchange Act
### Against Defendants Gleason and McKinney)

270.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

271.   This Count is asserted on behalf of the Company against Defendants Gleason and McKinney for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

272.   During their tenure as an executive officers, Defendants Gleason and McKinney were controlling persons of all officers of the Company within the meaning of Section 20(a) of the Exchange Act.  By reason of their control, Defendants Gleason and McKinney had the power and authority to direct the management and activities of the other Company officers, to hire and fire the other Company officers at whim, and to cause the other Company officers to engage in the

wrongful conduct complained of herein. Defendants Gleason and McKinney were able to and did control, directly or indirectly, the content of the public statements made by all other Company officers during the Relevant Period, including the materially misleading financial statements, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

273.    In their capacity as the senior executives, Defendant Gleason and McKinney had direct involvement in and oversight over the day-to-day operations of the Company officers and the Company's employees, who would not act unless Defendants Gleason and McKinney agreed with their course of conduct.

274.    As a result of the foregoing, Defendants Gleason and McKinney were controlling persons of the other Company officers within the meaning of Section 20(a) of the Exchange Act.

275.    As a direct and proximate result of Defendant Gleason and McKinney's conduct, the Company suffered damages in connection with its purchase of OZK common stock at materially inflated prices.

## COUNT VIII

### (Against the Director Defendants
### for Violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9)

276.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

277.    SEC Rule 14a-9, promulgated pursuant to section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.   Specifically, the Company's 2018 Proxy

Statement, which incorporated by reference its 2018 Form 10-K (for the fiscal year ended December 31, 2017) violated section 14(a) of the Exchange Act and SEC Rule 14a-9 because it included materially false and misleading information and failed to disclose (a) the true condition and history of the SC Loan and NC Loan (b) the impact of these loans on OZK's financial condition; (c) the Company's public statements regarding these loans were false and misleading and/or lacked a reasonable basis at all relevant times; and (d) the impact of these facts on Plaintiff's (and all other OZK shareholders) vote for election of directors and approval of amendment and restatement of the non-employee director stock plan.

278.   In the exercise of reasonable care, the Director Defendants should have known that the statements contained in the 2018 Proxy Statement were materially false and misleading.

279.   The misrepresentations and omissions in the 2018 Proxy Statement were material to Company stockholders in voting on the matters set forth for stockholder ratification in the 2018 Proxy.  The 2018 Proxy Statement was an essential link in the accomplishment of the continuation of these defendants' continued violation of their fiduciary duties.

280.   The Company was damaged as a result of these defendants' material misrepresentations and omissions in the 2018 Proxy Statement.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(A)   Declaring that Plaintiff may maintain this action on behalf of the Company and that Plaintiff is an adequate representative of the Company;

(B)   Finding Defendants liable for breaching their fiduciary duties owed to the Company;

(C)     Directing Defendants to take all necessary actions to reform and improve the Company's corporate governance, risk management, and internal operating procedures to comply with applicable laws and to protect the Company and its stockholders from a repeat of the rampant wrongful conduct described herein;

(D)     Awarding Plaintiff the costs and disbursements of this action, including attorneys', accountants', and experts' fees; and

(E)     Awarding such other and further relief as is just and equitable.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: August ___14th___, 2019

By _____

Joseph Gates, Ark. Bar No. 2010239
Paul Byrd, Ark. Bar No. 85020
**PAUL BYRD LAW FIRM, PLLC**
415 N. McKinley Street, Suite 210
Little Rock, AR  72205
Telephone: (501) 420-3050
Facsimile: (501) 420-3128
joseph@paulbyrdlawfirm.com
paul@paulbyrdlawfirm.com

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
Gregory M. Egleston
440 Park Avenue South, 5th Floor
New York, NY 10016
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

*(Pro Hac Vice pending)*

*Attorneys for Plaintiff*