## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS

| | |
|---|---|
| BARBARA BONESSI, Derivatively on Behalf of BANK OF THE OZARKS, INC., <br><br> Plaintiff, <br><br> v. <br><br> GEORGE GLEASON, NICHOLAS BROWN, PAULA H. J. CHOLMONDELEY, BEVERLY COLE, ROBERT EAST, KATHLEEN FRANKLIN, CATHERINE B. FREEDBERG, JEFFREY J. GEARHART, PETER C. KENNY, WILLIAM J. KOEFOED, JR., WALTER J. ("JACK") MULLEN, III, CHRISTOPHER ORNDORFF, ROBERT PROOST, JOHN REYNOLDS, M.D., STEVEN SADOFF, ROSS M. WHIPPLE, GREG MCKINNEY, TIM HICKS, DAN THOMAS, TYLER VANCE, LINDA GLEASON, JOHN CARTER, DARREL RUSSELL, and RICHARD CISNE, <br><br> Defendants, <br><br> and, <br><br> BANK OF THE OZARKS, INC., also known as BANK OZK, <br><br> Nominal Defendant. | SHAREHOLDER DERIVATIVE COMPLAINT <br><br><br> No. 4:19-cv-00567-LPR |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S
## SHAREHOLDER DERIVATIVE COMPLAINT

# TABLE OF CONTENTS

Page

INTRODUCTION.................................................................................................. 1

ALLEGATIONS OF THE COMPLAINT ........................................................... 4

    A.  The Parties ................................................................................................ 4

    B.  The Bank's Disclosures ........................................................................... 5

    C.  The Securities Litigation.......................................................................... 6

    D.  The First-Filed Derivative Litigation...................................................... 7

    E.  This Complaint......................................................................................... 7

ARGUMENT.......................................................................................................... 8

I.    The Complaint Should Be Dismissed For Failure To Comply With Rule 23.1's
    Verification Requirement.................................................................................. 9

II.   The Complaint Must Be Dismissed For Failure To Plead Demand Futility With
    Factual Particularity. ...................................................................................... 10

    A.  The Complaint Fails To Allege That A Majority Of The Demand Board
        Participated In The Alleged Wrongdoing. ........................................... 11

        1.  The Complaint Fails To Plead A Substantial Likelihood Of Liability For
            Any Federal Claim. .................................................................. 14

           a)  Section 10(b) Claim (Count VI) .................................... 15

           b)  Section 20(a) Claim (Count VII) ................................... 31

           c)  Section 14(a) Claim (Count VIII) .................................. 32

        2.  The Complaint Fails To Plead A Substantial Likelihood Of Liability For
            Any State Law Claim. ............................................................... 36

           a)  Breach of Fiduciary Duty (Counts I and V)................... 377

           b)  Gross Mismanagement (Count II) ................................. 42

            c)  Corporate Waste (Count III) .......................................... 42

           d)  Unjust Enrichment (Count IV)....................................... 45

    B.  The Complaint Fails To Allege That A Majority Of The Demand Board Was
        Dominated By Alleged Wrongdoers.................................................... 47

    C.  The Complaint Fails To Allege That A Majority Of The Demand Board Profited
        From The Alleged Wrongdoing........................................................... 49

CONCLUSION ................................................................................................... 50

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re 2007 Novastar Fin. Inc., Sec. Litig.,*
  579 F.3d 878 (8th Cir. 2009) ...............................................14

*Abbey v. Control Data Corp.,*
  603 F.2d 724 (8th Cir. 1979) ...........................................34, 35

*In re Abbott Labs. Derivative S'holder Litig.,*
  126 F. Supp. 2d 535 (N.D. Ill. 2000) ....................................43

*Abrams v. Baker Hughes Inc.,*
  292 F.3d 424 (5th Cir. 2002) ..............................................27

*Abrams v. Koether,*
  766 F. Supp. 237 (D.N.J. 1991) .........................................9, 10

*Adams v. Standard Knitting Mills, Inc.,*
  623 F.2d 422 (6th Cir. 1980) ..............................................36

*Stone ex rel. AmSouth Bancorporation v. Ritter,*
  911 A.2d 362 (Del. 2006) ...........................................37, 38, 39

*Aronson v. Lewis,*
  473 A.2d 805 (Del. 1984), *overruled on other grounds by Brehm v. Eisner,*
  746 A.2d 244 (Del. 2000) ..............................................12, 44

*Atari Corp. v. Ernst & Whinney,*
  981 F.2d 1025 (9th Cir. 1992) ............................................30

*Bacigalupo v. Kohlhepp,*
  240 S.W.3d 155 (Ky. Ct. App. 2007) ....................................13

*Beam v. Stewart,*
  845 A.2d 1040 (Del. 2004) ................................................48

*Blue Chip Stamps v. Manor Drug Stores,*
  421 U.S. 723 (1975).........................................................16

*Brehm v. Eisner,*
  746 A.2d 244 (Del. 2000) ...........................................42, 43, 45

*Calma v. Templeton,*
  114 A.3d 563 (Del. Ch. 2015)..............................................44

*Campbell v. Ashbury Auto., Inc.,*
  2011 Ark. 157, 381 S.W.3d 21 (2011)....................................47

*In re Caremark Int'l Inc. Derivative Litig.*,
698 A.2d 959 (Del. Ch. 1996)........................................................................37, 39

*In re Ceridian Corp. Sec. Litig.*,
542 F.3d 240 (8th Cir. 2008) ....................................................................................28

*Egleston ex rel. Chesapeake Energy Corp. v. McClendon*,
318 P.3d 210 (Okla. Civ. App. 2013) ......................................................................13

*In re China Auto. Sys. Inc. Derivative Litig.*,
C.A. No. 7145-VCN, 2013 WL 4672059 (Del. Ch. Aug. 30, 2013) .......................46

*In re Citigroup Inc. S'holders Litig.*,
No. 19827, 2003 WL 21384599 (Del. Ch. June 5, 2003) ........................................40

*In re Citigroup S'holder Derivative Litig.*,
964 A.2d 106 (Del. Ch. 2009)......................................................................41, 42, 43

*City of Birmingham Ret. & Relief Sys. v. Good*,
177 A.3d 47 (Del. 2017) ...........................................................................................37

*City of New Orleans Employees' Ret. Sys. v. PrivateBancorp., Inc.*,
Case No. 10 C 6826, 2011 WL 5374095 (N.D. Ill. Nov. 3, 2011) ..........................24

*City of Roseville Emps. Ret. Sys. v. Sterling Fin. Corp.*,
963 F. Supp. 2d 1092 (E.D. Wash. 2013) ..................................................19, 26, 29

*City of Roseville Emps.' Ret. Sys. v. Crain*,
No. 11–2919 (JLL), 2013 WL 9829650 (D.N.J. Sept. 26, 2013) ............................43

*Cottrell on behalf of Wal-Mart Stores, Inc. v. Duke*,
829 F.3d 983 (8th Cir. 2016) ....................................................................................11

*Cozzarelli v. Inspire Pharm. Inc.*,
549 F.3d 618 (4th Cir. 2008) ....................................................................................15

*Daily Income Fund, Inc. v. Fox*,
464 U.S. 523 (1984).....................................................................................................8

*Davis v. Davis*,
2016 Ark. App. 33, 480 S.W.3d 878 (2016).............................................................46

*DePriest v. AstraZeneca Pharm., L.P.*,
2009 Ark. 547, 351 S.W.3d 168 (2009)....................................................................45

*Desimone v. Barrows*,
924 A.2d 908 (Del. Ch. 2007).......................................................................... 40

iii

*Dews v. Halliburton Indus., Inc.*,
  288 Ark. 532, 708 S.W.2d 67 (1986)....................................................................46

*DiLeo v. Ernst & Young*,
  901 F.2d 624 (7th Cir. 1990) .................................................................22, 24, 30

*Berry ex rel. Dillard's, Inc. v. Dillard*,
  2011 Ark. App. 242, 382 S.W.3d 812 (2011).........................................................48

*DiRienzo v. Lichtenstein*,
  C.A. No. 7094-VCP, 2013 WL 5503034 (Del. Ch. Sept. 30, 2013).......................11

*Dittmer Properties, L.P. v. F.D.I.C.*,
  708 F.3d 1011 (8th Cir. 2013) ...............................................................................4

*ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009)..................................................................................26

*Espinoza v. Zuckerberg*,
  124 A.3d 47 (Del. Ch. 2015)...........................................................................43, 44

*Estates of McKnight v. Bank of Am., N.A.*,
  277 S.W.3d 173 (Ark. 2008)..................................................................................42

*In re F5 Networks, Inc.*,
  207 P.3d 433 (Wash. 2009)....................................................................................13

*Fait v. Regions Fin. Corp.*,
  655 F.3d 105 (2d Cir. 2011)...................................................................................24

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*,
  270 F.3d 645 (8th Cir. 2001) .................................................................................4

*Freedman v. Adams*,
  58 A.3d 414 (Del. 2013) ......................................................................................44

*In re Gen. Motors Co. Derivative Litig.*,
  C.A. No. 9627-VEG 2015 WL 3958724 (Del. Ch. June 26, 2015), *aff'd*, 133
  A.3d 971 (Del. 2016) ...........................................................................................12

*Guttman v. Huang*,
  823 A.2d 492 (Del. Ch. 2003)..........................................................................13, 49

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014)..............................................................................................31

*Hartness v. Nuckles*,
  2015 Ark. 444, 475 S.W.3d 558 (2015)..................................................................45

*Horman v. Abney*,
   No. C.A. No. 12290-VCS, 2017 WL 242571 (Del. Ch. Jan. 19, 2017) ................................41

*In re HP Derivative Litigation*,
   No. 5:10-cv-3608 EJD, 2012 WL 4468423 (N.D. Cal. Sept. 25, 2012)................................35

*Hulliung v. Bolen*,
   548 F. Supp. 2d 336 (N.D. Tex. 2008) ................................................................................34

*Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*,
   537 F.3d 527 (5th Cir. 2008) ...............................................................................................29

*Official Comm. Of Unsecured Creditors of Integrated Health Servs. v. Elkins*,
   No. Civ. A. 20228-NC, 2004 WL 1949290 (Del. Ch. Aug. 24, 2004)...................................11

*In re ITT Derivative Litig. v. ITT Corp.*,
   932 N.E.2d 664 (Ind. 2010) .................................................................................................13

*Janus Capital Grp., Inc. v. 1st Derivative Traders*,
   564 U.S. 135 (2011).............................................................................................................18

*Jarrett v. Panasonic Corp. of N. Am.*,
   8 F. Supp. 3d 1074 (E.D. Ark. 2013)....................................................................................47

*In re K-tel Int'l, Inc. Sec. Litig.*,
   300 F.3d 881 (8th Cir. 2002) ...................................................................14, 25, 26, 27, 28

*Kamen v. Kemper Fin. Servs., Inc.*,
   500 U.S. 90 (1991)........................................................................................................8, 10

*Kushner v. Beverly Enter., Inc.*,
   317 F.3d 820 (8th Cir. 2003) ..................................................................................19, 27, 29

*Laties v. Wise*,
   No. Civ.A. 1280–N, 2005 WL 3501709 (Del. Ch. Dec. 14, 2005) .........................................43

*In re Lendingclub Corp. Derivative Litig.*,
   C.A. No. 12984-VCM, 2019 WL 5678578 (Del. Ch. Oct. 31, 2019)....................................39

*Gen. Elec. Co. ex rel. Levit v. Cathcart*,
   980 F.2d 927 (3d Cir. 1992)...............................................................................................35

*Lewis v. Vogelstein*,
   699 A.2d 327 (Del. Ch. 1997)........................................................................................43, 45

*Lloyd v. CVB Fin. Corp.*,
   CV-10-06256 MMM(PJWx), 2012 WL 12883517 (C.D. Cal. Aug. 21, 2012)......................24

*Lustgraaf v. Behrens*,
  619 F.3d 867 (8th Cir. 2010) ..........................................................31

*Markewich v. Adikes*,
  422 F. Supp. 1144 (E.D.N.Y. 1976) ..............................................33

*In re Maxim Integrated Prod., Inc., Derivative Litig.*,
  574 F. Supp. 2d 1046 (N.D. Cal. 2008) .........................................32

*McAdams v. McCord*,
  584 F.3d 1111 (8th Cir. 2009) .......................................................15

*Mills v. Elec. Auto-Lite Co.*,
  396 U.S. 375 (1970)..................................................................33, 34

*Morgan v. Robertson*,
  271 Ark. 461, 609 S.W.2d 662 (Ct. App. 1980)..................9, 10, 47, 49

*Nolte v. Capitol One Fin. Corp.*,
  390 F.3d 311 (4th Cir. 2004) .........................................................24

*Okla. Firefighters Pension & Ret. Sys. v. Corbat*,
  No. C.A. 12151–VCG, 2017 WL 6452240 (Del. Ch. Dec. 18, 2017)....................................38

*Parnes v. Gateway 2000, Inc.*,
  122 F.3d 539 (8th Cir. 1997) ....................................................15, 26

*Podraza v. Whiting*,
  790 F.3d 828 (8th Cir. 2015) ...........................................4, 15, 26, 30

*Porte v. Home Fed. Sav. & Loan Ass'n*,
  409 F. Supp. 752 (N.D. Ill. 1976) ...................................................9

*In re Qualcomm Inc. FCPA Stockholder Derivative Litig.*,
  No. C.A. No. 11152–VCMR, 2017 WL 2608723 (Del. Ch. June 16, 2017)..........................40

*Rales v. Blasband*,
  634 A.2d 927 (Del. 1993) ................................................................9

*Rathborne v. Rathborne*,
  683 F.2d 914 (5th Cir. 1982) .........................................................16

*Rattner v. Bidzos*,
  No. 19700, 2003 WL 22284323 (Del. Ch. Oct. 7, 2003)....................................49

*Red Bud Realty Co. v. South*,
  153 Ark. 380, 241 S.W. 21 (1922)................................................9, 10

*Rojas v. Ellison, et al.*,
    No. CV 2018-0755-AGB, 2019 WL 3408812 (Del. Ch. July 29, 2019) ..............................38

*Sacks v. Reynolds Sec., Inc.*,
    593 F.2d 1234 (D.C. Cir. 1978) ....................................................................................16, 17

*Sanders v. Wang*,
    No. 16640, 1999 WL 1044880 (Del. Ch. Nov. 8, 1999) ........................................................47

*Schmidt v. Skolas*,
    770 F.3d 241 (3d Cir. 2014)..............................................................................................4

*SE. Pa. Transp. Auth. v. Orrstown Fin. Servs., Inc.*,
    No. 1:12-cv-00993, 2015 WL 3833849 (M.D. Pa. June 22, 2015) ........................................22

*SEC v. Das*,
    723 F.3d 943 (8th Cir. 2013) ...........................................................................................36

*SEC v. Shanahan*,
    646 F.3d 536 (8th Cir. 2011) ...........................................................................................36

*In re ShegdaTech, Inc.*,
    No. 11 civ. 1918 (LGS), 2014 WL 3928606 (S.D.N.Y. Aug. 12, 2014)..............................28

*Sofonia v. Principal Life Ins. Co.*,
    465 F.3d 873 (8th Cir. 2006) .....................................................................................16, 18

*South v. Baker*,
    62 A.3d 1 (Del. Ch. 2012)..........................................................................................11, 40

*In re Sportline.com Sec. Litig.*,
    366 F. Supp. 2d 1159 (S.D. Fla. 2004) .............................................................................16

*State v. Custard*,
    No. 06 CVS 4622, 2010 WL 1035809 (N.C. Super. Mar. 19, 2010) ....................................41

*Stepak v. Ross*,
    C.A. No. 7047, 1985 WL 21137 (Del. Ch. Sept. 5, 1985)......................................................49

*In re Stratasys Ltd. S'holder Sec. Litig.*,
    864 F.3d 879 (8th Cir. 2017) .....................................................................................26, 28

*Teamsters Union 25 Health Services & Insurance Plan v. Baiera*,
    119 A.3d 44 (Del. Ch. 2015)............................................................................................48

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)........................................................................................................15

*In re The Limited, Inc. S'holders Litig.*,
   No. CIV.A. 17148–NC, 2002 WL 537692 (Del. Ch. Mar. 27, 2002) ....................................44

*Thor Power Tool Co. v. C.I.R.*,
   439 U.S. 522 (1979)....................................................................................................................27

*TSC Indus., Inc. v. Northway, Inc.*,
   426 U.S. 438 (1976)...............................................................................................................33, 34

*Va. Bankshares, Inc. v. Sandberg*,
   501 U.S. 1083 (1991)..................................................................................................................24

*In re Verisign, Inc., Derivative Litig.*,
   531 F. Supp. 2d 1173 (N.D. Cal. 2007) ....................................................................30, 32, 36

*Wagner v. Selinger*,
   No. 16740, 2000 WL 85318 (Del. Ch. Jan. 18, 2000) ...........................................................43

*In re Walt Disney Co. Derivative Litig.*,
   906 A.2d 27 (Del. 2006) .............................................................................................................44

*Waterford Twp. Gen. Emps. Ret. Sys. v. SunTrust Banks, Inc.*,
   No. 1:09-cv-617-TWT, 2010 WL 3368922 (N.D. Ga. Aug. 19, 2010)...................................19

*Weinberger v. Am. Composting, Inc.*,
   No. 4:11CV00848 JLH, 2012 WL 1190970 (E.D. Ark. Apr. 9, 2012) .......8, 10, 13, 14, 47, 48

*Wilkin on behalf of Orexigen Therapeutics, Inc. v. Narachi*,
   No. CV 12412-VCMR, 2018 WL 1100372 (Del. Ch. Feb. 28, 2018)....................................13

*Wood v. Baum*,
   953 A.2d 136 (Del. 2008) ...........................................................................................................40

*In re Yahoo! Inc. S'holder Derivative Litig.*,
   153 F. Supp. 3d 1107 (N.D. Cal. 2015) ....................................................................................43

**Statutes**

15 U.S.C. § 78n.................................................................................................................................32

15 U.S.C. § 78t.................................................................................................................................31

15 U.S.C. § 78u-4 ...............................................................................................................14, 22, 26, 35

Ark. Code Ann. § 4-27-202 ............................................................................................................38

Ark. Code Ann. § 4-27-740 ...........................................................................................1, 9, 10, 13, 41

Ark. Code Ann. § 4-27-830 ........................................................................................................28, 29

**Other Authorities**

3A W. Fletcher, Cyclopedia of the Law of Private Corporations § 1034.80 (2019) .....................40

FDIC, FFIEC: Reports of Condition and Income Instructions for the FFEIC 051
    Report Form, Glossary at A-85 (2019),
    http://www.fdic.gov/regulations/resources/call/crinst/2019-03/031-041-
    319gloss-033119.pdf .................................................................................................................23

Financial Accounting Standards Board Accounting Standards Codification 310-
    10-35-16, https://www.fasb.org/store/subscriptions/fasb/registered ......................................20

KNEPPER, *Liability of Corporate Officers and Directors*, § 17.05 (3d ed.) ..................................11

**Rules**

Fed. R. Civ. P. 10(c) ......................................................................................................................4

Fed. R. Civ. P. 23.1 ...............................................................................................1, 9, 10, 12, 13

**Regulations**

17 C.F.R. § 240.14a ......................................................................................................................33

Pursuant to Rules 12(b)(6) and 23.1 of the Federal Rules of Civil Procedure and Section 4-27-740(b) of Arkansas Code, Defendants George Gleason, Nicholas Brown, Paula H. J. Cholmondeley, Beverly Cole, Robert East, Kathleen Franklin, Catherine B. Freedberg, Jeffrey J. Gearhart, Peter C. Kenny, William J. Koefoed, Jr., Walter J. Mullen, III, Christopher Orndorff, Robert Proost, John Reynolds, M.D., Steven Sadoff, Ross M. Whipple, Greg McKinney, Tim Hicks, Dan Thomas, Tyler Vance, Linda Gleason, John Carter, Darrel Russell, and Richard Cisne (the "Individual Defendants") and Nominal Defendant Bank OZK (the "Bank") (together with the Individual Defendants, the "Defendants") respectfully submit this memorandum of law in support of their motion to dismiss the Shareholder Derivative Complaint ("Complaint") filed by Plaintiff Barbara Bonessi ("Plaintiff").

## INTRODUCTION

This case should be dismissed because Plaintiff seeks to sue on behalf of Nominal Defendant Bank OZK but flouted the fundamental requirement for suing derivatively: serving a litigation demand on the Bank's board of directors.

This is the fourth in a series of flawed lawsuits that followed a drop in the Bank's stock price on October 19, 2018, after the Bank announced (among other things) its decision to write down two loans in its portfolio. The initial securities lawsuit, which is pending in this district before Judge James M. Moody, Jr., was filed on behalf of a putative class of investors. Those investors claim that the Bank "inflated" its stock price until it wrote down the loans and, as a result, they overpaid for shares they bought before then. Their arguments rest entirely on second-guessing, in hindsight, the timing of the Bank's accounting judgment that it had become unlikely that the loans would be fully repaid, though the investors offer no theory as to when or why the Bank had no choice but to reach that conclusion. A second, separate securities lawsuit was non-

suited.  The third suit, which is pending in Pulaski County Circuit Court, claims that the Bank's directors and officers are liable to the Bank for not predicting and preventing the alleged wrongdoing asserted in the first case.  The plaintiff in the third case purports to sue derivatively on behalf of the Bank against its directors and officers to recover for the injuries the Bank allegedly incurred.  Finally, this case rests on a similar theory of derivative liability and is based on the same facts.  Its only distinction is to add a handful of federal claims in an effort to proceed in this Court, rather than the circuit court where another plaintiff filed first.

In sum, this is a duplicative case that centers on the claim that the Bank's directors and officers are liable to the Bank for allegedly failing to oversee it in good faith.  Its purported theory is that the Individual Defendants should have caused the employees who have responsibility for making the Bank's accounting judgments to conclude that two of the Bank's many loans became unlikely to be repaid in full at some unspecified time before they disclosed that conclusion in the third quarter of 2018.  Notably, the Complaint does not—and cannot—plead that most of the Individual Defendants themselves had any role in the Bank's accounting decisions whatsoever.

Because Plaintiff has taken the extraordinary step of suing on the Bank's behalf without its consent, the survival of the Complaint turns not upon whether the allegations state a plausible claim, but upon whether the Complaint alleges with particularity that making a pre-suit demand on the Bank's board of directors would have been futile.  Plaintiff attempts to satisfy that requirement by asserting that a majority of the Bank's directors face a "substantial likelihood" of personal liability from the claims, rendering demand futile.  That assertion is wrong.

Demand futility is an exacting standard that requires specific, factual allegations that at least half of the directors could not properly consider a pre-suit demand.  The Complaint fails to satisfy that standard with respect to any claim.

2

This failure is glaring with respect to the federal claims.  Count VI asserts a claim for securities fraud under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), but Section 10(b) claims can be brought only where there is fraud in the purchase or sale of securities, which is not alleged here.  Although Section 10(b) claims are commonly brought by aggrieved investors *against* companies that issue stock, they have no application in suits brought *on behalf of* such companies against directors and officers who did not transact in stock with the company.  Moreover, to curb abusive securities litigation, Congress imposed strict standards for pleading scienter sufficient to sustain a claim under Section 10(b).  The allegations here are insufficient to satisfy that scienter standard with respect to those officers who actually play a role in the Bank's accounting decisions, and they do not even touch on scienter for the majority of the directors who are not even employees of the Bank and do not make accounting decisions at all.  Count VII is a claim for control person liability under Section 20(a) of the Exchange Act, but that claim is not even asserted against a majority of the directors (it names only one director).  For that reason it cannot survive Plaintiff's failure to make a demand even if the claim had merit (and it does not).  Count VIII is a claim under Section 14(a) of the Exchange Act to recover for injuries that may be incurred when a false proxy statement misleads stockholders into voting for harmful corporate action.  But none of the statements Plaintiff challenges were in the Bank's proxy statements or had anything to do with stockholder votes.

The state law claims (Counts I through V) are equally defective.  Each of them is premised on the faulty theory that the directors are liable *not* for engaging in wrongdoing that harmed the Bank, but instead for not preventing *management's* accounting judgments, which Plaintiff disputes in hindsight.  This theory of liability has never been upheld under Arkansas law.  Even under the standards applied by other leading jurisdictions this theory would fail without specific allegations

that a majority of the board was warned that the Bank was committing fraud and consciously ignored those warnings in bad faith.  No such allegations are pleaded here.

Plaintiff's failure to plead demand futility for any claim and her violation of the verification requirement for derivative complaints compel dismissal of this case in its entirety.

## ALLEGATIONS OF THE COMPLAINT

### A.    The Parties

Founded in 1903, Nominal Defendant Bank OZK is an Arkansas state bank headquartered in Little Rock.  Compl. ¶ 13.  Over the last century, the Bank has grown into a large regional, publicly owned bank providing retail and commercial banking services through 253 offices in Arkansas, Georgia, Florida, North Carolina, Texas, Alabama, South Carolina, California, New York, and Mississippi.  *See* Ex. A at 2 (excerpt of the Bank's 2017 Form 10-K); Compl. ¶ 144 (relying on the Bank's 2017 Form 10-K).[1]  The claims concern the Bank's commercial real estate lending, which is primarily overseen by the Bank's Real Estate Specialties Group ("RESG").  *E.g.*, Compl. ¶¶ 3–4.  RESG focuses on commercial real estate and acquisition, construction, and development lending.  *Id.* ¶ 94.

---

[1] All Exhibits are appended to the corresponding Motion to Dismiss, which is incorporated by reference. Fed. R. Civ. P. 10(c).  When resolving a motion to dismiss, courts may consider, among other things, "matters incorporated by reference or integral to the claim, items subject to judicial notice, [and] matters of public record." *Dittmer Properties, L.P. v. F.D.I.C.*, 708 F.3d 1011, 1021 (8th Cir. 2013) (quotation marks and citation omitted).  This is particularly relevant here, where Plaintiff alleges a securities fraud claim, because SEC filings are matters of public record. *See, e.g.*, *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014).  Moreover, they are judicially noticeable at the motion to dismiss stage. *See, e.g.*, *Podraza v. Whiting*, 790 F.3d 828, 833 (8th Cir. 2015) (taking judicial notice of SEC filings while reviewing motion to dismiss); *see also Fla. State Bd. of Admin. v. Green Tree Fin. Corp.,* 270 F.3d 645, 663 (8th Cir. 2001) (collecting cases where courts have considered SEC filings when evaluating a motion to dismiss).

The Bank's Board of Directors currently has sixteen members, all of whom are named as Defendants: George Gleason (who is also the Chief Executive Officer), Nicholas Brown, Paula H. J. Cholmondeley, Beverly Cole, Robert East, Kathleen Franklin, Catherine B. Freedberg, Jeffrey J. Gearhart, Peter C. Kenny, William A. Koefoed, Jr., Water J. Mullen, III, Christopher Orndorff, Robert Proost, John Reynolds, M.D., Steven Sadoff, and Ross M. Whipple.  Compl. ¶¶ 14–36.  These directors are referred to herein as the "Demand Board" because their ability to consider a pre-suit demand determines whether Plaintiff can assert derivative claims on behalf of the Bank.

The Complaint also names five former directors and officers as Defendants: Dan Thomas, Tyler Vance, Linda Gleason, Darrel Russell, and Richard Cisne.  Compl. ¶¶ 42–48; 52–54.

Finally, the Complaint names three current officers as Defendants:  Greg McKinney, the Bank's Chief Financial Officer and Chief Accounting Officer, *see* Compl. ¶ 38, Tim Hicks, the Bank's Chief Administrative Officer, *see id.* ¶ 40, and John Carter, the Bank's Chief Credit Officer, *see id.* ¶¶ 50–51.

### B.      The Bank's Disclosures

As a public company with a class of securities registered under Section 12 of the Exchange Act, the Bank files certain public reports required by the Exchange Act, including periodic reports on Form 10-K (annual), Form 10-Q (quarterly), proxy statements on Schedule 14a (annual), and, as needed, reports on Form 8-K (current).  The Bank previously filed these reports with the U.S. Securities and Exchange Commission (the "SEC"), but as a result of a recent restructuring, these reports have been filed with the Federal Deposit Insurance Corporation ("FDIC") and NASDAQ since June 2017.  Each is also posted on the Bank's investor relations website.

These periodic reports disclose, among other things, information about the Bank's total amount of nonperforming loans and its asset quality ratios (referred to by the Complaint as "risk

ratios"), which show the amount of the Bank's loans and assets that are nonperforming in proportion to its overall loans and assets. *See* Compl. ¶ 106 (relying on the Bank's 2015 Form 10-K); *see also* Ex. B at 37, 64 (excerpt of the Bank's 2015 Form 10-K). This loan information is presented as an overview of the Bank's entire loan portfolio, on a quarterly basis. It generally does not detail information at the individual loan level, as such detail is not required by securities laws or accounting principles generally accepted in the United States ("GAAP"), nor is it common in the industry.

The Complaint focuses on two loans and the effect they had on the information the Bank reported about its nonperforming loan totals overall. One is a $32.25 million commercial real estate loan to JTL Rock Hill, LLC, for that borrower's purchase of an enclosed retail shopping mall in South Carolina (the "SC Loan"). *See* Compl. ¶¶ 5, 96, 101(a). The second is a loan "estimated to be at least $34.3 million fully funded" for the purchase of a multi-phased land, residential lot and residential home development in North Carolina (the "NC Loan"). *See id.* ¶¶ 5, 96, 102(a).

On October 18, 2018, the Bank announced its financial results for the third quarter of that year, including the fact that it would incur charge-offs of $45.5 million related to the SC Loan and the NC Loan (collectively, the "Loans"). Compl. ¶ 166.

### C.     The Securities Litigation

The Bank's stock price declined the day after it announced its 2018 third-quarter financial results, Compl. ¶ 176, and two investors filed reflexive securities fraud class actions shortly thereafter. One investor filed *Colbert v. Bank OZK*, No. 18-cv-00793-JM, in the Eastern District of Arkansas just eight days later; another filed *Wood v. Bank OZK*, No. 18-cv-10800-GHW, in the Southern District of New York about a month later. The *Wood* action was transferred to the Eastern District of Arkansas and then voluntarily dismissed. The gravamen of the complaint in

*Colbert* is that the Bank, its CEO (George Gleason), and its CFO (Greg McKinney) allegedly committed securities fraud because they did not write off the Loans or deem them to be "nonperforming" sooner—though the complaint fails to specify when or why.  As a result, the *Colbert* complaint argues, the Bank underreported its total amount of nonperforming loans and thereby "inflated" its stock price until October 18, 2018, when it announced the write-offs.  The Bank, Mr. Gleason, and Mr. McKinney moved to dismiss the securities case, explaining that the claims impermissibly second-guess what are merely accounting judgments and fail to satisfy the strict requirements for pleading federal securities fraud.  The motion to dismiss is pending.

> **D.      The First-Filed Derivative Litigation**

About a month after *Colbert* was filed, another investor filed a shareholder derivative action, purportedly on behalf of the Bank, in the Circuit Court of Pulaski County, Arkansas.  The core premise of that case, captioned *Peak v. Gleason, et al.*, Case No. 60CV-18-8280, is that the director defendants supposedly breached fiduciary duties to the Bank because they did not prevent the purported wrongdoing alleged in *Colbert*.  The *Peak* defendants moved to dismiss because Ms. Peak failed to first demand that the Board take action against the individual defendants, as is required to litigate derivatively on a company's behalf.  That motion is pending.

> **E.      This Complaint**

Plaintiff filed this case on August 14, 2019.  The Complaint purports to assert derivative claims on behalf of the Bank against its current and former directors and officers.  It is brought under the same theory as the *Peak* complaint, with the majority of its factual allegations mirroring, and in certain sections repeating verbatim, the allegations of wrongdoing from the amended complaint in the *Colbert* action.  *See, e.g.*, Compl. ¶¶ 101–05 (repeating allegations "as recounted in the Securities Class Action").  Counts I through III assert claims against the Demand Board for breach of fiduciary duty, "gross mismanagement," and "waste" of corporate assets.  Count IV

asserts claims against certain officers and directors (Messrs. Gleason, East, Kenny, Mullen, Proost, Thomas, Hicks, McKinney, Vance, Carter, Cisne, and Russell, and Mses. Freedberg and Gleason) for unjust enrichment.  Count V claims that the Demand Board breached its fiduciary duties by not preventing certain directors and officers from trading in the Bank's stock at times when Plaintiff contends there was wrongdoing within the Bank.  Count VI claims that the Demand Board, Mr. McKinney, Mr. Hicks, and Mr. Vance committed securities fraud that violated Section 10(b) of the Exchange Act.  Count VII claims that Messrs. Gleason and McKinney are liable as control persons of the Bank under Section 20(a) of the Exchange Act.  Count VIII claims that the Demand Board violated Section 14(a) of the Exchange Act, which prohibits false and misleading proxy statements.

Plaintiff filed the Complaint without making a pre-suit demand on the Board.  Plaintiff asserts that it was "not necessary" because demand would have been futile.  Compl. ¶ 189. Plaintiff's demand-futility theory rests on the erroneous contention that the Individual Defendants face a "substantial likelihood of liability" and thus cannot consider a demand properly.  *See id.* ¶¶ 197–98, 202, 209, 215, 221, 228, 231, 234.

## ARGUMENT

It is a "basic principle of corporate governance that the decisions of a corporation—including the decision to initiate litigation—should be made by the board of directors."  *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 101 (1991) (quoting *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 530 (1984)).  Arkansas law "encourages corporations to address problems internally." *Weinberger v. Am. Composting, Inc.*, No. 4:11CV00848 JLH, 2012 WL 1190970, at *4 (E.D. Ark. Apr. 9, 2012).  Generally, a shareholder cannot bring an action in her own name to enforce a corporation's rights—such an action must be authorized by the board of directors and brought by

the corporation itself.  *Red Bud Realty Co. v. South*, 153 Ark. 380, 396, 241 S.W. 21, 27 (1922).

A shareholder can only seize control of a corporation's litigation decisions when either (1) the

shareholder made a pre-suit "demand"—i.e., request for the desired legal action—on the

corporation's board of directors, and the board refused or ignored the demand, or (2) making the

demand would be futile.  *Morgan v. Robertson*, 271 Ark. 461, 468, 609 S.W.2d 662, 665–66 (Ct.

App. 1980); *see also See* Ark. Code Ann. § 4-27-740(b); *Rales v. Blasband*, 634 A.2d 927, 932

(Del. 1993) (explaining that a stockholder's equitable right to assert derivative claims on behalf of

company is limited "to situations where the stockholder has demanded that the directors pursue

the corporate claim and they have wrongfully refused to do so or where demand is excused").  A

derivative plaintiff who fails to make a demand bears the burden of pleading demand futility with

particularity.  Fed. R. Civ. P. 23.1(b)(3); *accord* Ark. Code Ann. § 4-27-740(b).

Here, Plaintiff failed to make a demand or establish that demand would be futile.  Those

dual defects are fatal to her Complaint.

## I.     The Complaint Should Be Dismissed For Failure To Comply With Rule 23.1's Verification Requirement.

Rule 23.1 of the Federal Rules of Civil Procedure sets forth the pleading requirements for

actions brought derivatively on behalf of a corporation.  *See* Fed. R. Civ. P. 23.1(b).  Among other

things, Rule 23.1 unequivocally provides that "[t]he complaint must be verified."  "Failure to

verify the complaint may result in dismissal."  *Abrams v. Koether*, 766 F. Supp. 237, 258 (D.N.J.

1991) (dismissing unverified complaint).  The verification of the complaint in a shareholder

derivative action is not a purely technical requirement; it serves the important purpose of ensuring

"that the plaintiff or some other person has investigated the charges and found them to have

substance."  *Porte v. Home Fed. Sav. & Loan Ass'n*, 409 F. Supp. 752, 754 (N.D. Ill. 1976).  No

verification has been filed in this action, and Plaintiff has not signed the Complaint. That defect alone requires dismissal. *Abrams*, 766 F. Supp. at 257–58.

## II. The Complaint Must Be Dismissed For Failure To Plead Demand Futility With Factual Particularity.

Plaintiff admittedly failed to make a pre-suit demand on the Board. *See* Compl. ¶ 192. Arkansas law and the Federal Rules of Civil Procedure both impose rigorous requirements on a derivative plaintiff to meet her burden to plead demand futility. *See* Ark. Code Ann. § 4-27-740(b); Fed. R. Civ. P. 23.1(b)(3). "One consequence of the law's encouragement of internal resolution of corporate problems is that the pleading requirements in a shareholder derivative suit are generally far more demanding than typical permissive notice pleading." *Weinberger*, 2012 WL 1190970, at *4 (citations omitted).[2] To meet her pleading burden, a shareholder must "*allege with particularity*" facts establishing the reasons why she did not make a demand. Ark. Code Ann. § 4-27-740(b) (emphasis added); *Red Bud Realty Co.*, 153 Ark. at 396–97, 241 S.W. at 27. Courts scrutinize demand futility on "a case by case basis[,]" considering particular factual circumstances. *Morgan*, 271 Ark. at 467, 609 S.W.2d at 665; *see also Red Bud Realty Co.*, 153 Ark. at 396–97, 241 S.W. at 27.

Under Arkansas law, demand is excused when a majority of "the directors [1] are participants in the alleged wrongdoing, [2] 'were dominated by the alleged wrongdoers, or [3] profited [from] the alleged wrongdoing.'" *Morgan*, 271 Ark. at 466–67, 609 S.W.2d at 665

---

[2]  Whether it is futile to make a pre-suit demand is a question of substantive law governed by the law of the state where the company on behalf of which the plaintiff purports to assert derivative claims is incorporated. *Kamen*, 500 U.S. at 108–09; *Weinberger*, 2012 WL 1190970, at *3. The Bank is incorporated in Arkansas, *see* Compl. ¶ 13, and, therefore, Arkansas law governs the demand futility analysis here. As explained below, courts throughout the country also look to Delaware law for guidance because Delaware has a well-developed body of precedent concerning corporations and derivative litigation. *See infra* note 4.

(quoting KNEPPER, *Liability of Corporate Officers and Directors*, § 17.05 (3d ed.)).  Here, the Complaint fails to plead specific factual allegations that any of these three bases for excusing demand applies to a majority of the Demand Board and fails to establish any other basis for excusing demand.  Therefore, the Complaint must be dismissed.[3]

### A.   The Complaint Fails To Allege That A Majority Of The Demand Board Participated In The Alleged Wrongdoing.

The premise of Plaintiff's claims is that the Bank should have written down the Loans at an earlier (yet unspecified) point in time.  Crucially, however, the Complaint never alleges that *any* of the directors (other than Mr. Gleason, who also served as CEO) was involved in the accounting judgments on which its claims of wrongdoing rest.  Having not participated in the alleged wrongdoing, there is no reason why the board could not properly consider a pre-suit demand.

Although the Complaint alleges certain members of the Demand Board were members of purportedly relevant Board committees, courts that have considered similar allegations have deemed them insufficient to excuse demand: simple membership on a committee alone cannot establish liability as a matter of law.  *See Cottrell on behalf of Wal-Mart Stores, Inc. v. Duke*, 829 F.3d 983, 994–95 (8th Cir. 2016) (holding allegation that "directors must have known about a problem because someone was supposed to tell them about it" insufficient under Delaware law); *South v. Baker*, 62 A.3d 1, 17 (Del. Ch. 2012) ("[A]n allegation that the underlying cause of

---

[3]  The Complaint alleges that Defendants breached their fiduciary duties without delineating the particular actions (including the timing of any such actions) for which any Defendant is allegedly liable.  As the Complaint acknowledges, several Defendants are *former* members of the Board.  Once a director has resigned, that director may no longer be held liable for the subsequent actions of the Board.  *See DiRienzo v. Lichtenstein*, C.A. No. 7094-VCP, 2013 WL 5503034, at *17 (Del. Ch. Sept. 30, 2013); *Official Comm. Of Unsecured Creditors of Integrated Health Servs. v. Elkins*, No. Civ. A. 20228-NC, 2004 WL 1949290, at *8–9 (Del. Ch. Aug. 24, 2004).

corporate trauma falls within the delegated authority of a board committee does not support an inference that the directors on that committee knew of and consciously disregarded the problem for purposes of [Delaware's] Rule 23.1.").

Unable to plead any facts to support the theory that a majority of the Demand Board played any role in the alleged wrongdoing, Plaintiff resorts to an argument that has never been recognized under Arkansas law:  Demand would be futile because the Demand Board faces "a substantial likelihood of liability" from Plaintiff's claims.  *See, e.g.*, Compl. ¶¶ 202, 209, 215, 221, 228, 231, 234.

Delaware courts have recognized that directors can be disabled from reviewing a demand due to exposure from a plaintiff's claims, but they have emphasized that this is a narrow and disfavored exception to the demand requirement.  *Aronson v. Lewis*, 473 A.2d 805, 818 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).  If plaintiffs could avoid the demand requirement simply by naming the directors as defendants, then the demand requirement could be avoided in every case.  As Delaware courts have explained, "[i]f a mere allegation of liability on the part of the directors were enough to demonstrate a disabling self-interest, conclusory allegations of breach of director duty would eat the rule whole, in a single bite."  *In re Gen. Motors Co. Derivative Litig.*, C.A. No. 9627-VEG, 2015 WL 3958724, at *1 (Del. Ch. June 26, 2015), *aff'd*, 133 A.3d 971 (Del. 2016).  Therefore, a "mere threat" of director liability cannot suffice to overcome the demand requirement.  *Aronson*, 473 A.2d at 815.  Rather, "to have their impartiality compromised, [directors] must face a *substantial* likelihood of liability."

*Guttman v. Huang*, 823 A.2d 492, 503 (Del. Ch. 2003) (emphasis added).  Plaintiff must allege

these facts "with particularity."  Ark. Code Ann. § 4-27-740(b); *see also* Fed. R. Civ. P. 23.1.[4]

"The analysis of whether a majority of the board faces a substantial likelihood of personal

liability is conducted on a claim-by-claim basis."  *Wilkin on behalf of Orexigen Therapeutics, Inc.*

*v. Narachi*, No. CV 12412-VCMR, 2018 WL 1100372, at *10 (Del. Ch. Feb. 28, 2018) (internal

quotations omitted).  Here, Plaintiff does not remotely meet her burden of pleading a substantial

likelihood of liability for a majority of the Demand Board under any of her claims.  As discussed

in Section II.A.1 below, Plaintiff's federal claims are nonsensical in the context in which she

purports to sue on behalf of the Bank.  None of these claims is *plausible*, much less pleaded with

factual particularity sufficient to show a substantial likelihood of liability.  As explained in Section

II.A.2 below, the state law claims also lack merit and fall far short of showing that a majority of

the Demand Board faces a substantial likelihood of liability.  Because the non-employee directors

played no part in the challenged statements, Plaintiff's state law claims necessarily rest on the

assertion that the directors should have somehow predicted and prevented those statements from

being made by *others*.  Delaware courts have allowed such liability only in rare circumstances that

---

[4]   Because there is limited Arkansas precedent in this area, courts applying Arkansas law have
sought guidance from outside authority, including the law of Delaware, which has similar
statutory provisions and the most developed case law in the nation with respect to derivative
litigation.  *See, e.g.*, *Weinberger*, 2012 WL 1190970, at *5 & n.4 (observing that "[s]everal
states have adopted statutory language nearly identical to Ark. Code Ann. § 4-27-740(b) . . . .
[And] [w]hen interpreting these provisions, state courts often rely heavily upon Delaware
law").  Numerous jurisdictions recognize Delaware is the nation's preeminent authority on
corporate law and consult Delaware cases for guidance in adjudicating derivative claims.  *See,
e.g.*, *Egleston ex rel. Chesapeake Energy Corp. v. McClendon*, 318 P.3d 210, 215 (Okla. Civ.
App. 2013); *In re ITT Derivative Litig. v. ITT Corp.*, 932 N.E.2d 664, 668 (Ind. 2010); *In re
F5 Networks, Inc.*, 207 P.3d 433, 439 (Wash. 2009); *Bacigalupo v. Kohlhepp*, 240 S.W.3d 155,
157 (Ky. Ct. App. 2007).

are not applicable here, and there is no published Arkansas decision that recognizes such liability for directors.

Because this is a derivative case in which Plaintiff failed to make a pre-suit demand, any claim that falls short of pleading a substantial likelihood of liability for at least eight members of the sixteen-member Demand Board fails altogether. Even if it conceivably states a cause of action against *some* Defendant, the claim cannot survive dismissal because it must have been submitted to the Demand Board for consideration rather than thrust into court by Plaintiff without the Bank's authorization. *Weinberger*, 2012 WL 1190970, at *5.

### 1.    The Complaint Fails To Plead A Substantial Likelihood Of Liability For Any Federal Claim.

The Complaint does not plead a substantial likelihood of director liability under Section 10(b), 20(a), or 14(a) of the Exchange Act both because the Complaint does not come close to meeting the pleading standards set by the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), and because these claims are nonsensical in the context of the Plaintiff's theory of the case. The PSLRA requires securities fraud plaintiffs to "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." *In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 889 (8th Cir. 2002) (quoting 15 U.S.C. § 78u-4(b)(1)). A plaintiff must provide the "link between an alleged misleading statement and specific factual allegations demonstrating the reasons why the statement was false or misleading." *In re 2007 Novastar Fin. Inc., Sec. Litig.*, 579 F.3d 878, 883 (8th Cir. 2009).

To plead scienter in a securities fraud action, "a plaintiff must plead facts 'giving rise to a strong inference'" that the defendant acted with the requisite level of intent. *K-tel*, 300 F.3d at 904 (quoting 15 U.S.C. § 78u-4(b)(2)). An inference of scienter is sufficiently strong—and capable of surviving a motion to dismiss—"*only* if a reasonable person would deem the inference of scienter

cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Podraza v. Whiting*, 790 F.3d 828, 837 (8th Cir. 2015) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007)) (emphasis added).  Thus, a court "must take into account plausible opposing inferences," comparing "plausible, nonculpable explanations for the defendant's conduct with inferences favoring the plaintiff." *Id.* (internal quotation marks omitted). This heightened pleading standard contrasts sharply to the usual rule in non-PSLRA cases that draws all inferences in favor of the plaintiff at the pleadings stage.[5]

The factual allegations here are insufficient to sustain any of the federal securities claims, many of which have no application at all to claims brought derivatively on behalf of the Bank.  As a result, these assertions do not excuse demand.

### a)      Section 10(b) Claim (Count VI)

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must plead (1) that the defendant made a material misrepresentation or omission, (2) with scienter, (3) in connection with the purchase or sale of a security, (4) upon which the plaintiff relied, and (5) that plaintiff suffered (6) economic loss (7) caused by the alleged misstatement.  *McAdams v. McCord*, 584 F.3d 1111, 1113 (8th Cir. 2009).  Plaintiff has not sufficiently pleaded these elements.

### (1)      No Challenged Statement Was Made In Connection With The Purchase Or Sale Of A Security.

A Section 10(b) claim cannot withstand a motion to dismiss unless it is alleged to have been made "in connection with the purchase or sale of any security," which limits potential

---

[5]   Moreover, because Plaintiff's securities allegations "sound in fraud," Rule 9(b) of the Federal Rules of Civil Procedure applies, and the requisite level of intent must be pleaded with particularity. *See Cozzarelli v. Inspire Pharm. Inc.*, 549 F.3d 618, 629 (4th Cir. 2008); *see also Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 549 (8th Cir. 1997) (applying particularity requirement in the context of securities litigation).

plaintiffs to "actual purchasers and sellers." *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 728, 731 (1975). To determine what may be considered a purchase or a sale, "[c]ourts have looked to the economic reality of a transaction" and have found this element met when a transaction results in "a fundamental transformation of ownership interests." *Sofonia v. Principal Life Ins. Co.*, 465 F.3d 873, 878 (8th Cir. 2006) (analyzing definition of "in connection with the purchase or sale of a covered security" in the context of Securities Litigation Uniform Standards Act) (internal quotation marks omitted).

Consistent with *Sofonia*, other courts view a transaction to be a purchase or sale of a security when it results in "some surrendering of control, [a] change in ownership, or [a] change in the fundamental nature of an investment before a transfer," *Sacks v. Reynolds Sec., Inc.*, 593 F.2d 1234, 1240 (D.C. Cir. 1978) (finding that "transfer of accounts between brokers pursuant to a contract" falls outside the ambit of "purchase or sale of security") (internal quotation marks omitted), rather than a "mere transfer between corporate pockets," *Rathborne v. Rathborne*, 683 F.2d 914, 918–19 (5th Cir. 1982) (holding stock-for-assets trade between related companies is not a purchase or sale) (internal quotation marks omitted).

The Complaint asserts that "Defendants caused and/or allowed the Company to repurchase tens of thousands of shares of Company stock," *see* Compl. ¶ 260, but elsewhere admits that the transactions it refers to as "repurchase[s]" are instances in which the Bank did not "repurchase" stock at all, but rather *withheld* from issuing vested stock awards to officers in exchange for satisfying certain tax obligations incurred when their incentive awards vested. *See id.* ¶¶ 107, 130, 149, 153; *see also In re Sportline.com Sec. Litig.*, 366 F. Supp. 2d 1159, 1173 (S.D. Fla. 2004) (referring to the withholding of shares for tax purposes as a "forfeiture"). When restricted stock awarded under the Bank's incentive compensation plan vests, certain federal and state tax

withholding requirements apply to the recipient's award of stock.  *See* Compl. ¶¶ 107, 130, 149, 153.  The recipient may "authoriz[e] the [Bank] to withhold a number of vested Restricted Shares" in exchange for the Bank's payment of the recipient's tax obligations; if the recipient opts to do so, then he or she receives the earned shares minus those withheld to satisfy the tax obligations.  *See, e.g.*, Exs. C, D, and E (the Form Notice of Grant of Restricted Stock filed with the SEC when the Bank's Restricted Stock and Incentive Plan was amended in 2012, 2014, and 2016 respectively); Compl. ¶ 130 (relying on the Restricted Stock and Incentive Plan from 2016).[6]

This transaction does not involve a repurchase of the shares by the Bank because full ownership of the forfeited shares never transferred to the recipient in the first place.  *See Sacks*, 593 F.2d at 1240.  Recipients receive limited rights when they are awarded non-vested shares under the incentive plan (e.g., the temporary right to earn dividends or cast proxy votes).  *See* Exs. C, D, and E.  But recipients do not obtain full ownership of the shares, including the ability to transfer them, unless and until the shares vest.  *See id.* (each explaining that dividends and voting rights transfer immediately but "[u]ntil the date [the officer's] Restricted Shares become vested, [the officer] may not assign or otherwise transfer the Restricted Shares . . . " and that "[t]he Restricted Shares shall be held in escrow by [the Bank] until such time as the Restricted Shares vest").  Therefore, these stock recipients could not have possibly sold stock back to the Bank— they *never* owned shares that they had any right to sell before vesting.  And at the time of vesting, the Bank simply withheld the shares that Plaintiff claims it "repurchased."  Those vested shares were never transferred to the recipients, and they were never sold back.  Thus, there is no

---

[6]  In 2012, the Form Notice of Grant of Restricted Stock was Exhibit 10.1(B)(II) to a Form 8-K filed on August 23, 2012.  The 2014 and 2016 Form Notice of Grant of Restricted Stocks were Exhibits 10.14 and 10.16, respectively, to the Bank's 2017 10-K.

"repurchase" or "buy-back," and no "fundamental transformation of ownership interests" like the transaction in *Sofonia.*

To be sure, a chart in the Bank's SEC filings reflecting the number of shares withheld for tax purposes uses the term "repurchased." *See, e.g.*, Ex. B at 36 (excerpt of the Bank's 2015 Form 10-K); Compl. ¶ 106 (relying on the Bank's 2015 Form 10-K).  But courts look to the "economic reality" of the transaction—not labels. *See Sofonia*, 465 F.3d at 878.  Here, the SEC forms disclosing these transactions describe them as what they are: "withheld . . . shares to satisfy federal and state tax withholding requirements related to the vesting of . . . shares." Ex. B at 36.

At bottom, the Bank's payment of the taxes due on an award is not a purchase under Section 10(b).  Therefore, Count VI is categorically defective.

### (2)   The Complaint Pleads No Actionable Misrepresentation.

The Complaint fails to satisfy the PSLRA's exacting standard for pleading that the Bank's statements were false or misleading.  Although the Complaint repeats much of the *Colbert* complaint's claims regarding alleged misstatements, only three alleged statements are at issue for purposes of demand futility analysis.  The Demand Board is only potentially liable for statements over which the directors had "authority over the content of the statement and whether and how to communicate it." *Janus Capital Grp., Inc. v. 1st Derivative Traders*, 564 U.S. 135, 144 (2011). The only connection the Complaint draws between any challenged statement and the non-employee directors is to assert that the directors signed the Bank's annual reports on Form 10-K that they signed for the years 2015, 2016, and 2017. *See* Compl. ¶¶ 108, 131, 145.[7]  The Complaint

---

[7]   The directors dispute that signing an annual report makes them "makers" of every statement in those reports.  Defendants reserve the right to raise this defense later in the proceedings if necessary.

fails to plead with factual particularity that any of those statements—each of which reflects management's judgments regarding the Loans—was false or misleading at the time it was made.

    **(a)**    **Accounting Statements.**  The Complaint asserts that the Bank's financial reports should have disclosed that certain metrics regarding its loan portfolio—namely its nonperforming loans (or NPLs), nonperforming assets (or NPAs), and the related asset quality ratios—deteriorated earlier than the third quarter of 2018.  *See, e.g.*, Compl. ¶ 106.[8]  Plaintiff copies two alternative theories set forth in the *Colbert* complaint: each was either "impaired," *id.* ¶¶ 103–04, "and/or" was a troubled debt restructuring ("TDR"), *id.*, and should have been labeled "non-performing" at an unidentified date on or before February 19, 2016.  Like the *Colbert* complaint, this Complaint fails to plead that either theory applies to the Loans at issue.

    The Complaint fails to address the glaring fact that the Bank's independent registered public accounting firm issued an unqualified opinion with respect to the Bank's financial statements in 2016, 2017, and 2018, and did not require the Bank to restate any of its financial reports after the disclosure of the write-downs of the Loans.  The Complaint's silence in this regard casts serious doubt on its unsupported assertion that the Bank's financial statements in prior periods were incorrect.  *See Kushner v. Beverly Enter., Inc.*, 317 F.3d 820, 829 (8th Cir. 2003) (observing that it was "telling" that neither the outside auditors nor the regulators questioned defendant's accounting); *City of Roseville Emps. Ret. Sys. v. Sterling Fin. Corp.*, 963 F. Supp. 2d 1092, 1113–14 (E.D. Wash. 2013) (finding that plaintiff had failed to plead falsity where it did not contend that a restatement was required); *Waterford Twp. Gen. Emps. Ret. Sys. v. SunTrust Banks, Inc.*, No. 1:09-cv-617-TWT, 2010 WL 3368922, at *2 (N.D. Ga. Aug. 19, 2010) ("The Plaintiff

---

[8]  In fact, and as the Complaint admits, when the Loans "deteriorated" in the second and fourth quarters of 2017 the Bank recategorized them as "substandard" and treated them as such in the quarterly reports it disclosed for those quarters.  *See* Compl. ¶¶ 101(r), 102(b).

does not allege that anyone—other than the Plaintiff—has said that [the bank] should restate its financial reports.") (citing cases).

Not surprisingly, the Complaint fails to plead that the Loans were either "impaired" or "TDRs" before the Bank announced that they were.  Plaintiff devotes a mere five sub-paragraphs to describing the NC Loan, *see* Compl. ¶¶ 102(a)–(e), and they contain no specific allegations of delinquent payments or deteriorating financial performance that bear on whether the loan was impaired or a TDR.  In fact, the only support the Complaint provides for its assertion that the "NC Loan was impaired and/or nonperforming" is "because under OZK accounting policies and GAAP the *SC* Loan was a TDR and/or the *SC* Loan was otherwise deemed impaired and dependent upon collateral for repayment."  *See id.* ¶ 104 (emphases added).  Even assuming the references to the "SC Loan" in Paragraph 104 are typographical errors, Paragraph 104 is entirely conclusory, equivocal, and circular.  It pleads no factual allegations whatsoever to support the bare assertion that the loan was impaired or a TDR before the third quarter of 2018.

The allegations regarding the SC Loan are more verbose but equally deficient.

In accordance with GAAP, the Bank "consider[s] a loan . . . to be impaired when based on current information and events, it is probable that [it] will be unable to collect all amounts due according to the contractual terms thereof."  Ex. F at 44 (excerpt of the Bank's 2018 Form 10-K); *see* Compl. ¶ 277 (relying on the Bank's 2018 Form 10-K); *see also* Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") 310-10-35-16.[9]  The Bank accordingly must predict whether nonpayment of some portion of the loan is "likely to occur" based on current information in its possession.  ASC 310-10-35-18(a), 35-19.  The Complaint fails

---

[9]  Available on FASB's website, https://www.fasb.org/store/subscriptions/fasb/registered, using Basic View option.

to plead factual allegations establishing that nonpayment on the SC Loan was "probable" before the third quarter of 2018.

Plaintiff asserts that nonpayment of the SC Loan was "probable" because the Bank extended the maturity date of the loan on a number of occasions. *See, e.g.*, Compl. ¶ 101(k). But none of the allegations supports the conclusion that the loan would go unpaid merely because the parties mutually agreed to extend its maturity date. Instead, the Complaint acknowledges that extensions were a routine part of the parties' course of dealing, going back long before Plaintiff claims the loan was impaired. *See id.* ¶ 101(b) (describing five extensions under the original loan agreement between 2009 and 2011); *id.* ¶¶ 101(f)–(z) (describing nine extension agreements in the period after the loan was amended and restated in 2011). The Complaint makes clear that the borrower had not missed a monthly payment, admitting that the Bank was sweeping surplus cash flows from the property for a "long, long time." Compl. ¶ 172 (quoting the January 18, 2019 earnings call); Ex. G at 13–14 (Tr. of January 18, 2019 earnings call).

The Complaint also contends that the extension agreements were "defaults" showing that the SC Loan was not being paid according to its contractual terms and was, thus, impaired. Compl. ¶¶ 101(f)–(z). But once mutually agreed upon, the extension terms *are* the terms of the loan, and payment in accordance with those terms *is* payment "according to the contractual terms of the loan agreement," foreclosing impairment. ASC 310-10-35-16. The SC Loan was structured, as recognized in bank regulatory guidance, such that it would *not* be repaid in full through monthly payments after its three-year maturity period. *See* Office of the Comptroller of the Currency, *Comptroller's Handbook: Commercial Real Estate Lending*, at 39 (Jan. 27, 2017) (attached as Ex. H) ("Some types of income-producing property loans have a built-in restructuring trigger; such is the case with a five-year tenor in which payments are based on a 20-year amortization. In these

21

situations, the bank is able to periodically review the strength of the primary and secondary repayment sources and re-underwrite the credit."). At the conclusion of that short period, the parties unavoidably contemplated that the loan would be repaid through a new loan (whether by the Bank or someone else) or that the maturity date would be extended (renewed), as it had been many times before. It is not alarming or unusual that the parties opted for extensions, and it was entirely consistent with the Bank's practices. *See* Ex. A at 5 (excerpt of the Bank's 2017 Form 10-K) ("We offer a variety of real estate loan products that are generally amortized over five to thirty years, payable in monthly or other periodic installments of principal and interest, and due and payable in full (unless renewed) at a balloon maturity generally within one to seven years."); Compl. ¶ 144 (relying on the Bank's 2017 Form 10-K); Ex. H at 39 (Office of the Comptroller of the Currency Handbook).[10]

The Complaint also fails to plead sufficient allegations to demonstrate that the SC Loan was a TDR before the third quarter of 2018. A TDR is a loan "for which the terms have been modified and for which (i) the borrower is experiencing financial difficulties *and* (ii) [the Bank has] granted a concession to the borrower." Compl. ¶ 99 (emphasis added) (quoting the Bank's

---

[10] The Complaint also fails to plead that the Loans were impaired by making vague references to decreasing tenancy rates at the South Carolina property and other unspecified "financial difficulties." *See* Compl. ¶ 101(j). For starters, these assertions are pleaded upon "information and belief," *id.* ¶ 8 n.1, and lack the factual basis required by the PSLRA. 15 U.S.C. § 78u-4(b)(1); *see also, e.g.*, *SE. Pa. Transp. Auth. v. Orrstown Fin. Servs., Inc.*, No. 1:12-cv-00993, 2015 WL 3833849, at *43 (M.D. Pa. June 22, 2015) (granting dismissal of allegations that failed "to state with particularity all facts on which that belief is formed" (internal quotation marks omitted)). Moreover, the Complaint fails to plead why these factors would compel the Bank to conclude that nonpayment was "probable" before the third quarter of 2018. *See DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990) (affirming dismissal of securities-fraud claims where "[y]ou cannot tell from reading [the complaint] why the [plaintiffs] believe that the problems [with a bank's loans] were so apparent that . . . failure to increase the reserves amounted to 'fraud'").

2016 Form 10-K); Ex. I at 43 (excerpt of the Bank's 2016 Form 10-K).  The Complaint lacks factual allegations that the SC Loan was modified due to financial difficulties of the borrower.[11]

While that deficiency is dispositive, the Complaint also fails to plead the Bank made "concessions" necessary to make the SC Loan a TDR.  Under GAAP, "[a] creditor has granted a concession when, as a result of the restructuring, *it does not expect to collect all amounts due*, including interest accrued at the original contract rate." ASC 310-40-15-13 (emphasis added).  To qualify as a concession, the grant to the borrower must be a "concession to the debtor that it would not otherwise consider."  ASC 310-40-15-5; *see also* FDIC, FFIEC: Reports of Condition and Income Instructions for the FFEIC 051 Report Form, Glossary at A-85 (2019), (hereinafter "FDIC Call Report Glossary").[12]  Moreover, the creditor must be making the purported concession "for economic or legal reasons related to borrower's financial difficulties." FDIC Call Report Glossary at A-85.

The Complaint does not plead that the relevant GAAP factors show that any extension of the maturity date was a "concession."  Plaintiff never alleges that any extension was for a new, below-market interest rate or bore any other hallmark of a concession by the Bank, such as debt forgiveness.  Without an allegation that the extension was made for economic or legal reasons

---

[11]  To determine whether a borrower is experiencing the requisite financial difficulties, GAAP requires the Bank to consider a host of indicators, which include, among other considerations, "whether it is *probable* that the debtor would be in payment default on any of its debt in the foreseeable future without the modification," ASC 310-40-15-20(a) (emphasis added), and whether the creditor has "forecast[ed] that the debtor's entity-specific cash flows will be insufficient to service any of its debt (both interest and principal) in accordance with the contractual terms of the existing agreement for the foreseeable future," ASC-310-40-15-20(e). Plaintiff's attempt to plead that the SC Loan was a TDR suffers from the same deficiencies that defeat its attempt to plead impairment.  Plaintiff never pleads any delinquency in monthly payments, that any delinquency was probable in the future, or that the extension agreements were driven by financial difficulties.

[12]  Available at the FDIC's website, https://www.fdic.gov/regulations/resources/call/crinst/2019-03/031-041-319gloss-033119.pdf.

related to the borrower's financial difficulties—and that such extension lowered the interest rates below market, forgave any principal or interest owed, or provided some other modification the Bank would not otherwise consider—the extension cannot qualify as a concession, and the loan cannot be deemed a TDR.  *See, e.g.*, *Lloyd v. CVB Fin. Corp.*, CV-10-06256 MMM(PJWx), 2012 WL 12883517, at \*2, \*18 n.137 (C.D. Cal. Aug. 21, 2012) (holding that where the plaintiff had failed to allege sufficiently a concession, such as that the loan modification included a "forgiveness of principal" or a "substantial reduction in interest rates," the complaint did not adequately plead the elements required for a TDR).

At its core, the Complaint asserts that Plaintiff disagrees, in hindsight, with the predictive judgment calls the Bank made about when it had become unlikely that the Loans would be repaid in full.  *See, e.g.*, Compl. ¶ 101(k) (asserting Plaintiff's belief that the SC Loan was suffering "probable" losses); *id.* ¶ 101(m) (asserting Plaintiff's belief that OZK "had no reasonable basis to conclude" the SC Loan balance would be repaid).  But "[a] hindsight disagreement with management's commercial judgment not to write off loans earlier does not render earlier financial statements false.  Determinations of this sort are exercises in judgment, actionable only if they lacked any reasonable basis and were not genuinely believed."  *City of New Orleans Employees' Ret. Sys. v. PrivateBancorp., Inc.*, Case No. 10 C 6826, 2011 WL 5374095, at \*4 (N.D. Ill. Nov. 3, 2011) (citing *Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1090–93 (1991); *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 112–13 (2d Cir. 2011); *Nolte v. Capitol One Fin. Corp.*, 390 F.3d 311, 315–16 (4th Cir. 2004); *DiLeo v. Ernst & Young*, 901 F.2d 624, 626–27 (7th Cir. 1990)).  Here, the Complaint is devoid of specific factual allegations that the Bank's judgments lacked any reasonable basis, when the Bank had no choice but to conclude that the Loans were impaired, or why.  Absent such allegations, the Complaint pleads nothing more than Monday morning

quarterbacking on matters of judgment, and it fails to state a claim.  *See K-tel*, 300 F.3d at 890–91 (explaining that the application of GAAP requires judgment and that a lack of clairvoyance or changed circumstances does not amount to fraud).

> **(b)      General Expressions of Optimism Are Not Actionable.**      The Complaint's remaining allegations challenge general statements of corporate optimism, which Plaintiff does not even allege were made by the Bank's directors (other than George Gleason).  Such statements include discussions of the Bank's overall loan portfolio quality and risk, including those describing the portfolio as "pristine" and low risk, *see, e.g.*, Compl. ¶¶ 110, 116, 134, 135 (each citing statements made by officers, not non-employee directors, on analyst conference calls), and descriptions about the Bank's general lending strategy, including its disciplined credit quality, conservative approach, and focus on asset quality, *see, e.g., id.* ¶¶ 121, 132, 134, 135, 146, 147, 151 (each citing statements made by officers, not non-employee directors, on analyst conference calls or conferences).  All of these statements are inactionable.

*First*, no member of the Demand Board is alleged to have made any of these statements— other than Mr. Gleason, who also is the Bank's CEO and spoke on its behalf in that role.  For that reason, the Complaint confirms that the Demand Board could have considered claims regarding these statements, and demand was therefore required.

*Second*, Plaintiff has failed to plead facts alleging that these statements were false.  The Complaint fails to plead that the Loans were nonperforming before the third quarter of 2018, but even if they were, there would be no basis for Plaintiff to assert that these two loans somehow rendered certain Defendants' optimistic statements about its overall lending practices materially false.  In fact, even after taking into account the charge-offs announced on October 18, 2018, the Bank's net charge-off ratio was still at or below industry average.  *See* Ex. J at 5 (October 18, 2018

Management Comments ) (explaining that the Bank's net charge-off ratio for non-purchased loans has averaged about 37% of the industry's net charge-off ratio during its 21 years as a public company and has never exceeded that average); Compl. ¶ 102(c) (relying on October 18, 2018 Management Comments).

*Third*, these statements are inactionable puffery.  Statements are immaterial as a matter of law and mere puffery when they are "so vague and such obvious hyperbole that no reasonable investor would rely upon [it]."  *Parnes*, 122 F.3d at 547.  Descriptors like "pristine" are precisely the kind of "optimistic rhetoric" and "promotional phrase[s]" that are immaterial to investors and so vague as to be unverifiable.  *In re Stratasys Ltd. S'holder Sec. Litig.*, 864 F.3d 879, 882 (8th Cir. 2017) (internal quotation marks omitted).  The same is true for statements "regarding . . . 'highly disciplined' risk management," which are "merely generalizations regarding [the Bank's] business practices," *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 205–06 (2d Cir. 2009), as well as for "[w]ords like . . . 'conservative,' [which] are classic examples of corporate puffery because they do not provide any meaningful insight into the practices described," *City of Roseville*, 963 F. Supp. 2d at 1122.  These statements are immaterial as a matter of law, and, therefore, inactionable.

### (3)    The Complaint Fails To Adequately Plead Scienter.

The standard for pleading scienter under Section 10(b) is very high.  "[A] plaintiff must plead facts 'giving rise to a strong inference,' that the defendant acted intentionally or recklessly." *K-tel*, 300 F.3d at 904 (quoting 15 U.S.C. § 78u-4(b)(2)).  A plaintiff may do so by alleging (1) "a mental state embracing intent to deceive, manipulate, or defraud," or (2) "conduct which rises to the level of severe recklessness."  *Id.* at 893–94 (internal quotation marks omitted); *Podraza*, 790

F.3d at 836.[13]  In addition, an "unusual or heightened motive" and "opportunity" is "particularly important to establishing scienter."  *K-tel*, 300 F.3d 893–94.

The challenge of meeting that elevated pleading standard is compounded here because Plaintiff must plead with factual particularity that eight members of the Demand Board face a substantial likelihood of liability with respect to the challenged accounting judgments in the three annual reports the directors signed.  *See supra* at 13.  GAAP accounting principles "tolerate a range of 'reasonable' treatments, leaving the choice among alternatives to management."  *K-tel*, 300 F.3d at 890 (quoting *Thor Power Tool Co. v. C.I.R.*, 439 U.S. 522, 544 (1979)). Therefore, "the mere publication of inaccurate accounting figures or failure to follow GAAP, without more, does not establish scienter."  *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 432 (5th Cir. 2002).  Rather, "[t]he party must know that it is publishing materially false information, or must be severely reckless in publishing such information."  *Id.*; *see also Kushner*, 317 F.3d at 831 ("Allegations of GAAP violations are insufficient to state a securities fraud claim unless coupled with evidence of corresponding fraudulent intent.").

Not only does the Complaint fail to plead sufficiently that *management's* judgment in making these accounting decisions was intentionally or recklessly fraudulent, it does not even plead that any Demand Board member (other than Mr. Gleason) was involved in or even aware of the process, or that the Demand Board had any reason to question management's judgments.  *See, e.g.*, Compl. ¶¶ 109, 115, 120, 126, 133 (each alleging only that "Defendants knew, or recklessly disregarded" certain of Plaintiff's assumptions about the Loans without identifying *any* Demand Board member with this supposed knowledge or how or when he or she learned of it).  Arkansas

---

[13]  Notably, the U.S. Supreme Court has not ruled on the standard for scienter, and although the Eighth Circuit has, Defendants reserve the right to argue that scienter should be limited to intentional wrongdoing in the appropriate appellate forum.

law explicitly allows directors to "rely on information, opinions, reports, or statements . . . prepared or presented by officers or employees of the corporation [or] public accountants" as long as he or she reasonably believes those third parties to be reliable and competent.  Ark. Code Ann. § 4-27-830.  Section 10(b) claims against directors are dismissed where "the Complaint fails to allege facts tending to show that [defendants], who are outside directors, exceeded those roles and became involved in the everyday business of [the company]."  *In re ShegdaTech, Inc.*, No. 11 civ. 1918 (LGS), 2014 WL 3928606, at *10 (S.D.N.Y. Aug. 12, 2014).

To plead a substantial likelihood of liability for a majority of the Demand Board, Plaintiff must plead particularized factual allegations of at least *what* knowledge each director possessed and *when* he or she possessed it.  *See Stratasys*, 864 F.3d at 883–84 (citing *K-tel*, 300 F.3d at 891) (explaining that "[w]ithout tying the timing of the knowledge to the allegedly misleading statements, the shareholders do not plead facts sufficient to support a strong inference of scienter"); *In re Ceridian Corp. Sec. Litig.*, 542 F.3d 240, 248 (8th Cir. 2008).  The Complaint is devoid of any such factual allegation for any member of the Demand Board, which dooms Plaintiff's claim.[14]

Plaintiff's assertions that Defendants "knew" statements were materially false and misleading "by virtue of their receipt of information reflecting the true facts regarding the SC Loan and NC Loan, their control over, and/or receipt and/or modification of OZK's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential information concerning OZK and these loans" are bald assertions that are tentative to the point of taking no position on what the facts are.  Compl. ¶ 261.  This pleading tactic is

---

[14]  Plaintiff's allegations that certain defendants sold stock at inflated prices also fail to plead scienter.  The Eighth Circuit has made clear that identifying trades and concluding they were unusual or suspicious is insufficient.  *See K-tel*, 300 F.3d at 895–96.  The Complaint does not even include the majority of the Board in its conclusory assertions about insider trading.  *See infra* at Section II.C.

insufficient.   Courts have regularly declined to find a strong inference of scienter based on allegations that a particular defendant "must have known" about a misstatement because of that individuals' position at the company.  *Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 535 (5th Cir. 2008).[15]

There can be no inference of scienter where, as here, the individuals' position at the company explicitly allowed them to rely on both management and the Bank's public accountant. Ark. Code Ann. § 4-27-830(b)(2).   The accounting statements drafted by management were reviewed by the Bank's independent auditor, which reported in each of the Bank's 10-K filings that it had audited the Bank's accounting statements in accordance with accounting principles and concluded that the statements fairly presented the Bank's financial position.  *See* Ex. B at 84 (excerpt of the Bank's 2015 Form 10-K), Ex. I at 87 (excerpt of the Bank's 2016 Form 10-K); Ex. A at 83–84 (excerpt of the Bank's 2017 Form 10-K); *see also* Compl. ¶ 106 (citing the Bank's 2015 Form 10-K); Compl. ¶ 129 (citing the Bank's 2016 Form 10-K); Compl. ¶ 144 (citing the Bank's 2017 Form 10-K).   The Complaint does not allege that the auditors determined that the financial statements required restatement after the Loans were deemed nonperforming.   "It is telling to us that [defendant's] outside auditors did not question its accounting practices and that [defendant] received no warning letters from [regulators] concerning its practices during the class period."  *Kushner*, 317 F.3d at 829; *see also City of Roseville*, 963 F. Supp. 2d at 1142 (observing that "the lack of a restatement weighs against a finding of scienter").   The Complaint does not plead even conclusory assertions that the Demand Board had reason to question the independent auditor's judgments.

---

[15]   Directors do not participate in day-to-day management, including drafting the challenged statements.  *See* Ark. Code Ann. § 4-27-830(b).   Conclusory assertions to the contrary, such as the one in Paragraph 266 of the Complaint, are not sufficient to allege otherwise.

Indeed, the only cogent inference is that the directors rightfully relied on management to account for the Loans properly and then relied on the Bank's independent auditor to conduct its own assessment.  *See Podraza*, 790 F.3d at 837.  There is no allegation to the contrary.  Moreover, the Complaint does not even attempt to explain why Defendants would have any motive to delay writing off the Loans if writing them off would be inevitable.  It would make no sense to delay the inevitable to avoid a drop in the Bank's stock price; on Plaintiff's theory, that drop would have occurred at some point.  *Cf. DiLeo*, 901 F.2d at 627 ("Revealing the bad loans earlier might have helped the DiLeos, but it would have injured other investors by an equal amount.  The net is a wash.").  Because the Complaint fails to plead an inference of scienter that is at least as compelling as the inference of innocence, the claims cannot withstand a motion to dismiss.

### (4)    The Complaint Fails To Allege Reliance.

The Complaint asserts that "OZK relied on Defendants Gleason and McKinney's false or misleading statements" to "repurchas[e] common stock."  Compl. ¶ 177.  But Plaintiff cannot plausibly allege reliance on the part of the Bank when the individuals allegedly responsible for the Bank's supposed "repurchasing [of] common stock" are the same individuals who were alleged to be responsible for the Bank's allegedly false statements.  *See, e.g.*, Compl. ¶ 178; *see also id.* ¶¶ 102(d), 109, 115, 120, 126, 133, 164 (attributing knowledge or reckless disregard as to the purported issues with the Loans to all Defendant directors and officers); *id.* ¶¶ 156, 173 (attributing knowledge to the Bank itself).

"Reliance cannot be established when the individual allegedly acting on a misrepresentation 'already possesses information sufficient to call the representations into question.'"  *In re Verisign, Inc., Derivative Litig.*, 531 F. Supp. 2d 1173, 1209 (N.D. Cal. 2007) (quoting *Atari Corp. v. Ernst & Whinney*, 981 F.2d 1025, 1030 (9th Cir. 1992)).  Here, Plaintiff alleges that the Bank relied upon the allegedly misleading statements of Defendants when it

allegedly "repurchased" shares, but that is impossible because Plaintiff *also* attributes knowledge of the alleged fraud *to all of the directors and the Company itself.*  Plaintiff cannot have it both ways.  A corporation cannot rely on a false statement when it is alleged to have *known* that the statement was false.  Thus, Plaintiff fails to plead reliance.[16]

### b)    Section 20(a) Claim (Count VII)

As an initial matter, Plaintiff asserts Count VII against a single Board member: George Gleason.  Although the Count also names Mr. McKinney, he is not a member of the Board. Therefore, a majority of the Demand Board could have considered this claim, meaning that a demand was required and this claim must be dismissed on that ground alone.

In any event, Plaintiff cannot state a claim under Section 20(a).  To maintain a claim of control-person liability under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), a plaintiff must allege the "'primary violator' violated the federal securities laws." *Lustgraaf v. Behrens*, 619 F.3d 867, 873 (8th Cir. 2010).  This claim fails for two reasons.

---

[16]  Reliance also is contradicted by the Complaint, which concedes that the Bank withheld shares to pay taxes only because certain equity incentive plan awards vested.  *See* Compl. ¶¶ 107, 130, 149, 153.  "Investors can recover damages in a private securities fraud action only if they prove that they relied on the defendant's misrepresentation in deciding to buy or sell a company's stock." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 263 (2014).  In certain circumstances investors may rely on "a presumption that the price of stock traded in an efficient market reflects all public, material information—including material misstatements." *Id.*  But that presumption is rebuttable. *Id.* at 269.  Where a "defendant c[an] show that . . . a plaintiff would have bought or sold the stock even had he been aware that the stock's price was tainted," the presumption is rebutted. *Id.*  Assuming, without agreeing, that the prerequisites for the presumption of reliance have been pleaded here, the Complaint's admission that the Bank entered the transaction based on the end of a vesting period—and *not* based on an alleged misstatement or the stock price—defeats the presumption of reliance. *See id.* at 267–69.

*First*, there is no primary violation under Section 10(b), *see supra* at Section II.A.1.a.  Thus, the Complaint fails to plead the requisite primary violation that supports a claim under Section 20(a).

*Second*, it is impossible for Plaintiff to state a claim under Section 20(a).  Plaintiff's Section 20(a) allegations appear to attempt to assert a claim on behalf of the Bank, *see* Compl. ¶¶ 270–75, and also assert that the Bank itself was the primary violator directed by the alleged control persons, *see id.* ¶ 274 (asserting that Mr. Gleason and Mr. McKinney "were controlling persons" of the Bank's agents).  As courts have recognized, "it is logically impossible for a corporation on whose behalf a derivative action is brought to also be a primary violator."  *In re Verisign, Inc.*, 531 F. Supp. 2d at 1213.  Thus, there is "no primary violator over whom th[e Directors] [allegedly] exercised control."  *See In re Maxim Integrated Prod., Inc., Derivative Litig.*, 574 F. Supp. 2d 1046, 1067 (N.D. Cal. 2008).  Accordingly, the Court should dismiss Plaintiff's Section 20(a) claim.

### c)     Section 14(a) Claim (Count VIII)

Section 14(a) of the Exchange Act provides that it is unlawful for any person "to solicit any proxy or consent or authorization in respect to any security (other than an exempted security)" in violation of the SEC Rules.  15 U.S.C. § 78n(a).  Exchange Act Rule 14a-9, in turn, prohibits solicitations by means of proxy statements that are "false or misleading with respect to any material fact."  17 C.F.R. § 240-14a-9(a).  Together, Section 14(a) and SEC Rule 14a-9 prohibit an issuer from disseminating false or misleading information in a proxy statement for the purpose of securing shareholder support for or against a proposal.

To state a Section 14(a) claim, Plaintiff must plead that (1) a proxy statement contained a material misrepresentation or omission, (2) that caused the plaintiff injury, and (3) that the proxy solicitation was an essential link in the accomplishment of the injurious transaction.  *TSC Indus.,*

*Inc. v. Northway, Inc.*, 426 U.S. 438, 444 (1976); *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 385 (1970). In addition, Plaintiff also must plead a culpable state of mind. The Complaint fails to satisfy any of these elements.

### (1)  The Complaint Fails To Plead Any Misstatement Or Omission Of A Material Fact In The Proxy Statement.

The Complaint challenges only one proxy statement—the proxy statement the Bank issued on March 15, 2018 (the "2018 Proxy Statement"). Compl. ¶¶ 277–80; *see generally* Ex. K (2018 Proxy Statement). But the Complaint fails to plead that the 2018 Proxy Statement was misleading. In fact, the Complaint does not challenge a single statement in the 2018 Proxy Statement. *See Id.* ¶¶ 276–80. Instead, the Complaint's allegations regarding allegedly false or misleading information in the 2018 Proxy Statement are merely that it "incorporated by reference its 2018 Form 10-K (for the fiscal year ended December 31, 2017)" (referred to herein as the "2017 10-K"). *See id.* ¶ 277.

The 2018 Proxy Statement does not incorporate the 2017 10-K. Proxy statements regularly refer to other documents, including annual reports to shareholders which *must* be filed along with a proxy statement. *See* 17 C.F.R. § 240.14a-3(c). However, even a currently filed annual report that is referenced in a proxy statement is not considered incorporated by reference. "Absent a specific declaration of incorporation, a mere mention of the annual report does not incorporate it by reference." *Markewich v. Adikes*, 422 F. Supp. 1144, 1147 (E.D.N.Y. 1976) (internal citation omitted); 17 C.F.R. § 240.14a-3(c) ("The report is not deemed to be 'soliciting material' . . . except to the extent that the registrant specifically requests that it be treated as part of the proxy soliciting material or incorporates it in the proxy statement or other filed report by reference."). For that reason, any purported "[i]naccuracies in an annual report cannot form the basis for proxy fraud

liability unless the annual report is specifically incorporated into proxy materials." *Hulliung v. Bolen*, 548 F. Supp. 2d 336, 339–40 (N.D. Tex. 2008).

The 2018 Proxy Statement refers to the 2017 10-K, but it does not explicitly incorporate it by reference. *See* Ex. K at 1, 34–35, 38, 54–55, 57, 59, 67 (2018 Proxy Statement). Because the Complaint fails to plead the 2018 Proxy Statement contained any false or misleading statement, Count VIII cannot withstand a motion to dismiss.

The Complaint also fails to plead that any of the challenged statements were material. For purposes of a Section 14(a) claim, "[a]n omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *Northway*, 426 U.S. at 449. Plaintiff has pleaded no facts to suggest that any errors in the 2018 Proxy Statement were significant enough to be "important" to reasonable shareholders in their voting decisions. Indeed, the allegations make it impossible to understand what additional information would have changed any shareholder's vote on any corporate proposal.

### (2)     The Complaint Does Not Plead The Proxy Statement Caused A Transaction Which Harmed The Company.

Count VIII is also deficient because Plaintiff does not plead that the Bank's 2018 Proxy Statement was an "essential link in the accomplishment" of any contested action that harmed the Company. *Mills*, 396 U.S. at 385.

As the Eighth Circuit has explained, a claim for liability pursuant to Section 14(a), requires a showing that "the harm to plaintiff-shareholders must have resulted from the corporate transactions which were authorized as a result of the false or misleading proxy solicitations." *Abbey v. Control Data Corp.*, 603 F.2d 724, 732 (8th Cir. 1979). Alleging failure to disclose misconduct in proxy statements soliciting the election of officers or directors or the grant of certain stock options is not sufficient to state a claim. *See id.* at 731–32 (regarding election of officers

and approval of stock options); *see also Gen. Elec. Co. ex rel. Levit v. Cathcart*, 980 F.2d 927, 933 (3d Cir. 1992) (finding that "re-election [of] directors did not create any cognizable harm because the shareholders' votes did not authorize the transactions that caused the losses"); *In re HP Derivative Litigation*, No. 5:10-cv-3608 EJD, 2012 WL 4468423, at *11 (N.D. Cal. Sept. 25, 2012) (finding plaintiffs failed to show an "essential link between the proxy and any harm alleged" when plaintiffs "have not alleged facts pertaining to the Stock Incentive Plan"—the voted-upon transaction—"resulting in waste"—the alleged harm). "Any injury to [the] shareholders" from undisclosed illegal transactions "stems directly from" the authorization of those transactions "and not from allegedly misleading proxy solicitations dealing with unrelated corporate business matters." *Abbey*, 603 F.2d at 732.

Here, Plaintiff challenges only the Bank's assessment of certain loans in its financial statements, *see* Compl. ¶¶ 277, 279 (asserting the alleged misleading information "incorporated by reference" into the 2018 Proxy Statement related only to statements about and the condition of the Loans). Yet Plaintiff suggests only that the 2018 Proxy Statement secured shareholder authorization to reelect the Bank's directors and approve an updated director stock plan. Compl. ¶¶ 277, 279. Plaintiff does not allege that the 2018 Proxy Statement was used to obtain shareholder authorization for anything related to the Loans *at all*. Because the 2018 Proxy Statement was not used to obtain shareholder approval of any challenged action or any transaction that was harmful to the Bank, Plaintiff's claim under Section 14(a) fails as a matter of law. *Abbey*, 603 F.2d at 732.

### (3)   The Complaint Fails To Plead The Required State Of Mind.

Plaintiff has utterly failed to plead that any Defendant acted with the required state of mind. The PSLRA's heightened pleading standard requires that state of mind allegations be pleaded with particularity. *See* 15 U.S.C. § 78u-4(b)(2). For outside directors (i.e., every defendant named in

Count VIII except for Mr. Gleason), the Eighth Circuit has "concluded that scienter is an element." *SEC v. Shanahan*, 646 F.3d 536, 546–47 (8th Cir. 2011) (citing *Adams v. Standard Knitting Mills, Inc.*, 623 F.2d 422, 428 (6th Cir. 1980)).   Even for Mr. Gleason, Plaintiff still must allege negligence with particularity.   *SEC v. Das*, 723 F.3d 943, 953–54 (8th Cir. 2013).[17]

The Complaint's sole state of mind allegation regarding the purportedly false or misleading statement in the 2018 Proxy Statement is that "the Director Defendants should have known that the statements contained in the 2018 Proxy Statement were materially false and misleading." Compl. ¶ 278.   This boilerplate allegation of negligence does not even purport to plead that the fifteen outside directors on the Demand Board acted with scienter.   It also does not satisfy the particularity pleading standards of the PSLRA.   Indeed, the Complaint fails to plead any facts at all supporting an inference as to how Mr. Gleason failed to exercise reasonable care or how the remaining members of the Demand Board acted intentionally, *see Shanahan*, 646 F.3d at 546–47, in overseeing the solicitation of proxies.   Without such facts, Plaintiff's Section 14(a) claim must fail.   *See, e.g.*, *In re Verisign, Inc.*, 531 F. Supp. 2d at 1213 (holding that "plaintiffs fail[ed] to plead the required state of mind with particularity as to each defendant, as required by the PSLRA").

> ### 2.   The Complaint Fails To Plead A Substantial Likelihood Of Liability For Any State Law Claim.

The Complaint asserts state law claims for breach of fiduciary duty, gross mismanagement, corporate waste, and unjust enrichment but has not pleaded factual allegations establishing a substantial likelihood of liability for any of these claims.

---

[17]   The Supreme Court has not ruled on the standard for scienter with respect to a Section 14(a) claim.   Defendants reserve the right to argue that the requisite state of mind for a Section 14(a) claim against all defendants should be limited to intentional wrongdoing in the appropriate appellate forum.

a)        **Breach of Fiduciary Duty (Counts I and V)**

The Complaint purports to plead two separate fiduciary duty claims, Counts I and V.  They both rest on the theory that the Director Defendants should be liable for failing to prevent the events that gave rise to the *Colbert* action.  *See, e.g.*, Compl. ¶¶ 238, 258.

A company's directors who have not engaged in wrongdoing but merely did not predict and prevent wrongdoing by others have never been held liable in a derivative suit under Arkansas law.

Even under Delaware law, liability for director inaction resulting in corporate harm is very narrow and inapplicable here.  Claims asserting that directors are liable for allowing or not stopping harm to a company are commonly called failure-to-monitor claims, oversight claims, or simply "*Caremark*" claims, owing to the seminal decision that recognized this type of liability.  *See In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 971 (Del. Ch. 1996).  Delaware courts have repeatedly emphasized that oversight liability is "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment."  *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 372 (Del. 2006) (quoting *Caremark*, 698 A.2d at 967).

To assert a *Caremark* claim, a plaintiff must plead particularized factual allegations that: (a) "the directors utterly failed to implement any reporting or information system or controls"; or (b) "having implemented such a system or controls, [the directors] consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention."  *Stone*, 911 A.2d at 370.

Importantly, under either prong of *Caremark*, oversight liability "requires a showing that the directors *knew* that they were not discharging their fiduciary obligations."  *Id*. (emphasis added).  This culpable knowledge is essential because "a showing of bad faith is a necessary condition to director oversight liability" under *Caremark*.  *City of Birmingham Ret. & Relief Sys.*

*v. Good*, 177 A.3d 47, 55 (Del. 2017); *see also Stone*, 911 A.2d at 370.  Indeed, even a showing

that the directors were "on notice of systematic wrongdoing" and acted with "reckless indifference

toward the interests of the company" would be insufficient and implicate only the duty of care.

*Okla. Firefighters Pension & Ret. Sys. v. Corbat*, No. C.A. 12151–VCG, 2017 WL 6452240, at *1

(Del. Ch. Dec. 18, 2017).[18]

### (1)    The Complaint Makes Clear That The Board Implemented Systems Of Reporting And Monitoring.

When a complaint acknowledges the existence of established reporting procedures and

controls, it cannot state a claim under *Caremark*'s first prong.  In fact, plaintiffs "usually lose" in

"decisions dismissing *Caremark* claims" because "they must concede the existence of board-level

systems of monitoring and oversight such as a relevant committee."  *Rojas v. Ellison, et al.*, No.

CV 2018-0755-AGB, 2019 WL 3408812, at *9 (Del. Ch. July 29, 2019) (internal quotation marks

omitted).  As the Delaware Court of Chancery recently explained, a complaint fails to plead that

directors face a "substantial likelihood of liability for utterly failing to implement" reporting

controls if that complaint "is empty of the kind of fact pleading that is critical to a *Caremark* claim,

such as contentions that the company lacked an audit committee [or] that the company had an audit

committee that met only sporadically and devoted patently inadequate time to its work."  *In re*

---

[18]  Plaintiff's conclusory invocation of the "duty of care" cannot salvage her claims, because she pleads no careless Board decision and relies instead on "oversight liability" that can result only from bad faith action.  *Stone*, 911 A.2d at 369.  In any event, the directors are exculpated from liability to the Bank for monetary damages resulting from any breach of the duty of care.  *See* Ex. M at 3 (Amended and Restated Articles of Incorporation of Bank of the Ozarks (Apr. 10, 2017)) ("To the maximum extent provided by law, no member of the Board of Directors shall be liable to the Bank or its shareholders for any monetary damages for breach of his or her duty as a director."); *see also* Ark. Code Ann. § 4-27-202(b)(3) (permitting such an exculpation).

*Lendingclub Corp. Derivative Litig.*, C.A. No. 12984-VCM, 2019 WL 5678578, at *10 (Del. Ch. Oct. 31, 2019) (citation and quotation marks omitted, alterations in original).

Here, the Complaint alleges facts regarding the Bank's corporate governance structure that defeat demand futility under the first prong of *Caremark*. *See generally* Compl. ¶¶ 64–77. The Complaint acknowledges that the Bank has "eleven committees"—six Board-level committees and five comprised of directors and members of management—"to support the Board and management in the oversight of certain areas." *Id.* ¶ 65. It further alleges that the Board-level committees include an Audit Committee, which "[a]ssists the Board in fulfilling its oversight responsibilities relating to the Company's auditing, accounting and financial reporting processes," *see id.* ¶ 65(a); a Personnel and Compensation Committee, which reviews and approves compensation programs for officers, *see id.* ¶ 65(b); and a Risk Committee, which "[p]rovides oversight of the Company's enterprise-wide risk management framework and the Company's corporate risk structure," *id.* ¶ 65(d). Plaintiff nowhere alleges that these Committees do not meet or otherwise carry out their assigned duties.[19]

In pleading such facts, the Complaint has acknowledged that the Bank implemented "reporting or information system[s] or controls." *Stone*, 911 A.2d at 370. As a result, there can be no oversight liability under *Caremark*'s first prong. *See id*; *see also Caremark*, 698 A.2d at 970. Claiming the Board's monitoring could have been better, *see, e.g.*, Compl. ¶¶ 208, 214, is insufficient to state a claim, *see Stone*, 911 A.2d at 370.

---

[19]   In fact, the documents incorporated by reference into the Complaint also make clear that these Committees met regularly. *See, e.g.*, Ex. K at 21-22 (2018 Proxy Statement) (indicating that during 2017, the Risk Committee met four times, the Personnel and Compensation Committee met six times, and the Audit Committee met eight times).

### (2)    The Complaint Fails To Allege The Board Knew of Wrongdoing And Failed To Respond.

The Complaint also fails to state a claim under *Caremark*'s second prong because it never alleges facts to support the assertion that the directors had culpable knowledge of wrongdoing and failed to respond.  To plead liability under the second prong of *Caremark*, "a Complaint must allege (1) that the directors knew or should have known that the corporation was violating the law, (2) that the directors acted in bad faith by failing to prevent or remedy those violations, and (3) that such failure resulted in damages to the corporation."  *In re Qualcomm Inc. FCPA Stockholder Derivative Litig.*, No. C.A. No. 11152–VCMR, 2017 WL 2608723, at *2 (Del. Ch. June 16, 2017) (quotation marks and citation omitted).

To plead that directors knew or should have known that a corporation was violating the law, a plaintiff may assert factual allegations that the board was alerted to "evidence of illegality— the proverbial 'red flag.'"  *South*, 62 A.3d at 15.  The conscious failure to address red flags must rise to the level of a breach of the duty of loyalty, meaning "[the directors'] indolence was so persistent that it could not be ascribed to anything other than a knowing decision not to even try to make sure the corporation's officers had developed and were implementing a prudent approach to ensuring law compliance."  *Desimone v. Barrows*, 924 A.2d 908, 935 (Del. Ch. 2007); *see also* 3A W. Fletcher, Cyclopedia of the Law of Private Corporations § 1034.80 (2019) ("In the absence of red flags, good faith in the context of director oversight must be measured by the directors' actions to assure a reasonable information and reporting system exists and not by second guessing after the occurrence of employee conduct that results in an unintended adverse outcome.").

"Under Delaware law, red flags 'are only useful when they are either waved in one's face or displayed so that they are visible to the careful observer.'"  *Wood v. Baum*, 953 A.2d 136, 143 (Del. 2008) (quoting *In re Citigroup Inc. S'holders Litig.*, No. 19827, 2003 WL 21384599, at *2

(Del. Ch. June 5, 2003)).  And once a red flag is addressed, it stops waving and can no longer result in *Caremark* liability.  *See Horman v. Abney*, No. C.A. No. 12290-VCS, 2017 WL 242571, at *11 (Del. Ch. Jan. 19, 2017) (holding that an Assurance of Discontinuance Agreement that addressed and resolved alleged wrongdoing was not a "red flag" forewarning of renewed misconduct five years later); *see also State v. Custard*, No. 06 CVS 4622, 2010 WL 1035809, at *25 (N.C. Super. Mar. 19, 2010) (applying North Carolina law with guidance from Delaware law and holding directors not liable for failure to oversee in part because, although there were two potential red flags, there was "no evidence" that the directors "were aware" of them).

The Complaint has failed to plead facts that meet the stringent standard for oversight liability.  On its face, the Complaint never alleges a single red flag event—something that would have put the Board on notice of potential illegality and triggered directors' oversight responsibility. None of the alleged facts establish that the directors knew or should have known of alleged wrongdoing.  The Complaint does not even attempt to plead facts to show *how* directors—who are not employees of the company—could have learned about the two specific loans at issue any sooner than they did.  And even if the directors had learned about the loans earlier, the Complaint does not plead facts to show that this information would have arisen to the level of a red flag.  No auditor or regulator is alleged to even have deemed the previous accounting incorrect and directors are protected in relying in good faith on the reports of officers and experts.  Ark. Code Ann. § 4-27-740(b); *In re Citigroup S'holder Derivative Litig.*, 964 A.2d 106, 132 (Del. Ch. 2009).

To be sure, numerous times the Complaint asserts that the directors "knew or should have known" a certain fact, *see, e.g.*, Compl. ¶¶ 164, 190, 257, 278, but it provides no factual allegations that the directors had knowledge of a red flag.  Likewise, bare assertions that the Defendants "approved and/or permitted the wrongs alleged" and "authorized and/or permitted the false

statements to be disseminated" are similarly insufficient to allege either that the Board saw a red flag or failed to respond to an unidentified one.  Compl. ¶¶ 193, 194.  These textbook conclusory allegations do not satisfy the particularized factual pleading requirements of Rule 23.1.  *Cf. Brehm v. Eisner*, 746 A.2d 244, 255 (Del. 2000).

At bottom, the Complaint never alleges facts to establish that any director knew or should have known of alleged wrongdoing, and therefore fails to satisfy *Caremark*'s second prong.

In Count V, the Complaint also purports to bring a second breach of fiduciary duty claim for failing "to prevent illicit insider trades."  Compl. ¶ 256.  Count V fails for the same reasons that Count I fails.  The Complaint acknowledges that the Bank established oversight systems, so it cannot state a claim under *Caremark*'s first prong.  And, because the Complaint fails to plead with particularity that the Defendants knew of any supposed wrongdoing that would render the identified trades "illicit," it cannot succeed under *Caremark*'s second prong.

#### b)      Gross Mismanagement (Count II)

No Arkansas court has recognized "gross mismanagement" as a separate cause of action. Delaware courts have also rejected the claim, treating it instead as a claim for breach of fiduciary duty.  *See Citigroup*, 964 A.2d at 114 n.6 ("Delaware law does not recognize an independent cause of action against corporate directors and officers for reckless and gross mismanagement; such claims are treated as claims for breach of fiduciary duty.").  This Court should do the same. Regardless, it fails for the same reason as Plaintiff's fiduciary duty claims.

#### c)      Corporate Waste (Count III)

The Complaint also fails to state a claim for corporate waste.  Corporate waste has not been recognized as a claim under Arkansas law independent or different from a claim for breach of fiduciary duty.  *Cf. Estates of McKnight v. Bank of Am., N.A.*, 277 S.W.3d 173, 178 (Ark. 2008) (analyzing allegations of waste as a claim for breach of fiduciary duty).  Under Delaware law,

"[t]he test for waste by a corporate director is extreme and rarely satisfied." *Espinoza v. Zuckerberg*, 124 A.3d 47, 67 (Del. Ch. 2015). Such a claim is "confined to unconscionable cases where directors irrationally squander or give away corporate assets." *Brehm*, 746 A.2d at 263; *see also Wagner v. Selinger*, No. 16740, 2000 WL 85318, at *3 (Del. Ch. Jan. 18, 2000) (explaining that the "standard for a waste claim" is "extreme" and is "very rarely satisfied by a shareholder plaintiff" (quotation marks and citation omitted)). Indeed, if the corporation received any non-trivial consideration for the transaction in question, a waste claim is unlikely to succeed absent a showing of bad faith; the challenged transaction must essentially be a "gift." *See Zuckerberg*, 124 A.3d at 67 (citing *Lewis v. Vogelstein*, 699 A.2d 327, 336 (Del. Ch. 1997)).

The Complaint claims that the directors are liable for corporate waste for (1) "paying excessive compensation and bonuses" and awarding "self-interested stock options" to certain officers and directors, and for (2) incurring legal liability and related legal costs. Compl. ¶ 248. Neither theory supports a claim for waste.

*First*, a claim for corporate waste must be based on "board authorized action on the corporation's behalf." *Citigroup*, 964 A.2d at 135 n.96 (quotation marks and citation omitted).[20] The only transaction the Complaint cites in making a corporate waste claim is the approval of

---

[20]  *See also In re Yahoo! Inc. S'holder Derivative Litig.*, 153 F. Supp. 3d 1107, 1127 (N.D. Cal. 2015) (applying Delaware law and explaining that "a claim for waste must be predicated on an affirmative board decision"); *City of Roseville Emps.' Ret. Sys. v. Crain*, No. 11–2919 (JLL), 2013 WL 9829650, at *20 (D.N.J. Sept. 26, 2013) ("Because Plaintiff's claim of waste is indisputably based upon the Board's alleged inaction rather than any particular 'board authorized action,' the Court finds that Plaintiff has failed to state a claim of corporate waste that is plausible on its face."); *In re Abbott Labs. Derivative S'holder Litig.*, 126 F. Supp. 2d 535, 537 (N.D. Ill. 2000) ("The second count can be read as attacking the board's prior inaction, which resulted in the consent decree, but that is not a claim of corporate waste."); *cf. Laties v. Wise*, No. Civ.A. 1280–N, 2005 WL 3501709, at *2 (Del. Ch. Dec. 14, 2005) (rejecting waste claim as not being "ripe" where there were "no allegations (let alone particularized factual allegations) that the directors made a definitive decision").

compensation plans for executives and directors.  *See* Compl. ¶ 220.  But this allegation is made against only five members of the Demand Board.  *See id.* ("Defendants Brown, Cholmondeley, Franklin, Kenny, and Reynolds . . . approved excessive compensation plans.").  Therefore, a majority of the Demand Board *could* have considered this claim.

*Second*, a bare allegation that officers and directors' pay is "excessive" is insufficient to state a claim for waste as a matter of law.  *See Zuckerberg*, 124 A.3d at 67.  Directors have "broad corporate power to fix the compensation of officers."  *Aronson*, 473 A.2d at 817.  Here, the Complaint alleges no facts to support its claim that directors' compensation, bonuses, and stock options are so excessive that "no business person of ordinary, sound judgment would conclude that the corporation received adequate consideration."  *Freedman v. Adams*, 58 A.3d 414, 417 (Del. 2013) (quoting *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 74 (Del. 2006)).

Rather, the Complaint relies only on its underlying allegation that the directors have violated their fiduciary duties to justify its claim of waste.  Compl. ¶ 248 ("*As a result of the misconduct* described above, Director Defendants wasted corporate assets." (emphasis added)).  That is insufficient.  In fact, courts have dismissed corporate waste claims even where—unlike here—a complaint has successfully alleged a breach of fiduciary duty.  *See, e.g.*, *Calma v. Templeton*, 114 A.3d 563, 590 (Del. Ch. 2015); *see also In re The Limited, Inc. S'holders Litig.*, No. CIV.A. 17148–NC, 2002 WL 537692, at *7 (Del. Ch. Mar. 27, 2002) ("Although the challenged transactions may be questioned because of doubts about the loyalty of the directors approving them, it does not necessarily follow that they constitute corporate waste.").  In any event, the Complaint cannot rely on fiduciary duty to justify its waste claim where it has not sufficiently alleged a breach of fiduciary duty in the first instance.

Aside from the allegations that officers and directors breached their fiduciary duty by failing to prevent an alleged fraud, the Complaint does not allege that the Banks' officers and directors were not otherwise performing in their roles.  It therefore cannot be said that their compensation, bonuses, and stock grants served "no corporate purpose" for which the Bank received "no consideration." *Lewis*, 699 A.2d at 336.

*Third*, the Complaint's theory that directors are liable for waste because the Bank has incurred legal costs is also deficient.  As an initial matter, this allegation is speculative on its face.  The Complaint dedicates only part of a single sentence to this theory, alleging that the directors have "incurr[ed] *potentially* millions of dollars of legal liability and/or legal costs to defend Defendant's unlawful actions."   Compl. ¶ 248 (emphasis added).   Regardless, the Complaint makes no attempt to justify the alleged amount ("millions of dollars") of financial exposure, or to allege costs incurred to defend litigation amount to an "unconscionable" or "irrational[]" squander[ing]" of corporate assets.  *Brehm*, 746 A.2d at 263.  It also does not acknowledge that defense costs are unavoidably incurred even in defending against baseless claims.

### d)      Unjust Enrichment (Count IV)

The Complaint only asserts the unjust enrichment claim against six members of the Demand Board.  Therefore, a majority of the Demand Board could have considered this claim, meaning that a demand was required and this claim must be dismissed on that ground alone.

In any event, the Complaint fails to state a claim for unjust enrichment.  "Under the principle of unjust enrichment, a person should not be permitted unjustly to enrich himself at the expense of another, but should be required to make restitution of or for property or benefits received, retained, or appropriated." *Hartness v. Nuckles*, 2015 Ark. 444, at 7, 475 S.W.3d 558, 564 (2015) (internal quotations omitted).  "To find unjust enrichment, a party must have received something of value, to which he or she is not entitled and which he or she must restore." *DePriest*

*v. AstraZeneca Pharm., L.P.*, 2009 Ark. 547, at 20, 351 S.W.3d 168, 179 (2009).  Importantly,
"[t]here must also be some operative act, intent, or situation to make the enrichment unjust and
compensable."  *Dews v. Halliburton Indus., Inc.*, 288 Ark. 532, 536, 708 S.W.2d 67, 69 (1986).
This makes good sense, as "[o]ne is not unjustly enriched by receipt of that to which he is legally
entitled."  *Davis v. Davis*, 2016 Ark. App. 33, at 11, 480 S.W.3d 878, 885 (2016).

The Complaint claims that certain individual Defendants were unjustly enriched "as a
result of the compensation and director remuneration they received *while breaching fiduciary
duties*" they owed to the Bank.  Compl. ¶ 252 (emphasis added).  As described above, however,
the Complaint has failed to allege a breach of fiduciary duty by any Defendant.  The unjust
enrichment claim fails for this reason alone.  *See In re China Auto. Sys. Inc. Derivative Litig.*, C.A.
No. 7145-VCN, 2013 WL 4672059, at 10 (Del. Ch. Aug. 30, 2013) (dismissing unjust enrichment
claims where "the unjust enrichment claims are premised on . . . purported misstatements[] which
do not support a *Caremark* or other breach of fiduciary duty claim, and [where] the alleged insider
trading . . . implicates only a minority of the Board").

Regardless, the mere fact that directors were compensated for their services does not state
a claim for unjust enrichment simply because Plaintiff criticizes their oversight.  Instead, the
enrichment must be tied to the alleged breach.  *See, e.g.*, *China*, 2013 WL 4672059, at *10 (holding
that "Plaintiffs have not alleged with particularity that [members of the board] w[ere] unjustly
enriched *from* purported breaches of their fiduciary duties or other wrongful conduct" (emphasis
added)).  Here, however, the Complaint has alleged no facts which connect the directors'
compensation with the alleged wrongdoing—aside from a single conclusory allegation that the
directors were "unjustly enriched as a result of the compensation and director remuneration they

received while breaching fiduciary duties owed to [Bank] OZK," Compl. ¶ 252, the Complaint

pleads no facts to support the allegation that the directors were unjustly enriched.

Additionally, because unjust enrichment is an equitable doctrine, it does not apply where a

claim at law is available. *See Campbell v. Ashbury Auto., Inc.*, 2011 Ark. 157, 21, 381 S.W.3d 21,

36 (2011) (citation omitted); *see also Jarrett v. Panasonic Corp. of N. Am.*, 8 F. Supp. 3d 1074,

1086 (E.D. Ark. 2013) ("Under Arkansas law, the doctrine of unjust enrichment does not apply

when there is a valid, legal, and binding contract."). Here, the directors are compensated according

to the "Director Compensation Program" outlined in its proxy statement and approved by a vote

of the shareholders, which establishes the parameters of the directors' legal right to compensation.

*See* Ex. L at 22 (excerpt of 2019 Proxy Statement); Compl. ¶ 197 (relying on 2019 Proxy

Statement). The legal rights foreclose Plaintiff's unjust enrichment claim. *Cf. Sanders v. Wang*,

No. 16640, 1999 WL 1044880, at *6 (Del. Ch. Nov. 8, 1999) (holding that stock ownership plan

approved by shareholders was a contract).

**B.     The Complaint Fails To Allege That A Majority Of The Demand Board Was Dominated By Alleged Wrongdoers.**

The Complaint also fails to plead particularized facts that show a majority of the Demand

Board were "dominated by the alleged wrongdoers." *Morgan*, 271 Ark. at 467, 609 S.W.2d at 665

(internal quotations omitted); *Weinberger*, 2012 WL 1190970, at *5–6. "To demonstrate a lack of

independence, a plaintiff must allege, with particularity, factual allegations from which a court can

infer that the board members in question are acting at the direction of the allegedly dominating

individual or entity." *Weinberger*, 2012 WL 1190970, at *5 (quotation marks and citation

omitted).

The Complaint does not plead that any director was dominated by any alleged wrongdoer

or acting at a wrongdoer's direction. Instead, Plaintiff makes only the conclusory assertion that

"all of the Director Defendants are beholden to Defendant Gleason," *see* Compl. ¶ 196, but "the mere allegation that directors are dominated and controlled does not raise, per se, a reasonable doubt as to the board's independence and thus will not suffice to meet the demand-futility standard." *Berry ex rel. Dillard's, Inc. v. Dillard*, 2011 Ark. App. 242, at 10–11, 382 S.W.3d 812, 819 (2011) (applying Delaware law). Nor does the complaint sufficiently plead that Mr. Gleason dominated a majority of the board by baldly asserting that he "holds an outsized shareholder interest in the company." *See* Compl. ¶ 196. The Complaint concedes that Mr. Gleason and his wife, collectively, own less than 5% of the Bank's stock. *Id.* ¶ 197. Courts have rejected the contention that even *majority* share ownership is sufficient "to demonstrate a lack of independence on the part of other directors." *Weinberger*, 2012 WL 1109070, at *5. In fact, the Delaware Supreme Court has rejected shareholdings as a basis to plead domination over other directors even where an alleged wrongdoer founded the corporation and owned 94% of its stock. *Beam v. Stewart*, 845 A.2d 1040, 1054 (Del. 2004).

The Complaint purports to allege (at Compl. ¶ 197) that Mr. Gleason himself is not independent by pointing to a Proxy Statement that he is not "'independent' under the NASDAQ listing standards," *see* Ex. L at 16 (2019 Proxy Statement) (listing directors who are independent under NASDAQ listing standards), but "a board's determination of director independence under [listing standards] is qualitatively different from, and thus does not operate as a surrogate for, this Court's analysis of independence under Delaware law for demand futility purposes." *Teamsters Union 25 Health Services & Insurance Plan v. Baiera*, 119 A.3d 44, 61 (Del. Ch. 2015). The Complaint does not even purport to assert he is "beholden" to anyone in any event.

C. **The Complaint Fails To Allege That A Majority Of The Demand Board Profited From The Alleged Wrongdoing.**

The Complaint does not even purport to allege that a majority of the Demand Board profited from the alleged wrongdoing. *See Morgan*, 271 Ark. at 467–68, 609 S.W.2d at 665. As discussed in Section II.A.2.d, *supra*, the Complaint's purported unjust enrichment claims are fatally flawed, but—most importantly for demand futility analysis—are only brought against six members of the sixteen-member Demand Board. Furthermore, the supposed "insider trades" detailed in Paragraph 157 of the Complaint confirm that no other member of the Demand Board is even alleged to have benefited from an "illicit" trade. *See* Compl. ¶¶ 16–18, 21, 24, 27, 30, 33–35 (confirming that Mr. Brown, Ms. Cholmondeley, Ms. Cole, Ms. Franklin, Mr. Gearhart, Mr. Koefoed, Mr. Orndorff, Dr. Reynolds, Mr. Sadoff, and Mr. Whipple are not alleged to have benefited from any "illicit trades").

In any event, a director is not "'interested' whenever a derivative plaintiff cursorily alleges that he made sales of company stock in the market at a time when he possessed material, non-public information." *Guttman*, 823 A.2d at 502. Even if Arkansas, like Delaware, were to recognize a cause of action against directors who abuse their knowledge of a corporation's private information at the expense of purchasers on the open market, the complaint must plead "'that each sale by each individual defendant was entered into and completed on the basis of, and because of, adverse material non-public information.'" *Rattner v. Bidzos*, No. 19700, 2003 WL 22284323, at *10–11 (Del. Ch. Oct. 7, 2003) (emphasis added) (quoting *Stepak v. Ross*, C.A. No. 7047, 1985 WL 21137, at *5 (Del. Ch. Sept. 5, 1985)). There are no such allegations here.

Therefore, the Complaint concedes that those ten directors, who constitute a majority of the Demand Board, could have considered a demand.

## CONCLUSION

For the reasons set forth above, the Complaint fails to allege with factual particularity that at least half of the Demand Board could not properly consider a demand because they participated in or profited from the alleged wrongdoing or because they were dominated by the alleged wrongdoers.  Therefore, Plaintiff's failure to make a demand compels dismissal.

November 19, 2019                              Respectfully submitted,

Jess Askew III, Ark. Bar. No. 86005
Andrew King, Ark. Bar No. 2007176
Frederick H. Davis, Ark. Bar No 2012271
KUTAK ROCK LLP
124 W. Capitol Ave., Suite 2000
Little Rock, AR 72201-3706
Telephone: (501) 975-3000
E-mail:
jess.askew@kutakrock.com
andrew.king@kutakrock.com
frederick.davis@kutakrock.com


F. Joseph Warin (*pro hac vice*)
Jason J. Mendro (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Tel: (202) 955-8500
fwarin@gibsondunn.com
jmendro@gibsondunn.com

*Counsel for Nominal Defendant Bank OZK,
George Gleason, Nicholas Brown, Paula H. J.
Cholmondeley, Beverly Cole, Robert East,
Kathleen Franklin, Catherine B. Freedberg,
Jeffrey J. Gearhart, Peter C. Kenny, William
J. Koefoed, Jr., Walter J. Mullen, III,
Christopher Orndorff, Robert Proost, John
Reynolds, M.D., Steven Sadoff, Ross M.
Whipple, Greg McKinney, Tim Hicks, Tyler
Vance, Linda Gleason, John Carter, Darrel
Russell, and Richard Cisne.*

and

/s/ J. David Folsom
J. David Folsom, Ark. Bar No. 74170
JACKSON WALKER LLP
6002 Summerfield, Suite B
Texarkana, TX 75503
Tel: (903) 255-3250
dfolsom@jw.com

Charles L. Babcock (*pro hac vice*)
JACKSON WALKER LLP
1401 McKinney Street, Suite 1900
Houston, TX 77010
Tel: (713) 752-4210
cbabcock@jw.com

Christopher R. Bankler (*pro hac vice*)
JACKSON WALKER LLP
2323 Ross Avenue, Suite 600
Dallas, TX 75201
Tel: (214) 953-6053
cbankler@jw.com

*Counsel for Dan Thomas.*